No. 17-7002

# In the United States Court of Appeals
# For the Tenth Circuit

———————

KENA UTTER, ET AL.,

*Plaintiffs–Appellants,*

*v.*

AMIE COLCLAZIER, ET AL.,

*Defendants–Appellees.*

———————

On Appeal from the United States District Court
for the Eastern District of Oklahoma
The Honorable Ronald A. White
D.C. No. 6:16-cv-00182-RAW

———————

**APPELLANTS' APPENDIX
VOLUME I OF III
(APLT. APP. 1–211)**

———————

Heath Merchen
323 East Madison
Oklahoma City, Oklahoma 73105
Telephone: (405) 523-4345
Facsimile: (405) 523-4392
hmerchen@okea.org

*Attorney for Kena Utter, Aubrey Holsapple, and Dara Campbell*

April 26, 2017

## Certificate of Digital Submission
## and Privacy Redactions

I hereby certify that Volume I of Appellants' Appendix, as submitted in Digital Form via the Court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with the most recent version of Windows Defender Virus Scanner, a commercial virus-scanning program that is updated daily, and, according to the program, is free of viruses. In addition, I certify that all required privacy redactions have been made.

/s/Heath Merchen
Heath Merchen

## Certificate of Service

I hereby certify that on this 26th day of April 2017, I electronically transmitted Volume I of Appellants' Appendix to the Clerk of Court using the ECF system. Based on the Electronic Records currently on file, the Clerk of Court will transmit a Notice of Docket Activity and electronic copy of this appendix to the following ECF registrants: Emily B. Fagan, and John K.F. Langford

Laura Holmes – Lholmes@cfel.com
Laura Holmgren-Ganz – Lganz@cfel.com

*Attorneys for Defendants–Appellees*

I further certify that on this 26th day of April, 2017, one copy of Volume I of Appellants' Appendix was dispatched to Federal Express for delivery within two (2) business days to:

Ms. Elisabeth A. Shumaker
Clerk of Court
United States Court of Appeals for the Tenth Circuit
Byron White United States Courthouse
1823 Stout Street
Denver, CO 80257

/s/Heath Merchen
Heath Merchen

## Index to Volumes of Appendix

| Volume No. | Page Nos. |
|:---:|:---:|
| I | 1–211 |
| II | 212–478 |
| III | 479–614 |

# Table of Contents

| Dkt. No. | Date | Document | Page No. |
|---|---|---|---|
| colspan Volume I | | | |
| – | 04/10/2017 | Docket Sheet for *Utter et al.v. Colclazier et al.,*  Case No. 6:16-CV-00182-RAW (E.D. Okla.) | 1 |
| 03 | 05/13/2016 | Amended Petition (Attached to Notice of Removal) | 7 |
| 05 | 05/19/2016 | Defendant's Partial Motion to Dismiss | 29 |
| 05-01 | 05/19/2016 | Exhibit 1 – Board Minutes June 11, 2015 | 40 |
| 05-02 | 05/19/2016 | Exhibit 2 – Board Minutes June 12, 2014 | 54 |
| 06 | 05/20/2016 | Defendant's Answer | 60 |
| 17 | 07/15/2016 | Plaintiffs' Response to Defendants' Partial Motion to Dismiss | 64 |
| 18 | 07/29/2016 | Defendants' Reply to Plaintiffs' Response to Defendants' Partial Motion to Dismiss | 74 |
| 23 | 10/27/2016 | Order Granting Partial Motion to Dismiss | 81 |
| 25 | 11/14/2016 | Plaintiffs' Motion to Clarify | 88 |
| 26 | 11/14/2016 | Defendants' Motion for Summary Judgment | 92 |
| 26-01 | 11/14/2016 | Exhibit 1 – Pritchard Deposition | 122 |
| 26-02 | 11/14/2016 | Exhibit 2 – Colclazier Deposition | 126 |
| 26-03 | 11/14/2016 | Exhibit 3 – Cadenhead Deposition | 138 |
| 26-04 | 11/14/2016 | Exhibit 4 – Upton Deposition | 154 |
| 26-05 | 11/14/2016 | Exhibit 5 – Cheatwood Deposition | 161 |
| 26-06 | 11/14/2016 | Exhibit 6 – Utter Deposition | 166 |
| 26-07 | 11/14/2016 | Exhibit 7 – Utter Record | 173 |
| 26-08 | 11/14/2016 | Exhibit 8 – Seminole Negotiated Agreement Section | 175 |
| 26-09 | 11/14/2016 | Exhibit 9 – Minutes of Special Board Meeting December 17, 2014 | 177 |
| 26-10 | 11/14/2016 | Exhibit 10 – District Payroll Records | 179 |

| Dkt. No. | Date | Document | Page No. |
|---|---|---|---|
| 26-11 | 11/14/2016 | Exhibit 11 – Campbell Deposition | 182 |
| 26-12 | 11/14/2016 | Exhibit 12 – Osborn Deposition | 189 |
| 26-13 | 11/14/2016 | Exhibit 13 – Board Policy on Board Powers | 193 |
| 26-14 | 11/14/2016 | Exhibit 14 – Board Meeting Agenda June 11, 2015 | 194 |
| 26-15 | 11/14/2016 | Exhibit 15 – Board Minutes June 11, 2015 | 197 |
| 26-16 | 11/14/2016 | Exhibit 16 – Holsapple Deposition | 201 |
| 26-17 | 11/14/2016 | Exhibit 17 – Cadenhead Affidavit | 208 |
| 26-18 | 11/14/2016 | Exhibit 18 – Teacher Contracts | 209 |
| **Volume II** | | | |
| 34 | 11/28/2016 | Plaintiffs' Opposition to Defendants' Motion for Summary Judgment | 212 |
| 34-01 | 11/28/2016 | Exhibit 1 – Pritchard Deposition | 226 |
| 34-02 | 11/28/2016 | Exhibit 2 – Cheatwood Deposition | 258 |
| 34-03 | 11/28/2016 | Exhibit 3 – Colclazier Deposition | 289 |
| 34-04 | 11/28/2016 | Exhibit 4 – Upton Deposition | 329 |
| 34-05 | 11/28/2016 | Exhibit 5 – Admission of Defendant | 355 |
| 34-06 | 11/28/2016 | Exhibit 6 – Campbell Deposition | 358 |
| 34-07 | 11/28/2016 | Exhibit 7 – Cadenhead Deposition | 410 |
| 34-08 | 11/28/2016 | Exhibit 8 – Osborn Deposition | 462 |
| 35 | 11/28/2016 | Defendants' Response to Plaintiffs' Motion to Clarify | 473 |
| **Volume III** | | | |
| 40 | 12/05/2016 | Plaintiffs' Request for Leave to Amend Petition | 479 |
| 40-01 | 12/05/2016 | Exhibit 1 - Proposed Second Amended Petition | 485 |
| 40-02 | 12/05/2016 | Exhibit 2 | 521 |
| 40-02 | 12/05/2016 | Exhibit 2 – 01 Pritchard Deposition | 521 |
| 40-02 | 12/05/2016 | Exhibit 2 – 02 Cheatwood Deposition | 528 |
| 40-02 | 12/05/2016 | Exhibit 2 – 03 Colclazier Deposition | 531 |

| Dkt. No. | Date | Document | Page No. |
|---|---|---|---|
| 40-02 | 12/05/2016 | Exhibit 2 – 04 Upton Deposition | 540 |
| 40-02 | 12/05/2016 | Exhibit 2 – 06 Campbell Deposition | 546 |
| 40-02 | 12/05/2016 | Exhibit 2 – 07 Cadenhead Deposition | 551 |
| 40-02 | 12/05/2016 | Exhibit 2 – 09 Negotiated Agreement | 567 |
| 40-02 | 12/05/2016 | Exhibit 2 – 10 Levy Deposition | 570 |
| 40-02 | 12/05/2016 | Exhibit 2 – 11 Willis Deposition | 579 |
| 40-02 | 12/05/2016 | Exhibit 2 – 12 Utter Deposition | 586 |
| 42 | 12/12/2016 | Defendants' Reply to Plaintiffs' Opposition to Summary Judgment Motion | 588 |
| 44 | 12/13/2016 | Order Denying Plaintiffs' Motion for Clarification and Plaintiffs' Request for Leave to Amend | 599 |
| 46 | 12/15/2016 | Order Granting Defendants' Motion for Summary Judgment in Part | 602 |
| 47 | 12/15/2016 | Judgment | 614 |

APPEAL,REMAND

# U.S. District Court
## Eastern District of Oklahoma (Muskogee)
## CIVIL DOCKET FOR CASE #: 6:16–cv–00182–RAW

Utter et al v. Colclazier et al
Assigned to: Judge Ronald A. White
Referred to: Magistrate Judge Steven P. Shreder (Settlement)
Case in other court:  10th Circuit, 17–07002
                              Seminole County District Court,
                              CJ–16–00048
Cause: 28:1441 Petition for Removal– Civil Rights Act

Date Filed: 05/13/2016
Date Terminated: 12/15/2016
Jury Demand: Defendant
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Kena Utter**                                     represented by   **Heath Merchen**
                                                                    Merchen Law Offices PLLC
                                                                    1411 N. Robinson Ste 300
                                                                    Oklahoma City, OK 73107
                                                                    405–834–4007
                                                                    Email: hmerchen@okea.org
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Aubree Holsapple**                               represented by   **Heath Merchen**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dara Campbell**                                  represented by   **Heath Merchen**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Amie Colclazier**                                represented by   **Laura L. Holmes**
                                                                    Center for Education Law, Inc.
                                                                    900 N Broadway, Ste 300
                                                                    Oklahoma City, OK 73102
                                                                    405–528–2800
                                                                    Fax: 405–528–5800
                                                                    Email: lholmes@cfel.com
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Laura L. Holmgren–Ganz**
                                                                    Center for Education Law, Inc.
                                                                    900 N Broadway, Ste 300
                                                                    Oklahoma City, OK 73102
                                                                    405–528–2800
                                                                    Fax: 405–528–5800
                                                                    Email: lganz@cfel.com
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Jack Cadenhead**                                 represented by

APLT. APP. 001

**Laura L. Holmes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura L. Holmgren–Ganz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mickey Upton**                    represented by   **Laura L. Holmes**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura L. Holmgren–Ganz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Independent School District I–01 of**          represented by   **Laura L. Holmes**
**Seminole County**
*State of Oklahoma*
*also known as*
Seminole School District

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura L. Holmgren–Ganz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/19/2016 | | PETITION/COMPLAINT with Jury Demand filed in State Court against All Defendants by Kena Utter, Aubree Holsapple, Dara Campbell (jcb, Deputy Clerk) (Entered: 05/13/2016) |
| 05/02/2016 | | AMENDED PETITION/COMPLAINT with Jury Demand filed in State Court against All Defendants by Kena Utter, Aubree Holsapple, Dara Campbell (jcb, Deputy Clerk) (Entered: 05/13/2016) |
| 05/13/2016 | 1 | CIVIL COVER SHEET by Jack Cadenhead, Amie Colclazier, Independent School District I–01 of Seminole County, Mickey Upton (jcb, Deputy Clerk) (Entered: 05/13/2016) |
| 05/13/2016 | 2 | MINUTE ORDER by Court Clerk. Defendant is directed to add the case number to their Notice of Removal, file the document along with all exhibits using the *Other Initiating Documents – Notice of Removal* event and pay the $400 filing fee within 7 days. (Filing Fee due by 5/20/2016)(jcb, Deputy Clerk) (Entered: 05/13/2016) |
| 05/13/2016 | 3 | NOTICE of Removal from Seminole County Dist.Ct., case number CJ–2016–48 (paid $400 filing fee; receipt number 1086–988455) by Jack Cadenhead, Amie Colclazier, Independent School District I–01 of Seminole County, Mickey Upton (With attachments)(Holmgren–Ganz, Laura) (Entered: 05/13/2016) |
| 05/19/2016 | 4 | ATTORNEY APPEARANCE by Laura L. Holmes on behalf of All Defendants (Holmes, Laura) (Entered: 05/19/2016) |
| 05/19/2016 | 5 | PARTIAL MOTION to Dismiss Case for Failure to State a Claim by All Defendants (With attachments) Responses due by 6/2/2016(Holmgren–Ganz, Laura) (Entered: 05/19/2016) |

APLT. APP. 002

| 05/20/2016 | 6 | ANSWER to Petition/Complaint filed in State Court Petition/Complaint ) by Jack Cadenhead, Amie Colclazier, Independent School District I–01 of Seminole County, Mickey Upton (Holmgren–Ganz, Laura) (Entered: 05/20/2016) |
|---|---|---|
| 06/02/2016 | 7 | ORDER by Judge Ronald A. White Setting Scheduling Conference for 6/29/2016 at 10:45 AM in Chambers, Room 227, US Courthouse, 5th & Okmulgee, Muskogee, OK before Judge Ronald A. White. Joint Status Report due by 6/21/2016.(neh, Deputy Clerk) (Entered: 06/02/2016) |
| 06/21/2016 | 8 | First JOINT STATUS REPORT by Dara Campbell, Aubree Holsapple, Kena Utter (Merchen, Heath) (Entered: 06/21/2016) |
| 06/21/2016 | 9 | First DISCLOSURES per FRCP 26 by Dara Campbell, Aubree Holsapple, Kena Utter (Merchen, Heath) (Entered: 06/21/2016) |
| 06/21/2016 | 10 | DISCLOSURES per FRCP 26 by Jack Cadenhead, Amie Colclazier, Independent School District I–01 of Seminole County, Mickey Upton (Holmes, Laura) (Entered: 06/21/2016) |
| 06/23/2016 | 11 | MINUTE ORDER by Judge Ronald A. White STRIKING the Status and Scheduling Conference previously set for 6/29/2016 at 10:45 AM with Scheduling Order to soon follow.(lal, Deputy Clerk) (Entered: 06/23/2016) |
| 06/24/2016 | 12 | SCHEDULING ORDER by Judge Ronald A. White setting scheduling order date(s) to include the following : Exhibit List due by 10/4/2016 ; Witness List due by 10/4/2016 ; Dispositive Motions due by 11/14/2016 ; Discovery due by 11/21/2016 ; Proposed Pretrial Order due by 12/8/2016 ; Pretrial Conference set for 12/15/2016 at 10:30 AM in Chambers, Room 227, US Courthouse, 5th & Okmulgee, Muskogee, OK before Judge Ronald A. White ; and Jury Trial set for 1/4/2017 at 09:00 AM in Courtroom 2, Room 224, US Courthouse, 5th & Okmulgee, Muskogee, OK before Judge Ronald A. White.(lal, Deputy Clerk) (Entered: 06/24/2016) |
| 06/30/2016 | 13 | ORDER by Judge Ronald A. White directing plaintiffs to admit defendants' pending partial motion to dismiss or file a response and show good cause for failure to timely do so no later than 7/14/16(lal, Deputy Clerk) (Entered: 06/30/2016) |
| 07/01/2016 | 14 | Plaintiffs' Response to Court's Order to Show Cause and Plaintiffs' Request for Extension of Time by All Plaintiffs (With attachments) Responses due by 7/15/2016(Merchen, Heath) Modified event type and docket entry text on 7/5/2016 (lal, Deputy Clerk). (Entered: 07/01/2016) |
| 07/05/2016 | 15 | MINUTE ORDER by Judge Ronald A. White granting plaintiffs' request for extension of time ( 14 Motion for Extension of Time to Respond to Motion). Accordingly, plaintiffs are directed to file their response to Defendants' Partial Motion to Dismiss and Brief in Support (Re: 5 MOTION to Dismiss Case for Failure to State a Claim ) no later than 7/15/2016. (lal, Deputy Clerk) (Entered: 07/05/2016) |
| 07/13/2016 | 16 | SETTLEMENT CONFERENCE ORDER by Judge Ronald A. White: Settlement Conference set for 12/8/2016 at 10:00 AM in Chambers, Room 425, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. Settlement Conference Statements due 11/24/2016. (tmb, Chambers) (Entered: 07/13/2016) |
| 07/15/2016 | 17 | RESPONSE to Motion (Re: 5 MOTION to Dismiss Case for Failure to State a Claim ) by Dara Campbell, Aubree Holsapple, Kena Utter ; (With attachments)(Merchen, Heath) (Entered: 07/15/2016) |
| 07/29/2016 | 18 | REPLY to Response to Motion (Re: 5 MOTION to Dismiss Case for Failure to State a Claim) by Jack Cadenhead, Amie Colclazier, Independent School District I–01 of Seminole County, Mickey Upton ;(Holmgren–Ganz, Laura) (Entered: 07/29/2016) |
| 10/04/2016 | 19 | WITNESS LIST by Dara Campbell, Aubree Holsapple, Kena Utter (Merchen, Heath) (Entered: 10/04/2016) |
| 10/04/2016 | 20 | EXHIBIT LIST by Dara Campbell, Aubree Holsapple, Kena Utter (Merchen, Heath) (Entered: 10/04/2016) |

APLT. APP. 003

| 10/04/2016 | 21 | WITNESS LIST by Jack Cadenhead, Amie Colclazier, Independent School District I–01 of Seminole County, Mickey Upton (Holmgren–Ganz, Laura) (Entered: 10/04/2016) |
|---|---|---|
| 10/04/2016 | 22 | EXHIBIT LIST by Jack Cadenhead, Amie Colclazier, Independent School District I–01 of Seminole County, Mickey Upton (Holmgren–Ganz, Laura) (Entered: 10/04/2016) |
| 10/27/2016 | 23 | ORDER by Judge Ronald A. White: granting 5 Defendants' Partial Motion to Dismiss (cjt, Deputy Clerk) (Entered: 10/27/2016) |
| 11/14/2016 | 24 | Unopposed MOTION to Extend Deadline(s) *of Settlement Offer* by All Plaintiffs Responses due by 11/28/2016(Merchen, Heath) (Entered: 11/14/2016) |
| 11/14/2016 | 25 | MOTION to Clarify (Re: 23 Ruling on Motion to Dismiss Case for Failure to State a Claim) by All Plaintiffs; Responses due by 11/28/2016(Merchen, Heath) (Entered: 11/14/2016) |
| 11/14/2016 | 26 | MOTION for Summary Judgment by All Defendants (With attachments) Responses due by 11/28/2016(Holmgren–Ganz, Laura) (Entered: 11/14/2016) |
| 11/15/2016 | 27 | MOTION to Extend Deadline(s) *of Settlement Conf. Deadlines* by All Defendants Responses due by 11/29/2016(Holmgren–Ganz, Laura) (Entered: 11/15/2016) |
| 11/15/2016 | 28 | MINUTE ORDER by Magistrate Judge Steven P. Shreder granting 24 Motion to Extend Settlement Offer Deadline. Plaintiffs' settlement offer is due 11/16/2016, and Defendants' response is due 11/23/2016. (tmb, Chambers) (Entered: 11/15/2016) |
| 11/18/2016 | 29 | MINUTE ORDER by Magistrate Judge Steven P. Shreder granting 27 Motion to Extend Settlement Conference Deadlines. Defendant's response to Plaintiff's settlement offer is due 11/23/2016. Settlement Conference Statements are due 11/30/2016. (tmb, Chambers) (Entered: 11/18/2016) |
| 11/21/2016 | 30 | Supplemental WITNESS LIST by Dara Campbell, Aubree Holsapple, Kena Utter (Merchen, Heath) (Entered: 11/21/2016) |
| 11/22/2016 | 31 | MOTION to Exclude Plaintiffs' Witnesses and MOTION to Extend Scheduling Order Dates by All Defendants Responses due by 12/6/2016(Holmgren–Ganz, Laura). Added MOTION to Extend Scheduling Order Dates on 12/6/2016 (dma, Deputy Clerk). (Entered: 11/22/2016) |
| 11/23/2016 | 32 | MOTION in Limine by All Defendants Responses due by 12/7/2016(Holmgren–Ganz, Laura) (Entered: 11/23/2016) |
| 11/28/2016 | 33 | MINUTE ORDER by Judge Ronald A. White directing defendants supplement Defendants' Motion to Exclude Plaintiffs' Witnesses Listed on Plaintiffs' Witness List–Supplemented and Alternative Motion for Extension of Time filed 11/22/16 (Re: MOTION to Exclude Plaintiffs' Witnesses ) AND Defendants' Motion in Limine and Brief in Support filed 11/23/16 ( 32 MOTION in Limine ) to comply with Local Civil Rule 7.1(f) within 5 days of this date.(lal, Deputy Clerk) (Entered: 11/28/2016) |
| 11/28/2016 | 34 | RESPONSE in Opposition to Motion (Re: 26 MOTION for Summary Judgment ) by Dara Campbell, Aubree Holsapple, Kena Utter ; (With attachments)(Merchen, Heath) (Attachments 1 through 8 replaced to redact personal identifiers and NEF regenerated on 12/1/2016) (lal, Deputy Clerk). (Entered: 11/28/2016) |
| 11/28/2016 | 35 | RESPONSE to Motion (Re: 25 First MOTION to Clarify ) by Jack Cadenhead, Amie Colclazier, Independent School District I–01 of Seminole County, Mickey Upton ;(Holmgren–Ganz, Laura) (Entered: 11/28/2016) |
| 11/29/2016 | 36 | MINUTE ORDER by Judge Ronald A. White : Counsel for plaintiffs is directed to provide forthwith for use by the Court a bound manual copy of the pleading and/or exhibits as filed at Dkt. # 34 . Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading(s) was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 34 Response in Opposition to Motion ) (lal, Deputy Clerk) (Entered: 11/29/2016) |

| 12/01/2016 | 37 | Amended MOTION in Limine by All Defendants Responses due by 12/15/2016(Holmgren–Ganz, Laura) (Entered: 12/01/2016) |
| 12/01/2016 | 38 | SUPPLEMENT (Re: 31 MOTION to Exclude Plaintiffs' Witnesses ) by All Defendants Responses due by 12/15/2016(Holmgren–Ganz, Laura) Modified docket entry text and termed motion on 12/6/2016 (lal, Deputy Clerk). (Entered: 12/01/2016) |
| 12/01/2016 | 39 | PROPOSED JURY INSTRUCTIONS by Jack Cadenhead, Amie Colclazier, Independent School District I–01 of Seminole County, Mickey Upton (Holmes, Laura) (Entered: 12/01/2016) |
| 12/05/2016 | 40 | MOTION for Leave to Amend Petition and MOTION to Extend Scheduling Order Dates by All Plaintiffs (With attachments) Responses due by 12/19/2016(Merchen, Heath). Added MOTION to Extend Scheduling Order Dates on 12/6/2016 (dma, Deputy Clerk). (Entered: 12/05/2016) |
| 12/08/2016 | 41 | MINUTES of Settlement Conference held on 12/8/2016 before Magistrate Judge Steven P. Shreder: Plaintiffs Kena Utter, Dara Campbell, and Aubree Holsapple were present and represented by counsel Heath Merchen. Defendants Amie Colclazier, Jack Cadenhead, and Mickey Upton were present and represented by counsel Laura Holmes and Laura Ganz. Defendant Seminole School District was present by and through Superintendent Alfred Gaches and board members Marci Donaho, Mickey Upton, Claudia Willis, Jack Cadenhead, and Amie Colclazier, and was represented by counsel Laura Holmes and Laura Ganz. Also present with defendants were minute clerk Linda Warden, and insurance representative Richard Hall. Conference concluded WITHOUT settlement. (tmb, Chambers) (Entered: 12/08/2016) |
| 12/12/2016 | 42 | REPLY to Response to Motion (Re: 26 MOTION for Summary Judgment ) by Jack Cadenhead, Amie Colclazier, Independent School District I–01 of Seminole County, Mickey Upton ;(Holmes, Laura) (Entered: 12/12/2016) |
| 12/12/2016 | 43 | RESPONSE to Motion (Re: 37 Amended MOTION in Limine ) by Dara Campbell, Aubree Holsapple, Kena Utter ;(Merchen, Heath) (Entered: 12/12/2016) |
| 12/13/2016 | 44 | ORDER by Judge Ronald A. White denying plaintiffs' motion for reconsideration and clarification of the court's order of dismissal ( 25 Motion to Clarify) and denying plaintiffs' motion to amend( 40 Motion for Leave to File Document(s)) (lal, Deputy Clerk) (Entered: 12/13/2016) |
| 12/14/2016 | 45 | MINUTE ORDER by Judge Ronald A. White granting Defendants' Motion for Summary Judgment filed 11/14/16 (Re: 26 MOTION for Summary Judgment ) as to the federal claims only with the state law claims to be remanded to state court for further proceedings. (WRITTEN ORDER TO FOLLOW) Accordingly, the pretrial conference previously set for 12/15/2016 at 10:30 AM, the jury trial previously set for 1/4/2017 at 9:00 AM and all deadlines associated with these settings are deemed STRICKEN. (lal, Deputy Clerk) (Entered: 12/14/2016) |
| 12/15/2016 | 46 | ORDER by Judge Ronald A. White granting in part defendants' motion for summary judgment ( 26 Motion for Summary Judgment) remanding state claims to the District Court for Seminole County, Oklahoma, and deeming as moot defendants' motion to exclude plaintiffs' witnesses or for extension of time and motions in limine 31 Motion to Exclude; 31 Motion to Extend Scheduling Order Dates ; 32 Motion in Limine; 37 Motion in Limine) (lal, Deputy Clerk) (Entered: 12/15/2016) |
| 12/15/2016 | 47 | JUDGMENT by Judge Ronald A. White entering judgment in favor of defendants Independent School District I–01 of Seminole County, Amie Colclazier, Jack Cadenhead and Mickey Upton and against plaintiffs Aubree Holsapple, Dara Campbell and Kena Utter (terminates case) (lal, Deputy Clerk) (Entered: 12/15/2016) |
| 12/28/2016 | 48 | BILL OF COSTS (Re: 47 Judgment, ) by Jack Cadenhead, Amie Colclazier, Independent School District I–01 of Seminole County, Mickey Upton (Holmes, Laura) (Entered: 12/28/2016) |
| 12/28/2016 | 49 | BRIEF in Support of Bill of Costs (Re: 48 Bill of Costs ) by Jack Cadenhead, Amie Colclazier, Independent School District I–01 of Seminole County, Mickey Upton (Holmes, Laura) (Entered: 12/28/2016) |

| 01/12/2017 | 50 | NOTICE OF APPEAL to Circuit Court (paid $505 appeal fee; receipt number 1086–1051743) (Re: 47 Judgment, ) by Dara Campbell, Aubree Holsapple, Kena Utter (Merchen, Heath) (Entered: 01/12/2017) |
| 01/12/2017 | 51 | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 50 Notice of Appeal, 47 Judgment and 46 Order. Preliminary record transmitted to 10th Circuit Court of Appeals electronically. (Re: 50 Notice of Appeal – Final Judgment ) (jcb, Deputy Clerk) (Entered: 01/12/2017) |
| 01/12/2017 | 52 | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 17–7002 (Re: 50 Notice of Appeal – Final Judgment ) (jcb, Deputy Clerk) (Entered: 01/13/2017) |
| 01/13/2017 | 53 | ORDER TAXING COSTS by Court Clerk taxing costs in amount of $2,799.85 in favor of Defendants against Plaintiffs (Re: 48 Bill of Costs) (dma, Deputy Clerk) (Entered: 01/13/2017) |
| 01/25/2017 | 54 | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 50 Notice of Appeal – Final Judgment ) by Dara Campbell, Aubree Holsapple, Kena Utter (Merchen, Heath) (Entered: 01/25/2017) |
| 01/31/2017 | 55 | LETTER re: Record Complete. A Transcript Order Form has been filed stating no transcripts are necessary or are already on file. Record Complete Letter transmitted to 10th Circuit Court of Appeals electronically. (Re: 50 Notice of Appeal – Final Judgment ) (jcb, Deputy Clerk) (Entered: 01/31/2017) |

APLT. APP. 006

## IN THE DISTRICT COURT OF SEMINOLE COUNTY
## STATE OF OKLAHOMA

KENA UTTER, AUBREE HOLSAPPLE,  )
and DARA CAMPBELL,  )
    )
        Plaintiffs,  )
    )
vs  )    Case No. CJ-2016-48
    )
AMIE COLCLAZIER, JACK CADENHEAD,  )
MICKEY UPTON, and INDEPENDENT  )
SCHOOL DISTRICT NO. I-01  )
OF SEMINOLE COUNTY, STATE  )
OF OKLAHOMA, a/k/a SEMINOLE SCHOOL  )
DISTRICT,  )
    )
        Defendants  )

## AMENDED PETITION

The Plaintiffs, Kena Utter, Aubree Holsapple and Dara Campbell, respectfully amend their

Petition as a matter of course, pursuant to 12 O.S. § 2015.  Plaintiffs had prior to filing suit

requested and received what were allegedly complete copies of Plaintiffs' personnel files from

Defendant Seminole School District, which contained continuing contracts with no temporary

contract documentation.    After the present lawsuit was filed, Defendant Seminole School

District supplemented their records request response with the three temporary contracts (which

were the only documents withheld from the personnel files when the original request was made).

Plaintiffs have therefore amended their Petition to comport with the newly provided, and

previously withheld documentation.

    The Plaintiffs, Kena Utter, Aubree Holsapple and Dara Campbell, for their claims against

Defendants, Amie Colclazier, Jack Cadenhead, Mickey Upton and Independent School District

1

Exhibit No. 3

No. I-01 of Seminole County, State of Oklahoma a/k/a Seminole School District allege and state as follows:

1.    This action arises under Oklahoma contract law, The Oklahoma Teacher Due Process Act 70 O.S. § 6-101.32 *et seq*., the Oklahoma Open Meeting Act 25 O.S. § 301 *et seq.,* Article 2, Section 7 of the Oklahoma Constitution, the First Amendment to the United States Constitution, (actionable pursuant to 42 U.S.C. §1983), the Fourteenth Amendment to the United States Constitution, (actionable pursuant to 42 U.S.C. §1983), the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*., and Oklahoma tort law.

2.    All actions about which Plaintiffs complain occurred in Seminole County, State of Oklahoma.   All Defendants reside in Seminole County, Oklahoma.   Therefore, the above entitled court has jurisdiction and is the appropriate venue for this action.

3.    This action seeks declaratory relief, equitable relief, actual damages, and punitive damages against the Defendants, as well as the costs and attorney fees for prosecution of these claims for the Plaintiffs.

4.    Plaintiffs were, prior to the termination/nonrenewal which is the subject of this lawsuit, employees of Independent School District No. I-01 of Seminole County, State of Oklahoma, a/k/a Seminole School District.

5.    Plaintiffs were employed by Seminole School District for the 2014-2015 school year on temporary contracts and subject to a negotiated agreement between Seminole School District and the local bargaining agent, Seminole Association of Classroom Teachers ("Seminole ACT").

6.    Defendants, Amie Colclazier, Jack Cadenhead, and Mickey Upton ("Board

2

Members") are and were at all times pertinent to this lawsuit members of the Seminole School District Board of Education ("Board"). All three are and were at all times pertinent hereto residents of Seminole County, Oklahoma. Each Defendant Board Member is being sued in their individual capacity as well as in their official capacity as school board members.

7.     Seminole School District, is a body corporate and politic authorized to sue and be sued in its corporate name. The Board is the governing body of the Seminole School District under Oklahoma law and is required, *inter alia,* to follow the statutes and regulations of the state of Oklahoma in administering the affairs of the Seminole School District.

8.     Seminole School District qualifies as an "employer" as that term is defined in the Family Medical Leave Act, ("FMLA"), 29 U.S.C. § 2611(4).

9.     The Seminole ACT has, at all times material hereto, been recognized by the Board as the bargaining agent for all members of the certified teaching bargaining unit. The Seminole ACT and the Board have annually collectively bargained wages, hours, fringe benefits, and other terms and conditions of employment for members of the certified employee bargaining unit since recognition of Seminole ACT as the exclusive representative for all members of the certified employee bargaining unit employed by the Seminole School District.

10.     The Seminole ACT and the Seminole School District are subject to the mandates of the Oklahoma School Code, OKLA. STAT. tit. 70, § 1-101, *et seq.,* and the provisions of the Oklahoma School Code that govern negotiations with school employees, OKLA. STAT. tit. 70 §§ 509.1-509.11.

## CONTRACTUAL, STATUTORY, AND CONSTITUTIONAL FRAMEWORK:

11.     The negotiated agreement between the Seminole Board of Education and Seminole

3

APLT. APP. 009

ACT requires evaluation of teachers be conducted solely by principals who have observed the teacher's instruction and further provides that no teacher shall be terminated without due process. Specifically, Article IX, Section 9.3 and Article XI 11.2 of the negotiated agreement states that "No teacher shall be suspended, demoted, or terminated without due process." Article XI, Section 11.2, further provides that "Each evaluation shall be based upon the evaluator's actual observation and knowledge of the teacher evaluated while performing his/her job function. Teachers will be evaluated by principals, as required by law."

12.     OKLA. STAT. tit. 70, § 6-101.26 states that the dismissal and suspension provisions of the Teacher Due Process Act of 1990 shall apply to teachers who are employed on temporary contracts for a complete school year and to teachers who are employed in positions fully funded by federal or private categorical grants, except that such teachers shall be employed only for the duration of the temporary contract or the grant.

13.     All Plaintiffs were employed for a complete school year and the due process requirements for dismissal apply. Although Defendant Board Members refused to state grounds and mischaracterized their action as nonrenewal, the underlying reasons for their actions were disciplinary and retaliatory, and not the result of a contract lapse. As such, the Plaintiffs had the statutory right to the hearing and process protections of the Teacher Due Process Act.

14.     OKLA. STAT. tit. 70, § 6-101.26 requires that any teacher to whom the act applies facing termination or nonrenewal be provided certified written notice of the reasons for the proposed action and a full pre-termination due process hearing before the board. That statute reads, in pertinent part, as follows:

> A. Whenever a board of education receives a recommendation from the superintendent for the dismissal or nonreemployment of a teacher, the

4

board or individual designated by the board shall mail a copy of the recommendation to the teacher by certified mail, restricted delivery, return receipt requested, by personal delivery to the teacher with a signed acknowledgement of receipt, or by delivery by a process server. By the same means, the board shall notify the teacher of the right to a hearing before the board and the date, time and place set by the board for the hearing, which shall be held within the school district not sooner than twenty (20) days or later than sixty (60) days after receipt of notice by the teacher, the date on the personal receipt by hand-delivery to the teacher, or the date of delivery by a process server. The notice shall specify the statutory grounds upon which the recommendation is based upon for a career teacher or shall specify the cause upon which the recommendation is based upon for a probationary teacher. The notice shall also specify the underlying facts supporting the recommendation. At the hearing, the teacher shall be entitled to all rights guaranteed under the circumstances by the United States Constitution and the Constitution of Oklahoma.

B. The teacher hearing shall be conducted by the district board according to procedures established by the State Board of Education.

C. Only after due consideration of the evidence and testimony presented at the hearing shall the district board decide whether to dismiss or nonreemploy the teacher. The vote of the board shall be made in an open meeting. The board shall also notify the teacher of the decision, including the basis for the decision, by certified mail, restricted delivery, return receipt requested, or substitute process as provided by law. The decision of the board regarding a teacher shall be final and nonappealable. At the hearing the burden of proof shall be upon the superintendent or designee, and the standard of proof shall be by the preponderance of the evidence. The teacher shall receive any compensation or benefits to which the teacher is otherwise entitled until the decision of the board becomes final. If the hearing for a teacher is for nonreemployment, such compensation and benefits may be continued only until the end of the current contract of the teacher.

15.     OKLA. STAT. tit. 70, § 6-101.26 predates the incidents which gave rise to this claim and constitutes clearly established law of which a reasonable person should have known with respect to the prohibition against a school board terminating Plaintiffs' contracts without the statutorily required notice and hearing.

16.     OKLA. ADMIN. CODE §210:35-3-48 2016, requires that school board members

5

refrain from involvement in or interference with the administrative functions of the school, and

reads in pertinent part as follows:

> a.  The local board shall have the responsibility for the operation of the
>     school, and for performance of their powers and duties as specified in
>     statute. [Reference: 70:5-117; SL Section 65 Powers and Duties]
>
> (1)  The local board shall be responsible for developing and adopting
>     effective policies for the operation of the school(s), which must include
>     those policies required by statute. The staff, students, and community
>     shall be involved in the development of the policies which relate to
>     them. The local board's policies shall be prepared in printed form and
>     shall be made available to staff, students, and community.
>
> (2)  The governing local board shall be responsible for the selection
>     and evaluation of its chief executive officer who shall be the
>     superintendent or other designated head of the school system.
>
> (3)  The local board and its individual members shall refrain from
>     involvement in or interference with the administrative functions of the
>     school.

17.     OKLA. ADMIN. CODE §210:35-3-48 2016 predates the incidents which gave rise to

this claim and constitutes clearly established law of which a reasonable person should have known

with respect to a board member interfering with a school administrator's evaluative function and

independently terminating or nonrenewing a teacher for alleged (but undisclosed) poor teaching

performance, contrary to administrative recommendations.

18.     OKLA. STAT. tit. 25 O.S. § 303, prohibits secretive meetings of public bodies and

provides as follows:

> All meetings of public bodies, as defined hereinafter, shall be held at
> specified times and places which are convenient to the public and shall
> be open to the public, except as hereinafter specifically provided. All meetings
> of such public bodies, except for executive sessions of the State Banking
> Board and Oklahoma Savings and Loan Board, shall be preceded by
> advance public notice specifying the time and place of each such meeting to
> be convened as well as the subject matter or matters to be considered at such

meeting, as hereinafter provided.

OKLA. STAT. tit. 25 O.S. § 304 provides definitions used in the Oklahoma Open Meeting

Act, and reads, in pertinent part, as follows:

1. "Public body" means the governing bodies of all municipalities located within this state, boards of county commissioners of the counties in this state, boards of public and higher education in this state and all boards, bureaus, commissions, agencies, trusteeships, authorities, councils, committees, public trusts or any entity created by a public trust, including any committee or subcommittee composed of any of the members of a public trust or other legal entity receiving funds from the Rural Economic Action Plan Fund as authorized by Section 2007 of Title 62 of the Oklahoma Statutes, task forces or study groups in this state supported in whole or in part by public funds or entrusted with the expending of public funds, or administering public property, and shall include all committees or subcommittees of any public body. Public body shall not include the state judiciary, the Council on Judicial Complaints when conducting, discussing, or deliberating any matter relating to a complaint received or filed with the Council, the Legislature, or administrative staffs of public bodies, including, but not limited to, faculty meetings and athletic staff meetings of institutions of higher education when those staffs are not meeting with the public body, or entry-year assistance committees. Furthermore, public body shall not include the multidisciplinary team provided for in subsection C of Section 1-502.2 of Title 63 of the Oklahoma Statutes or any school board meeting for the sole purpose of considering recommendations of a multidisciplinary team and deciding the placement of any child who is the subject of the recommendations. Furthermore, public body shall not include meetings conducted by stewards designated by the Oklahoma Horse Racing Commission pursuant to Section 203.4 of Title 3A of the Oklahoma Statutes when the stewards are officiating at races or otherwise enforcing rules of the Commission;

2. "Meeting" means the conduct of business of a public body by a majority of its members being personally together or, as authorized by Section 307.1 of this title, together pursuant to a videoconference. Meeting shall not include informal gatherings of a majority of the members of the public body when no business of the public body is discussed;

The Oklahoma Attorney General further defined the above statutory requirements in 1981,

7

APLT. APP. 013

and 1981 OK AG 69 reads, in pertinent part, as follows:

> "Permitting a single member of the governing body to obtain a consensus
> or vote of that body by privately meeting alone with each member, would
> be to condone decision making by public bodies in secret, which is the very
> evil against which the Open Meeting Act is directed. The Open Meeting
> Act's prohibition against this type of decision making is not dependent upon
> whether a majority of the members of a governing body gather together at
> the same place at the same time in the presence of each other."  See also
> *Berry v. Bd. of Governors of Reg. Dentists*, Okl., 611 P.2d 628, 631 (1980)
> (prohibiting informal meetings that result in formal action:  "Informal
> gatherings among a majority of the members to decide on any course of
> action is prohibited by the Act.")

19.    OKLA. STAT. tit. 25 O.S. § 301, *et seq*. and 1981 OK AG 69 predate the incidents

which gave rise to this claim and constitute clearly established law of which a reasonable person

should have known with respect to the prohibition on a majority of board members meeting

individually with one another outside of any school board meeting to decide on formal board

action.

20.    The Family Medical Leave Act, 29 U.S. Code § 2612 provides in pertinent part, as

follows:

> (a)    In general (1) Entitlement to leave
> Subject to <u>section 2613 of this title,</u> an eligible employee shall be entitled to
> a total of 12 workweeks of leave during any 12-month period for one or
> more of the following:
>
> … (C) In order to care for the spouse, or a son, daughter, or parent, of the
> employee, if such spouse, son, daughter, or parent has a serious health
> condition.
>
> …(b) Leave taken intermittently or on reduced leave schedule
> (1) In general
>
> … Subject to paragraph (2), subsection (e)(2), and subsection (b)(5) or (f)
> (as appropriate) of **section 2613 of this title,** leave under subparagraph (C)

or (D) of subsection (a)(1) or under subsection (a)(3) may be taken intermittently or on a reduced leave schedule when medically necessary.

29 U.S. Code § 2615 provides in pertinent part as follows:

(a) Interference with rights

(1) Exercise of rights
It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination
It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

21.      29 U.S. Code § 2612, 2615 predates the incidents which gave rise to this claim and constitutes clearly established law of which a reasonable person should have known with respect to the prohibition against an employer terminating or nonrenewing an employee's contract in retaliation for the employee's exercise of administratively approved intermittent leave to care for her child with a serious health condition.

22.      The First Amendment to the United State Constitution prevents public employers from retaliating against public employees for exercising their right to freedom of speech.   The United Stated Supreme court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S. Ct. 1731 (1968), dealt with the specific issue of a teacher speaking out publicly regarding school finance issues and held, in pertinent part, as follows:

More importantly, the question whether a school system requires additional funds is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive. On such a question free and open debate is vital to informed decisionmaking by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent.

9

APLT. APP. 015

Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

*Id.* at 571, 572.

23.     *Pickering v. Board of Education* predates the incidents which gave rise to this claim and constitutes clearly established law of which a reasonable person should have known with respect to the prohibition against a school district terminating or nonrenewing the teacher's contract in retaliation for the teacher's exercise of their right to freedom of speech on the topic of the school district's need for additional funds.

24.     The Fourteenth Amendment to the United States Constitution and Article 2, Section 7 of the Oklahoma Constitution each constitute clearly established law with respect to the requirement that prior to termination, public employees are entitled to a hearing that is not only fair and impartial, but also avoids the appearance that fairness and impartiality are lacking. *Staton v. Mayes*, 552 F.2d 908 (10th Cir. 1977).   Specifically, it is clearly established law that statements before the hearing by a school board member indicating the board member's intent to remove a school employee, and discussions prior to a board meeting among board members about the intended removal, reveal a tribunal not meeting the demands of due process for a hearing with fairness and the appearance of fairness.   *Id.* at 914.

25.     The Fourteenth Amendment to the United States Constitution constitutes clearly established law with respect to each of the following, individually and taken together:   1) teachers must be accorded the due process provided by state statute prior to facing loss of their employment; 2) public employees are entitled to a name clearing hearing when and if elected officials terminate or nonrenew them for undisclosed reasons and then the officials spread rumors in the public about poor job performance; 3) public employees in whom state statute vests an

10

employment or property interest are entitled to a pre-termination hearing wherein the reasons underlying the termination are disclosed and the employee is given a meaningful opportunity to respond. *See Stanton, supra*, and *Short v. Kiamichi Area Vo-Tech School*, 1988 OK 89.

## FACTUAL BACKGROUND

26.    During the 2014-2015 school year, each of the Plaintiffs received exemplary evaluations and were recommended for rehire by both their site level principals and the Superintendent.

27.    During the 2014-2015 school year, the Defendant Seminole School District had proposed a bond issue to build a new school, which was ultimately opposed by the three Defendant Board Members named in this suit.

28.    Plaintiff Dara Campbell, as a private citizen and using her private time and means, vocally and publicly supported the bond issue to raise funds for the school district.

29.    Plaintiff Data Campbell was employed as a teacher and was not involved in the development and implementation of policies for the Seminole School District.

30.    One or more Board Members contacted Plaintiff Dara Campbell directly and made it clear that the Board Member(s) opposed the bond issue and that she should stop supporting it.

31.    Plaintiff Kena Utter is an "eligible employee" as that term is defined in the FMLA, 29 U.S.C. § 2611(2) and has a child with a serious health condition, as that term is defined in the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*.

32.    Plaintiff Kena Utter made arrangements with her principal to take intermittent leave on mornings when her child's health condition required care.   Her principal approved of the intermittent leave.

11

APLT. APP. 017

33.     A fellow staff member of Plaintiff Kena Utter reportedly contacted one of the Board Members to share her displeasure with Plaintiff Kena Utter's intermittent leave.

34.     Plaintiff Aubree Holsapple had a disagreement during a meeting regarding a special education student with a fellow staff member who was a friend to one of the Board Members.   That fellow staff member reportedly contacted one of the Board Members to share her dislike of Plaintiff Aubree Holsapple.

35.     Plaintiffs contracts were due to be renewed at a public school board meeting on June 11, 2015 along with the contracts of other probationary teachers in the district.

36.     Prior to the school board meeting, the Board Members contacted the Superintendent to inform him that they planned on terminating and/or nonrenewing Plaintiffs.

37.     The Board Members had contacted one another prior to the school board meeting and outside of any official board meeting to discuss the termination and nonrenewal of Plaintiffs' employment.

38.     The Board Members agreed outside of board meetings to vote against the Superintendent's recommendation to renew the contracts of Plaintiffs.

39.     The Board Members made statements to members of the public and to school administrators that they intended to terminate and/or nonrenew the Plaintiffs.

40.     At the June 11, 2015 board meeting, the Board Members, representing a majority of the five member board and acting under color of state law, voted to terminate and/or not to renew the contracts of the Plaintiffs and did so without any written notice, without any due process hearing, and without providing any specified reason for their action.

41.     The Board Members voted to terminate and/or nonrenew and/or not rehire Plaintiff

APLT. APP. 018

Dara Campbell for undisclosed reasons, believed to be retaliation for her public and vocal support of the school bond issue.

42.     The Board Members voted to terminate and/or nonrenew and/or not rehire Plaintiff Kena Utter for undisclosed reasons, believed to be retaliation for her exercise of rights under the Family Medical Leave Act.

43.     The Board Members voted to terminate and/or nonrenew and/or not rehire Plaintiff Aubree Holsapple for undisclosed reasons, believed to be retaliation for her disagreement with a fellow staff member who was close to one of the Board Members.

44.     At the June 11, 2015 board meeting, the Superintendent objected and informed the Board Members that their actions in terminating the contracts of Plaintiffs were inappropriate, not in accordance with law, and violated the contractual and statutory rights of the teachers.

45.     The remaining two board members, Claudia Willis, and Cai Levy, opposed the termination and vocalized their dissent and their belief that the action of the Defendant Board Members was unlawful and inappropriate.

46.     The Superintendent of Seminole Public Schools resigned at the close of the board meeting on June 11, 2015 as he believed the actions of the board were unlawful and retaliatory.

47.     Neither the positions held by Plaintiffs nor the programs within which the Plaintiffs taught were eliminated or reduced.

48.     Plaintiffs suffered loss of employment, loss of reputation, loss of income, emotional distress, harm to reputation, and material adverse employment action.

49.     Plaintiffs were not provided certified notice of nonrenewal as required by 70 O.S. § 6-101.3(7).

13

50.     Plaintiffs were not provided with a certified recommendation for termination as required by 70 O.S. § 6-101.3(7).

51.     Plaintiffs were not provided notice of hearing as required by 70 O.S. § 6-101.3(7).

52.     Plaintiffs were not provided a pre-termination due process hearing as required by 70 O.S. § 6-101.3(7).

53.     Following the board meeting, one or more Defendant Board Members stated to third parties that "they had good reason" for terminating the Plaintiffs and that the Plaintiffs were "not effective at their jobs."

54.     The Defendant Board Members had time to deliberate the decision to terminate and/or nonrenew and/or not rehire the Plaintiffs.

55.     The decision of the Board Members to terminate and/or nonrenew and/or not rehire Plaintiffs was not made in the heat of the moment and was not made while under the stress of an emergency situation.

56.     Each of the following individual actions of the Defendant Board Members, and any combination of said actions taken together, shock the conscience and/or constitute reckless indifference to the clearly established statutory and/or constitutional rights of the Plaintiffs: retaliating against employees for the exercise of statutory and constitutional rights, terminating/refusing to rehire employees without the statutorily required due process hearing, terminating and/or refusing to rehire employees based on undisclosed rumor and innuendo alone, failing to provide Plaintiffs with an impartial and unbiased hearing, engaging in micromanagement and termination and/or refusal to renew individual employee contracts in contradiction to the principal and superintendent's recommendations and evaluations, intentionally interfering with

14

the Plaintiffs' prospective employment contracts, and conspiring together outside of public board meetings to terminate Plaintiffs' employment without providing any stated reason or rationale.

57.     In terminating and/or nonrenewing and/or not rehiring the Plaintiffs in the manner stated herein, the Board Members acted outside the scope of their statutory and/or regulatory authority.

58.     The Board Members acted with intent to deprive Plaintiffs' of their contractual, statutory, and/or constitutional rights.

## COUNT I
## BREACH OF CONTRACT

59.     Plaintiffs incorporate paragraphs 1 through 58.

60.     Plaintiffs' contracts with the Seminole School District incorporate all state and federal statutes in effect at the time of this action and are subject to the provisions of the negotiated agreement existing between the Seminole Board of Education and the Seminole ACT.

61.     The Board, breached their contractual obligations to Plaintiffs in the following manner:

    a.  Violating Article II, Section 2.1, which provides in pertinent part, as follows: "The Board and the Association agree to abide by all state and federal statutes, rulings, and regulations."   In terminating and/or nonrenewing and/or not rehiring Plaintiffs, the Board Members failed to abide by statutory and constitutional due process requirements, regulatory restrictions on direct board involvement in school administrative matters, statutory evaluation requirements and restrictions, and Oklahoma Statutes governing open meetings.

15

b. Violating Article IX, section 9.3 of the Seminole ACT Contract which provides that "no teacher shall be suspended, demoted, or terminated without due process. Such action taken against a teacher shall be in compliance with sections 6-102.1 through 6-102.3 and 6-103.1 through 6-103.12 of Title 70 of Oklahoma Statutes. The Board Members nonrenewed and/or terminated Plaintiffs without due process and without the required statutory compliance.

c. Violating Article XI Section 11.2, which reads in pertinent part, as follows: "Each evaluation shall be based upon the evaluator's actual observation and knowledge of the teacher evaluated while performing his/her job function. Teacher will be evaluated by Principals, as required by law." By terminating the Plaintiffs for any alleged "poor performance," as judged by parties other than the Plaintiff's principal, the Board Members have violated this provision.

## COUNT II
## VIOLATION OF
## THE TEACHER DUE PROCESS ACT

62.     Plaintiffs incorporate paragraphs 1 through 61.

63.     The Board failed to comply with the Teacher Due Process Act of 1990, OKLA. STAT. tit. 70, § 6-101.20 *et seq.*, through each of the following actions: (1) the Board failed to initiate a hearing for dismissal and/or nonrenewal; (2) the Board failed to receive a recommendation to dismiss and failed to mail Plaintiffs a copy of any recommendation; (3) the Seminole School District failed to provide notice of underlying facts; (4) the Seminole School District failed to provide a written admonishment, (5) the Seminole School District failed to provide the statutorily required pre-termination hearing, (6) the Seminole School District failed to

16

provide a name clearing hearing when Plaintiff's were allegedly terminated/nonrenewed/not rehired for performance related reasons.

64.    Despite the complete and continuing failure to comply with the Constitutional and statutory requirements, the Board Members voted to terminate and/or nonrenew Plaintiffs.

## COUNT III
## VIOLATION OF
## THE OPEN MEETING ACT

65.    Plaintiffs incorporate paragraphs 1 through 64.

66.    The Board and the Defendant Board Members violated OKLA. STAT. tit. 25 O.S. § 303, *et seq.* when a majority of its Board Members met, each individually with one another, outside of a public board meeting to discuss and decide to oppose the Superintendent's recommendation to renew Plaintiffs' contracts.

## COUNT IV
## § 1983 - VIOLATION OF DUE PROCESS
## (*Liberty Interest*)

67.    Plaintiffs incorporate paragraphs 1 through 66.

68.    The Defendant Board and the Defendant Board Members violated Plaintiffs due process rights and liberty interests in the following manner:

    a.  From and since the date of their termination, Plaintiffs have been falsely accused of undefined "misconduct" and/or "ineffective teaching" in the employment for which they were terminated by the Defendant.

    b.  The false and undefined allegations of the conduct by the Defendant Board Members stigmatized the good name, reputation, honor and integrity of the Plaintiffs.

17

c.  The stigmatizing allegations, were the basis for the action taken by the Board
    Members to terminate Plaintiffs at an open public meeting of the Seminole
    Board of Education.

d.  The combination of the stigmatizing rumors or accusations in public
    circulation, with the resulting discharge of the Plaintiffs being within a short
    period of time thereafter, created a public impression that the discharges of
    Plaintiffs were related to the rumors and accusations circulated by the
    Defendant Board Members.

e.  Plaintiffs were never given the opportunity to address any false accusations or
    even be informed of the specific nature of the alleged "misconduct."

f.  Plaintiffs were never provided a written (or oral) list of the specific charges or
    the specific allegations of the cause for their termination by the Defendants.
    As public employees, Plaintiffs have a *liberty interest* right in their employment
    with the Defendants under the Fourteenth Amendment to the United States
    Constitution.

g.  The Defendants, by denying Plaintiffs either a pre-termination or post
    termination hearing to clear their names, have deprived Plaintiffs of their liberty
    interest rights under the Fourteenth Amendment to the United States
    Constitution.

h.  Plaintiffs have been injured by the said deprivation of their constitutional rights
    through loss of past wages and benefits, future wages and benefits, and
    emotional distress and any other relief allowed under 42 U.S.C. §1983.

18

APLT. APP. 024

i.  Plaintiffs are also entitled to an award of attorney fees and costs under 42 U.S.C. § 1988 if they are the prevailing party under 42 U.S.C. § 1983 *liberty interest* cause of action.

### COUNT V
### § 1983 - VIOLATION OF DUE PROCESS
### (*Property Interest*)

69.  Plaintiffs incorporate paragraphs 1 through 68.

70.  Under both the Oklahoma Constitution and the Fourteenth Amendment to the United States Constitution, Plaintiffs have a property interest in their continued employment as provided by Oklahoma law governing continuing teacher contracts.  Plaintiffs are further entitled to the statutory pre-termination process afforded under Oklahoma law before being terminated or non-renewed.

71.  The Board and the Defendant Board Members violated Plaintiffs due process rights and property interests in the following manner:

a.  Plaintiffs were never given the opportunity to address any accusations or even be informed of the specific nature of the alleged "misconduct" prior to or following their termination and/or nonrenewal.

b.  Plaintiffs were never provided a written (or oral) list of the specific charges or the specific allegations of the cause for their termination by the Defendants.

c.  The Defendants denied Plaintiffs either a pre-termination or post termination hearing.

d.  The Defendants denied Plaintiffs the pre-termination hearing required by Oklahoma Statute under the Teacher Due Process Act.

19

**COUNT VI**
**§ 1983 - VIOLATION OF THE**
**FIRST AMENDMENT FREEDOM OF SPEECH**

72.     Plaintiffs incorporate paragraphs 1 through 71.

73.     The Board and the Defendant Board Members violated the right of Plaintiff Dara Campbell by terminating and/or nonrenewing her in retaliation for her exercise of the right to freedom of speech under the First Amendment to the United States Constitution.

**COUNT VI**
**§ 1983 - VIOLATION OF THE**
**FAMILY MEDICAL LEAVE ACT**

74.     Plaintiffs incorporate paragraphs 1 through 73.

75.     The Board and the Defendant Board Members violated the right of Plaintiff Kena Utter by terminating and/or nonrenewing her in retaliation for her exercise of rights under the Family Medical Leave Act.

**COUNT VII**
**INTENTIONAL INTERFERENCE WITH**
**PROSPECTIVE BUSINESS INTERESTS**

76.     Plaintiffs incorporate paragraphs 1 through 75.

77.     The Board Members individually intentionally interfered with Plaintiffs' prospective contractual business interest with the Seminole School District by violating state law and colluding outside of public meetings to terminate and/or nonrenew Plaintiffs' contracts without cause and without providing any form of recourse or hearing.

**WHEREFORE,** Plaintiffs demand judgment against Defendant, Independent School District No. I-01 of Seminole County, State of Oklahoma, a/k/a Seminole School District and

20

against the Defendant Board Members, Amie Colclazier, Jack Cadenhead and Mickey Upton in an

amount to be determined at trial but that is in excess of the amount required for diversity

jurisdiction pursuant to Section 1332 of Title 28 of the United States Code the cost of this action,

reinstatement to their positions, invalidation of board action performed in violation of the open

meetings act, punitive damages against the Defendant Board Members for their violations of

Plaintiffs' statutory and constitutional rights, along with post judgment interest at the statutory rate

from the date of the judgment until paid in full, and any further relief that is just, proper and

equitable.

Respectfully submitted,

_____
Heath Merchen (OBA #19391)
Oklahoma Education Association
P. O. Box 18485
Oklahoma City, OK   73154
Tele: (405)528-7785 Fax: (405)523-4392
hmerchen@okea.org

## CERTIFICATE OF MAILING

I certify that I mailed a copy of the foregoing Amended Petition on the 2nd day of May, 2016 to the following:

Amie Colclazier                     Jack Cadenhead
519 Ideal St.                       13 Harber Ct.
Seminole, OK 74868                  Seminole, OK 74868

Mickey Upton                        Claudia Willis, Clerk of the Board
1116 Van Drive                      Seminole School District
Seminole, OK   74868                2300 Pecan Dr.
                                    Seminole, OK 74868

_____

APLT. APP. 027

Heath Merchen

APLT. APP. 028

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **KENA UTTER, AUBREE HOLSAPPLE,** ) | |
| **and DARA CAMPBELL,** ) | |
| ) | |
| **Plaintiffs** ) | |
| ) | |
| **-vs-** ) | **CIV-16-182-RAW** |
| ) | |
| **AMIE COLCLAZIER, JACK CADENHEAD,** ) | |
| **MICKEY UPTON, and INDEPENDENT** ) | |
| **SCHOOL DISTRICT NO. I-01 OF** ) | |
| **SEMINOLE COUNTY, STATE OF** ) | |
| **OKLAHOMA, a/k/a SEMINOLE SCHOOL** ) | |
| **DISTRICT,** ) | |
| ) | |
| **Defendants.** ) | |

## DEFENDANTS' PARTIAL MOTION TO DISMISS
### AND BRIEF IN SUPPORT

### Introduction

Defendants Amie Colclazier ("Colclazier"), Jack Cadenhead ("Cadenhead"), Mickey

Upton ("Upton") and Independent School District No. I-01 of Seminole County, State of

Oklahoma, a/k/a Seminole School District ("District")[1], hereby move for partial dismissal of

---

[1]

Oklahoma law provides that a school district is a body corporate possessing the powers of a corporation for public purposes. 70 O.S. §5–105. The law further provides that a school district may sue and be sued by the name and style of "Independent School District Number ..." Plaintiffs refer to Seminole School District Board of Education ("Board") (Doc. No. 3-3, Amended Petition, ¶ 6) and appear to assert claims against the Board of Education. However, the Board of Education is not a proper party to a lawsuit.

G:\Seminole\Utter\Pldgs\Def. Partial MTD.wpd

Plaintiffs' Amended Petition for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

Plaintiffs bring this action against District and District's Board members Colclazier, Cadenhead and Upton (collectively referred to as "Board Members")[2] alleging, in part, breach of contract for failing to follow the provisions of the Collective Bargaining Agreement ("CBA") provisions which refer to the Teacher Due Process Act ("TDPA") (Count I), denial of due process under the TDPA, 70 O.S. §§6-101.20 *et seq.* (Count II), denial of liberty interest without due process of law under 42 U.S.C. §1983 ("Section 1983") (Count IV), and denial of property interest without due process of law under Section 1983 (Count V). For their claims, Plaintiffs allege that District employed Plaintiffs as temporary teachers for the 2014-2015 school year, that Plaintiffs were subject to the CBA between District and Seminole ACT, and that Plaintiffs were terminated. Doc. No. 3-3, Amended Petition ¶¶ 4, 9, 10 and 21.

Defendants move to dismiss Plaintiffs's Count I (breach of contract) and II (violation of the TDPA), violation of liberty without due process under 42 U.S.C. §1983, and, Plaintiffs' Count V, violation of property without due process under 42 U.S.C. §1983.

---

[2]

With respect to the claims alleged under Section 1983 against Board Members in their official capacity (Doc. No. 3-3, Amended Petition, ¶ 6.) the law is well-settled that a suit against a person in his or her official capacity is the same as a suit against the public entity. *Griess v. Colorado*, 841 F.2d 1042, 1045 (10th Cir. 1988). Thus, the naming of the individuals in their official capacity is redundant of the naming of the governmental entity, and Board Members should be dismissed in their official capacity as to all counts.

APLT. APP. 030

## STANDARD OF REVIEW

A motion pursuant to Rule 12(b)(6) assumes that the court is authorized to resolve the dispute and tests whether there is a legal dispute to resolve. The function of a Rule 12(b)(6) motion is to test the law of a claim, not the facts which support it. *Niece v. Sears, Roebuck and Company*, 293 F.Supp. 792, 794 (N.D. Okla. 1968).

In deciding a motion to dismiss for failure to state a claim, the allegations of the complaint must be viewed in the light most favorable to the plaintiff. *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984). Pleadings that are no more than legal conclusions are not entitled to the assumption of truth; while legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950 (2009). A complaint need not contain detailed factual allegations; however, a plaintiff's obligation requires more than labels and conclusions, and a mere recitation of the elements of a cause of action will not be sufficient. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A plaintiff must allege sufficient facts to "nudge [ ] their claims across the line from conceivable to plausible." *Id.* at 570.

One of the purposes of the plausibility requirement is "to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success" and "to inform the defendants of the actual grounds of the claim against them." *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008). The "degree of specificity necessary to

APLT. APP. 031

establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context" which ultimately depends on the type of case. *Robbins*, 519 F.3d at 1248.

## ARGUMENT AND AUTHORITY

**Proposition I: Plaintiffs' Counts I , II and V Fail to State a Claim Because Temporary Teachers Are Not Entitled Due Process for Nonrenewal of Their Contracts.**

In Count I, Plaintiffs allege that District breached its contractual obligations set forth in the CBA by failing to follow state and federal law regarding non-renewal of their teaching contracts. In Count II, Plaintiffs allege that District failed to comply with the TDPA. In Count V, Plaintiffs allege that District and Individual Board members violated Plaintiffs' due process rights under the Fourteenth Amendment and the Oklahoma Constitution by failing to provide the statutory pre-termination process afforded under Oklahoma law, specifically the TDPA, prior to being terminated or non-renewed. Thus, all of Plaintiffs' claims in Counts I, II, and V are based on alleged violations of the TDPA, 70 O.S. §6-101.20 et seq.

Plaintiffs have asserted and Defendants do not dispute that they were employed on temporary contracts for the 2014-2015 school year. Doc. No. 3-3, Amended Petition, ¶ 5. Pursuant to Federal Rules of Evidence 201(b), the Court may take judicial notice of the minutes of District's Board of Education meetings held on June 12, 2014 and June 11, 2015. Defendants' Exhibits 1 and 2.[3] The minutes of June 12, 2014 reflect in Item 22 that Plaintiffs

---

[3] *See Schubert v. City of Rye,* 775 F.Supp.2d 689 (S.D.N.Y. 2011) (District court took judicial notice of city council's meeting minutes on a motion to dismiss).

were hired on a temporary contract. The minutes of June 11, 2015 reflect in Item 34 that the Board was considering taking action on the Superintendent's recommendation to hire Plaintiffs and that they would be moving from temporary teachers to non-career teachers.

Oklahoma law defines dismissal as "the discontinuance of the teaching service of an administrator or teacher during the term of a written contract..." 70 O.S. §6-101.3(2). Nonreemployment is defined as the "nonrenewal of the contract of an administrator or teacher upon expiration of the contract." 70 O.S. §6-101.3(3).The TDPA sets forth the procedures for school districts to follow to dismiss or non-renew various categories of teachers. 70 O.S. §6-101.25.

Oklahoma law specifically addresses the applicability of the TDPA to temporary teachers and states:

> A. The dismissal, suspension and nonreemployment provisions of the Teacher Due Process Act of 1990 shall not apply to:
>    1. Substitute teachers;
>    2. Adult education teachers; and
>    3. **Teachers who are employed on temporary contracts.**
> B. The dismissal and suspension provisions of the Teacher Due Process Act of 1990 shall apply to teachers who are employed on temporary contracts for a complete school year ..., **except that such teachers shall be employed only for the duration of the temporary contract** ... (emphasis added).

70 O.S. §6-101.23. Thus, the law in Oklahoma is clear that a teacher employed on a temporary contract is NOT entitled to the procedures set forth in the TDPA when the temporary contract is nonrenewed or merely allowed to expire at the end of the temporary contract.

Defendants did not violate the TDPA or breach the collective bargaining agreement setting forth the rights under the TDPA because the TDPA was not applicable to the situation presented by Plaintiffs. Rather, as evidenced by the minutes of the June 11, 2015 meeting, Defendants did not vote to grant new contracts to Plaintiffs and thus, allowed their contracts for the 2014-2015 school year to expire without any further action.

Under Count V, Plaintiffs allege deprivation of due process of their property interest under Section 1983 and Article 2, Section 7 of the Oklahoma Constitution. Doc. No.3-3, Amended Petition ¶¶ 24, 70-71. "Determination of whether a plaintiff has a property interest is a question of state law." *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 207, 48 L.Ed.2d 684 (1976). A property interest is not created by either the Federal or Oklahoma Constitutions but is created by and  defined by state law or contract. *Id.* "To have a property interest, a person must have more than a unilateral expectation, but, must instead, have a legitimate claim of entitlement to the interest." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972).

Since Oklahoma law does not provide for procedures to non-renew a temporary teacher's contract at the end of the temporary contract but specifically provides that the teacher shall only be employed for the duration of the temporary contract, a temporary teacher has no property interest in continued employment. When a temporary teacher's contract is merely allowed to end and the contract is not renewed, there is no violation of due

APLT. APP. 034

process. *DeHart v. Ind. Schl. Dist. No. 1 of Tulsa County*, 259 P.3d 877, 883, 2011 OK CIV APP 68.

As temporary teachers, Plaintiffs had no right of continued employment with District unless their contracts of employment were renewed. Therefore, Plaintiffs had no property interest which would entitle them to due process under the Fourteenth Amendment or the Oklahoma Constitution.

Since Plaintiffs were teachers employed on temporary contracts, they were not entitled to any due process relative to the non-renewal of their contracts of employment under the CBA, the TDPA, or the Fourteenth Amendment or Oklahoma Constitution's due process provisions. Thus, for the reasons stated above, Counts I, II, and V of Plaintiffs' Amended Petition should be dismissed.

**Proposition II:  Plaintiffs Fail to Establish Any Liberty Interests.**

In Count IV,  Plaintiffs  allege that Defendants denied them of their liberty interest without due process under Section 1983. Plaintiffs allege that Board Members made statements to the public and school administrators that they intended to terminate Plaintiffs and voted accordingly.  One or more of the Board Members stated to a third party that "they had good reason" for terminating the Plaintiffs and Plaintiffs were "not effective at their jobs". Doc. No. 3-3, Amended Petition ¶¶ 19, 33, 47-48.

For a liberty claim under Section1983, a public employee must show that: "'1) the protection of his good name, reputation, honor, and integrity, and 2) his freedom to take

advantage of other employment opportunities'". *Conaway v. Smith,* 853 F.2d 789,794, (10th Cir. 1988) quoting *Miller v. City of Mission, Kan.,* 705 F.2d 368 (10th Cir.); *Weathers v. West Yuma County School Dist. R-J-1,* 530 F.2d 1335, 1338 (10th Cir. 1976). The Supreme Court has stated that, for statements to be stigmatizing, they must rise to such a serious level as to place the employee's "good name, reputation, honor, or integrity at stake". *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S. Ct. 2701, 33 LED.2d 548 (1972). In *Roth,* the Supreme Court noted that "a charge of dishonesty or immorality would be stigmatizing".*Id.* However, stigmatization or reputational damage alone, no matter how egregious is not sufficient to support a Section 1983 claim. *Paul v. Davis,* 424 U.S. 693, 697-713, 96 S.Ct. 1155, 1158, 47 LED.2d (1976). A reputational liberty claim must be entangled with some other "tangible interest such as employment". *Id.* at 701. Declining to re-employ Plaintiffs does not impose on them a stigma or other disability that forecloses their freedom to take advantage of other employment opportunities. See *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 LED.2d 548 (1972).

Not every charge, even when false, rise to the stigmatization level. Examples of no deprivation of liberty are: *Conway v. Smith,* 853 F.2d 789 (10th Cir. 1988) (City employees discharge for neglect of duties and insubordination even when false does not give rise to a liberty claim); *Sullivan v. Stark,* 808 F.2d 737, 739 (10th Cir. 1987)(Charge that a park ranger was negligent or derelict in performing his duties did not implicate liberty interest); *Asbill v. Housing Authority of Choctaw Nation,* 726 F.2d 1499 (10th Cir. 1984) (Charge of disputing

G:\Seminole\Utter\Pldgs\Def. Partial MTD.wpd               -8-

authority of a new agency director held not to stigmatize discharged employee); *Sipes v. United States,* 744 F.2d 1418 (10th Cir. 1984) (Discharge for tardiness, unreliable behavior, and horseplay not a liberty interest infraction); *Stritzl v. U.S. Postal Service,* 602 F.2d 249, 252 (10th Cir. 1979) (Poor work habits and low productivity held not to implicate liberty interest); and, *Weathers v. West Yuma County School Dist. R-J-1*, 530 F.2d 1335 (10th Cir. 1976) (Nontenured teacher discharged for inappropriate language, too much busy work, and questionable group grading system is not a deprivation of liberty).

In this case, Plaintiffs allege that Defendants falsely accused them of undefined "misconduct", "ineffective teaching" and/or "not effective in their jobs", as the basis for their termination/nonrenewal of employment. Doc. No. 3-3, Amended Petition ¶¶19, 33 and 48. Such allegations are not charges of dishonesty or immorality, and thus do not rise to the *Roth* level of stigmatization. "Even though a record of nonretention in one job, might make [Plaintiffs] somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amount to a deprivation of 'liberty'." *Roth,* 408 U.S. at 573. Additionally, Plaintiffs fail to allege that Defendants alleged statements foreclosed them from taking advantage of other employment opportunities. Doc. No. 3-3, Amended Petition ¶ 48. Plaintiffs do not allege that Defendants invoked any rules or regulations to bar them from all other public employment as teachers in public schools. *See Roth,* 408 U.S. at 573. Since Plaintiffs' Amended Petition fails to allege that the statements made by Defendants were stigmatizing and denied them of their freedom to take advantage of other employment

APLT. APP. 037

opportunities, Plaintiffs Count IV for deprivation of liberty under Section 1983 should be dismissed against Defendants.

## CONCLUSION:

Plaintiffs' Counts I, II, IV and V of their Amended Petition should be dismissed because:

1.     Plaintiffs were teachers on temporary contracts and are NOT entitled to due process procedures under the TDPA or the collective bargaining agreement;

2.     Since Plaintiffs had temporary contracts, no property interest existed under Oklahoma law, and they have no claim under 42 U.S.C. §1983 for deprivation of due process of property; and,

3.     Plaintiffs' nonrenewal/termination of contracts and any alleged statements by Board Members were not stigmatizing in accordance with *Roth* and did not deny Plaintiffs of their freedom to take advantage of other employment opportunities.

Thus, for the reasons, stated above, Defendants, Amie Colclazier, Jack Cadenhead, Mickey Upton, and Independent School District No. I-01 of Seminole County, State of Oklahoma,

APLT. APP. 038

a/k/a Seminole School District, respectfully move this Court to dismiss Counts I, II, IV and

V of Plaintiff's Amended Petition.

THE CENTER FOR EDUCATION LAW, P.C.

s/Laura L. Holmgren-Ganz
Laura L. Holmes, OBA #14748
Laura L. Holmgren-Ganz, OBA #12342
900 N. Broadway, Suite 300
Oklahoma City, OK 73102
Telephone: (405) 528-2800
Facsimile: (405) 528-5800
LHolmes@cfel.com
LGanz@cfel.com
Attorneys for Defendants

## Certificate of Service

I hereby certify that on May 19, 2016, I filed the attached document with the Clerk of

Court.  Based on the records currently on file in this case, the Clerk of Court will transmit

a Notice of Electronic Filing to those registered participants of the electronic Case Filing

System: Heath Merchen

S/Laura L. Holmgren-Ganz
Laura L. Holmgren-Ganz

APLT. APP. 039

**Corrected Minutes** – **Regular Board Meeting**
**Seminole Public Schools**
**Thursday, June 11, 2015, 6:00 p.m.**
**Seminole Middle School Library**
**618 Mike Snyder Avenue, Seminole, OK  74868**

**Corrections on agenda items #17 and #18 are shown in red.**

1. President Cai Levy called the meeting to order.

2. Members present:  Cai Levy, Jack Cadenhead, Amie Colclazier, Claudia Willis, Mickey Upton.

3. CONSENT AGENDA:
   All of the following items, which concern reports and items of a routine nature normally approved at board meetings, will be approved by one vote, unless any member wishes to consider an item separately. The consent agenda consists of the discussion, consideration, and approval of the following items:

   A.  1. Minutes of the May 11, 2015, board meeting
   B.  Financial reports:
       1. Activity Accounts
       2. Treasurer's Report
   C.  Encumbrances and changes as follows:
       1. General Fund (FY15) – #1298-1887; #1889-1893; #50000-50269
       2. Building Fund (FY15) - #3
       3. Child Nutrition Fund (FY15) - #50008-50019
       4. Bond Fund (FY15) - #4-5
   D.  Fundraisers:
   E.  Resignations:
       1. Elisha Davis
       2. Debbie Hallum
   F.  Contracts:
       1. Barlow and Associates – Federal programs
       2. Wewoka Public Schools – Memorandum of Understanding – Wewoka Public Schools Co-op Head Start 2015-2016
       3. Oklahoma School Assurance Group 2015/2016 Workers' Compensation Insurance
       4. Patricia Ford – School psychological consulting services
       5. The City of Seminole – Seminole Softball Complex
       6. OSIG – School Insurance
       7. Jenmark –medical therapy for the district
       8. iMarc Billing Services – Medicaid billing services for the district

Amie Colclazier made the motion that Consent Agenda items 3B through F8 be approved, excluding P.O. #1878 from the General Fund. Jack Cadenhead seconded the motion.

> Cai Levy – yes
> Jack Cadenhead – yes
> Amie Colclazier – yes
> Claudia Willis – yes
> Mickey Upton – yes

Jack Cadenhead made the motion seconded by Claudia Willis that the minutes of the May 11, 2015 board meeting be approved.

> Cai Levy – yes
> Jack Cadenhead – yes
> Amie Colclazier – abstain
> Claudia Willis – yes
> Mickey Upton – yes

4. Introduction of guests and public discussion by those who requested audience.

   Those addressing the board were: Lynn Wieck, Aubree Holsapple, Kena Utter, Jack Mattingly, Tim Mathews, Zoe Howell, Chris Anson, Dara Campbell, Andreya Mitchell, Heath Merchant, Tom Newell, Kaleb Gordon, Steve Schoaps, Lisa Cobb, Jack Tinsley, Angie Turner, Cat Pollock, Krista Clark, William Choate and Colleen Schelb.

5. Administrative report.

   Mr. Pritchard reported on matters pertaining to the school sites. The board agreed to hold a Special Board Meeting on Thursday, July 9th, at 6:00 following receipt of the engineer's report on the high school.

6. Principals' Reports.

   The principals gave brief reports regarding their sites, including summer school activities.

7. Facilities and Operations Report.

   Mr. Lemmings gave a facilities and operations report. He talked about projects being done this summer. He also addressed the possibility or leasing busses giving the board information regarding Agenda item 8.

8. Consider and take necessary action to approve encumbrance #1888 to Midwest Bus Sales for $95,550 to lease 7 buses.

   Jack Cadenhead made the motion seconded by Amie Colclazier to approve agenda item 8.

> Cai Levy – yes
> Jack Cadenhead – yes
> Amie Colclazier – yes
> Claudia Willis – yes
> Mickey Upton – yes

9.   Consider and take necessary action to approve or deny student transfers as recommended by the superintendent.

Jack Cadenhead made the motion seconded by Claudia Willis to approve agenda item 9.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

10.   Consider and take necessary action to dispose of old school records.

Amie Colclazier made the motion seconded by Claudia Willis to approve agenda item 10.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

11.   Consider and take necessary action to approve "Temporary Appropriations" for fiscal year 2015-2016.

| | |
|---|---|
| General Fund | 13,447,738.00 |
| Building Fund | 1,547,875.00 |
| Child Nutrition Fund | 946,653.00 |
| Patterson Scholarship | 500.00 |
| Lancaster Scholarship | 500.00 |

Jack Cadenhead made the motion seconded by Amie Colclazier to approve Temporary Appropriations for fiscal year 2015-2016.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

APLT. APP. 042

12.    Consider and take necessary action to move $200 from account 818, Junior class, to account 819, Senior class.

Amie Colclazier made the motion seconded by Jack Cadenhead to approve agenda item 12.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

13.    Consider and take necessary action to move $3.72 from activity account 864, Middle School reading and to move $52.42 from activity account 860, 8th grade English, to account #805, Middle School concession, and to close activity account 864, Middle School reading and to close activity account 860, 8th grade English

Amie Colclazier made the motion seconded by Claudia Willis to approve agenda item 13.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

14.    Consider and take necessary action to create activity account 876, 4-H Club.

Jack Cadenhead made the motion seconded by Amie Colclazier to approve agenda item 13.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

15.    Consider and take necessary action to approve the following expenditures for activity account 876, 4-H:  fund raising projects and expenses, student medical expenses and/or special needs, field trips, equipment and/or supplies, projects, student needs, educational material, training, appliances and/or electronics, 4-H supplies and awards, 4-H jackets/dress/apparel, conventions, contests, local/state fair equipment and trips.

Amie Colclazier made the motion seconded by Jack Cadenhead to approve agenda item 15.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

APLT. APP. 043

16.   Discussion and possible action to accept the best bid for the sprinkler system at Wilson.

Mickey Upton made the motion seconded by Claudia Willis to table agenda item 16 until the July 9th board meeting.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

17.   Discussion and possible action to amend the concurrent class policy.

Claudia Willis made the motion seconded by Mickey Upton to table item 17 until the July 13 regular meeting so it can be presented in the form of policy language.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

18.   Discussion and possible action to adopt a Resolution regarding college courses successfully completed concurrently at Seminole State College.

## A RESOLUTION OF THE SEMINOLE PUBLIC SCHOOL
## DISTRICT BOARD OF EDUCATION

Whereas concurrent enrollment is a cooperative education program set forth by the State Board of Education and the Regents for Higher Education;

Whereas concurrent enrollment allows students enrolled in an accredited Oklahoma high school to be admitted provisionally to a college or university in the Oklahoma State System of Higher Education as special students provided they meet certain requirements; and

Whereas effective July 1, 2009, the Oklahoma Legislature amended 70 O.S. § 628.13, to include the following:

*"When a student earns college credit through concurrent enrollment, school districts shall provide academic credit for any concurrently enrolled higher education courses that are correlated with the academic credit awarded by the institution of higher education. Academic credit shall only be transcripted as elective credit if there is no correlation between the concurrent enrollment higher education course and a course provided by the school district;"*

NOW, THEREFORE, BE IT RESOLVED THAT Seminole High School juniors and seniors remain allowed to enroll concurrently at Seminole State College beginning with the summer semester at the end of the sophomore year of high school if they meet the following eligibility requirements:

1. They must be enrolled at Seminole High School.
2. They must have completed or currently be taking the Regents CORE course requirements.
3. They must take or have taken the ACT or SAT test. (Juniors must have a composite of 21 or a 3.5 GPA.)
4. Seniors must have a composite of 19 or a 3.0 GPA.
5. They must be enrolled in fewer than 6 credit hours per semester at Seminole High School as attested by the High School Counselor or Principal; and

BE IT FURTHER RESOLVED THAT all eligible juniors and seniors who enroll concurrently at Seminole State College shall continue to receive college and high school credit for each successfully completed course taken at Seminole State College.

Approved:     June 11, 2015

_____

Cai Levy, Board President


_____

Jack Cadenhead, Vice President


Jack Cadenhead made the motion seconded by Mickey Upton to table item 18 until the next regular board meeting.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes


19.     Discussion and possible action on an Employee Ethical Use of Wireless Telecommunications Devices Policy.

Amie Colclazier made the motion seconded by Claudia Willis to table item 19 until the July 13, 2015 board meeting.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

APLT. APP. 045

20.     Consider and take necessary action to change the order of business for the June, July and August board meetings, eliminating the Principals' reports during those months, adding a high level end of year report in June.

"Principal Reports will normally occur when school is in session, primarily September – May. An End of Term report by the Superintendent will be provided at the first regular meeting after school is released for summer break."

Jack Cadenhead made the following motion, seconded by Amie Colclazier:

"Principal Reports will normally occur when school is in session, primarily September – May. An End of Term report by the Superintendent will be provided at the June or July regular meeting."

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

21.     Discussion and possible action to negotiate with SACT a Faculty Dress Code policy and Extra Duty policy.

Proposed Faculty Dress Code, to read as follows:

The Board of Education feels that the faculty members are professional people, and their dress should be a compliment to the profession and a positive example for students and community. All teachers shall dress appropriately considering the accepted custom, style and mores of the educational profession. Clothing should be neat, clean, in good repair, and appropriate for on the job appearances at all times. Teachers shall not wear on the outside of their clothing any jewelry or similar artifacts that are obscene, distracting, or may cause disruptions to the educational environment.

-       Any attire for male and female must be in compliance with the Student Dress Code for Seminole Public Schools.

-       The Dress Code applies not only to instructors, but to all personnel, at all locations, except designated personnel.

-       Only physical education teachers are permitted to wear jogging/wind suits and shorts. Physical education instructors shall follow the faculty dress code for their gender on parent conference days, PTO meetings, and other occasions when not instructing class.

**Appropriate dress for females**:

-       Dresses and skirts which are no shorter than three inches above the knee. Dresses and skirts which are ankle length and tight enough to hinder walking are not acceptable attire. The slit of a dress or skirt must come no higher than three inches above the knee.

APLT. APP. 046

- Slacks and Capri pants may be worn in an appropriate manner. Capri pants must be below the knee. Physical education teachers may wear shorts. All other female staff will not wear shorts.*
- No jeans of any color will be acceptable.*
- T-shirts (other than school affiliated shirts) are not allowed. Low cut blouses, see-through clothing, off the shoulder, halter style, tank tops, or clothing which reveals the midriff are not appropriate staff attire. Sleeveless clothing must cover undergarments.
- Shoes and sandals without a back strap are acceptable. Beach style flip-flops are not acceptable attire.
- Athletic shoes are not acceptable for nonphysical education teachers. However, special needs foot attire, to accommodate foot problems or appropriate activities may be addressed by the principal. Athletic shoes are allowed on the playground and during other times (such as filed trips and physical education) when regular dress shoes may be a hazard.
- Earrings on females are the only visible piercing allowed.
- Hats are not to be worn inside.

**Appropriate dress for males:**

- Men are encouraged, but not required, to wear ties. Shirts for males shall have collars. Banded collars on button shirts, collared sport shirts, three-button golf shirts, suit, sport coats and dress shirts are permissible.
- Slacks and casual dress pants are acceptable. Physical education teachers will be able to wear shorts. All other male staff will not wear shorts.*
- Shoes and sandals without a back strap are acceptable. Beach style flip flops are not acceptable attire.
- Athletic shoes are not acceptable for nonphysical education teachers. However, special needs foot attire, to accommodate foot problems or appropriate activities may be addressed by the principal. Athletic shoes are allowed on the playground and during other times (such as field trips and physical education) when regular dress shoes may be a hazard.
- Facial hair should be kept neat and clean. Hair length will follow the same policy in the Student-Parent Handbooks (i.e. hair length should not impair vision).
- Earrings and visible piercing on males will not be accepted.
- Hats are not to be worn inside.

*Jeans, tennis shoes, and shorts (no shorter than three inches above the knee) shall be allowed on field trips that involve outdoor activities and at appropriate after school events. Bus drivers are permitted to wear jeans and tennis shoes. Custodial and Maintenance workers are permitted to wear tennis shoes. The School Safety and Compliance Officer shall wear a uniform.

By enacting this dress code policy, the Board of Education recognizes that there are occasions when individuals may need to wear specific clothing due to medical reasons or as a part of a *bona fide* personal religious practice. When such is the case, the employee shall provide documentation to his or her supervisor of the medical necessity or his or her *bona fide* personal religious practice that gives rise to the need for deviation from this dress code policy.

Any attire deemed inappropriate by the principal is prohibited. The employee may be asked to return to school with the appropriate attire.

APLT. APP. 047

**WAIVER:** The Superintendent may waive the dress code for district employees when school is not in session. Employees will be notified by the Superintendent when such a waiver is in effect, defining the parameters of the dress code waiver based on seasonal weather conditions, special events, and the like. The principal may waive the dress code for school employees when school is not in session. Employees will be notified by the principal when such a waiver is in effect, defining the parameters of the dress code waiver based on seasonal weather conditions, special events and the like.

**Proposed Extra Duty Policy, to read as follows:**

<u>Extra Duty and Extended Duty Contracts</u>

Certified employees may be contracted to provide sponsorship and coaching duties as recommended by the Superintendent and approved by the Board. Compensation for such positions will be provided in accordance with a Board approved extra duty salary schedule.

Certified employees may be contracted for additional days beyond the regular contract period. Compensation for such extended duty will be calculated on the existing salary schedule.

The Board may establish a separate salary schedule for summer school assignments. Assignment to extra duty, extended duty and summer school is for one (1) year only and may be renewed or eliminated annually upon the recommendation of the Superintendent and at the discretion of the Board.

All extra duty contracts shall be in writing and shall be approved by the Board of Education.

Jack Cadenhead made the motion seconded by Amie Colclazier that the superintendent negotiate with SACT on the extra duty policy and faculty dress code policy.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

22. Discussion and possible action to commit to the development of a Facilities Master Plan which maintains the centralized campus of the District's facilities in its current area.

Amie Colclazier made the motion seconded by Jack Cadenhead to table agenda items 22-28 until our next special meeting.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

23.   Discussion and possible action on the planning and construction of Ag Barns/Greenhouse and auxiliary facilities on the property on the current campus as recommended by the Agricultural Educational Facilities Committee.

24.   Discussion and possible action to direct the Superintendent to contact financial advisement firms FirstSouthwest, Columbia Capital and The PFM Group, in writing, and inquire as to each firm's renewal of its former proposal and possible contracting with for future bond issues and facilities planning.

25.   Discussion and possible action to direct the Superintendent to solicit bids for the paving and re-paving of various parking lots around the High School/Middle School campus.

26.   Discussion and possible action to direct the Superintendent to solicit bids for the construction of awnings/canopies from Seminole Middle School to the High School Cafeteria.

27.   Discussion and possible action to direct the Superintendent to issue Request for Proposals to architectural firms for the design/development of the Facilities Master Plan, to include potential capital improvements projects, *to-wit:*

A. Expansion of the High School Cafeteria to serve one High School lunch period and students at Betty L. Smith Early Childhood Center.

B. Conversion of Wilson Multi-Purpose Room to also serve as Cafeteria and addition of a Kitchen and additional improvements to effectuate same.

C. Expansion of Wilson office area and creation of additional classrooms from the current Kitchen/Cafeteria/Stage.

D. Renovation/expansion of current Gymnasium and conversion to safe room.

E. Construction of a new Gymnasium/safe room next to the current Gymnasium (southwest corner of College and Timmons streets).

F. Construction of a new High School STEM facility, which would include requisite number of state of the art science labs, technology and computer labs and Media Center.

G. Needed renovations/improvements to current High School in order to continue safely serving students and other purposes.

H. Installation of sprinkler system at Northwood Elementary School.

I. Needed expansion of Betty L. Smith Early Childhood Center.

28.   Discussion and possible action to direct the superintendent to negotiate a real estate contract for the purchase of the residence and real property located at 530 Mike Snyder, Seminole OK.

29.   Discussion and possible action to amend the Seminole Public School Board Policy to provide school lunches at no cost to all students enrolled in Seminole Public School through the United States Department of Agriculture's Community Eligibility Provision, and to authorize the transfer of funds from the General Fund to the Child Nutrition Fund in order to effectuate said policy.

**Proposed policy amending Section 3.3 of the Board Policy Handbook as follows:**

3.3      Lunch Rooms.

    3.3.1   The Seminole School District shall operate lunch rooms in cooperation with the National School Lunch Program. The school lunch services shall be operated on a nonprofit basis. Each school lunch service shall be expected to be self-sustaining financially.

    3.3.2   It shall be the policy of the Seminole Board of Education to provide school lunch room food services to the children enrolled in the Seminole Public Schools without regard to race, color, or national origin.

    3.3.3   Lunch room policies shall conform to federal and state regulations and shall be reviewed sufficiently to help assure compliance with such regulations.

    3.3.4   ~~If money is left in a student's account at the end of the year, it will be placed in the student's account for the next school year. Refunds of excess account money will be made upon request. When students leave the district without requesting a refund, any amount over $3.00 will be forwarded to the last known address. Amounts less than $3.00, and money returned through failed attempts, will be considered donations to the Child Nutrition Fund. All graduating seniors will be refunded any excess money.~~ It shall be the policy of the Seminole Board of Education to provide school lunch room services to all children enrolled in the Seminole Public Schools at no cost, regardless of their income or background, as long as the Seminole Public School District remains eligible for the Community Eligibility Provision through the United States Department of Agriculture.

    3.3.5   In order to effectuate the policy set forth in 3.3.4, above, transfers of funds from the General Fund to the Child Nutrition Fund in whatever amount necessary shall be authorized by this policy.

    Jack Cadenhead made the motion seconded by Amie Colclazier that the school take all the necessary steps to effectuate agenda item 29 for school year 2016-2017.

    Cai Levy – yes
    Jack Cadenhead – yes
    Amie Colclazier – yes
    Claudia Willis – yes
    Mickey Upton – yes

30.     PROPOSED EXECUTIVE SESSION TO DISCUSS THE EMPLOYMENT OF THOSE CERTIFIED AND/OR NON-CERTIFIED PERSONNEL LISTED IN AGENDA ITEM 34 PURSUANT TO 25 O.S.SEC. 307 (B)(1).

31.     Consider and take necessary action to convene in executive session.

    Mickey Upton made the motion seconded by Jack Cadenhead that the board convene in executive session to discuss the employment of McKayla Plett.

Cai Levy – no
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – no
Mickey Upton – yes

32.   Consider and take necessary action to acknowledge the return of the board to open session

Jack Cadenhead made the motion seconded by Claudia Willis that the board return to open session.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

33.   Board president's executive session statement.

Cai Levy made the statement that the board only discussed the employment of McKayla Plett in executive session.

34. Consider and take necessary action on the superintendent's recommendation to hire the following employees:

| Teachers: Moving from Temporary to Non-Career | Teachers: Temporary 2nd year | Teachers: Temporary New Hires |
|---|---|---|
| Lisa Battige | Carey Floyd | Derek Atyia – High School - social studies |
| Jessica Cagle | Josh Forrester | Tami Cole - Wilson |
| Dara Campbell | Laura Headley | Jennifer Choate - Wilson |
| Lisa Campbell | Shane Hodgins | Denise Dean - Middle School language arts |
| Kaleb Gordon | Shannon Hodgins | Susan Gates - Northwood |
| Aubree Holsapple* | Brian McAlvain | Peter Jankowiak - High School science |
| Valerie Jones | Ron Osborn* | McKayla Plett - Middle School math |
| Samantha Manuel | Delaney Pennock | Ben Rothrock - Northwood |
| Beth Moreno | Tywana Reese | John Walker - Alt Ed |
| Diana O'Connell | Thomas Scott | |
| John Phillips | Shane Stanfill | |
| Gina Riley | Donna Summy | *Counselors |
| Kena Utter | Chontaye Walter | |

| Summer School Teachers: | Summer School Assistants: | Driver Education Instructors: | Summer Sports: |
|---|---|---|---|
| Thurza Baker | Vicki Anderson | Blake Johnson | Blake Johnson - baseball |
| Charity Boyer | Denese Byrd | Eric Phillips | Eric Phillips - weightlifting |
| Jessica Cagle | Jordan Dobson | Wade Rigney | Shawn Snyder - baseball |
| Tammy Conner | Debbie Mitchell | | Charles Kemp - basketball |
| Lacey Davis | Cindi Mize | Summer Employees: | Pam Fletcher - softball |
| Janice Harvey | Kellye Swearingen | | Pam Fletcher - basketball |
| Kade Houck | | Brenda Bighead | Jeremy Bryan - basketball |
| DeAnn Leader | | Donna Dixon | Sybbia Phillips - volleyball |
| Carol Lloyd | Summer Cafeteria Workers: | Judy Robbins | McKayla Plett - softball |
| Bethany Moreno | | Alta Shiplett | Bobby Sanford - cross country |
| Angie Parks | Vicky Davidson | Kade Davis | Bobby Sanford - basketball |
| Brenna Pierce | Nina Kennedy | Kyaah Fox | Chontaye Walter - basketball |
| Tywana Reese | June Sexton | Christopher Gaddis | Harlon House - basketball |
| Peggy Robbins | Toni Stillwell | Uriah Hardeman | Wendell Reese - weightlifting |
| Joann Sharp | | Alexis Long | |
| Katie Sims | Cafeteria: | Tyler Miller | Middle School Secretary: |
| Kena Utter | Jackie Whiteside | Dake Reese | Pamela Baker |
| Ann Walker | | Shawn Snyder | |
| | | Charles Kemp | ISD: Kenneth Crawford |

APLT. APP. 052

Jack Cadenhead made the motion that all of the employees listed above be re-hired with the exception of Dara Campbell, Aubrey Holsapple, and Kena Utter. John Walker asked that his name be removed from the list. Amie Colclazier seconded the motion.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

Claudia Willis made the motion seconded by Cai Levy that Dara Campbell, Aubrey Holsapple, and Kena Utter be re-hired for the 2015/2016 school year.

Cai Levy – yes
Jack Cadenhead – no
Amie Colclazier – no
Claudia Willis – yes
Mickey Upton – no

35. New Business.

In new business, Superintendent Jeff Pritchard made the announcement that he and Assistant Superintendent Ronda Townsend would be retiring effective June 30, 2015.

Amie Colclazier made the motion seconded by Jack Cadenhead that the retirements of Jeff Pritchard and Ronda Townsend be accepted.

Cai Levy – no
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – no
Mickey Upton – yes

36. Adjourn.

Jack Cadenhead made the motion seconded by Claudia Willis that the meeting be adjourned.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

APLT. APP. 053

**Minutes**
**Seminole Public Schools Special Board Meeting**
**Thursday, June 12, 2014, 5:30 p.m.**
**Seminole Public Library – Goldie Barnett Room**
**424 N. Main, Seminole, OK  74868**

1.      President Jamie Mills called the meeting to order.

2.      Members present:  Jamie Mills, Cai Levy, Jack Cadenhead, Amie Colclazier, Claudia Willis

3.      CONSENT AGENDA:
        All of the following items, which concern reports and items of a routine nature normally
        approved at board meetings, will be approved by one vote, unless any member wishes to
        consider an item separately. The consent agenda consists of the discussion, consideration, and
        approval of the following items:

        A.      1.  Minutes of the May 12, 2014, board meeting
                2.  Minutes of the May 15, 2014 special board meeting
        B.      Financial reports:
                1.  Activity Accounts
                2.  Treasurer's Report
        C.      Encumbrances and changes as follows:
                1.  General Fund (FY14)- #1057-1836; #50003-50281
                2.  Building Fund (FY14)- None
                3.  Child Nutrition Fund (FY14) -#39; #50003-50020
        D.      Fundraisers:
        E.      Resignations
                1. Allen Briggs – effective May 23, 2014
                2. Paula Vandeveer – effective May 23, 2014
                3. Roxie Auld – effective June 4, 2014
        F.      Contracts:
                1.  Barlow and Associates
                2.  East Central Oklahoma On-Line Consortium Cooperative Agreement
                3.  Wewoka Public Schools Head Start Agreement August 1, 2014-July 31, 2014
                4.  Oklahoma School Assurance Group 2014/2015 Workers' Compensation Insurance
                5.  Pro-Top Cleaning – summer custodial services at the high school
                6.  Patricia Ford – School psychological consulting services
                7.  The City of Seminole – Seminole Softball Complex
                8.  Renaissance Architects- AIA Agreement
                9.  OSIG – School Insurance

        Cai Levy asked that items A 1 and A 2 be voted on separately. Jack Cadenhead made the
        motion seconded by Amie Colclazier to approve item A1.

        Jamie Mills – Yes
        Cai Levy – Yes
        Jack Cadenhead – Yes
        Amie Colclazier – Yes
        Claudia Willis - Yes

                                                                        APLT. APP. 054

6:16-cv-00182-RAW   Document 5-2   Filed in ED/OK on 05/19/16   Page 2 of 6

Amie Colclazier made the motion seconded by Claudia Willis that item A2 be approved.

Jamie Mills – Yes
Cai Levy – Abstain
Jack Cadenhead – Yes
Amie Colclazier – Yes
Claudia Willis - Yes

Jack Cadenhead made the motion seconded by Claudia Willis that items B through F9 be approved, with the exception of F8, the contract with Reniassance Architects.

Jamie Mills – Yes
Cai Levy – Yes
Jack Cadenhead – Yes
Amie Colclazier – Yes
Claudia Willis – Yes

Claudia Willis made the motion seconded by Cai Levy that item F8 be approved without the addendum to the contract.

Jamie Mills – Yes
Cai Levy – Yes
Jack Cadenhead – Yes
Amie Colclazier – Yes
Claudia Willis - Yes

4.      Introduction of guests and public discussion by those who requested audience.

        No one requested audience with the board.

5.      Administrative report.

        Mr. Pritchard gave the administrative report.

6.      Consider and take necessary action to approve or deny student transfers as recommended by the superintendent.

        Jamie Mills made the motion seconded by Claudia Willis that item 6 be approved.

        Jamie Mills – Yes
        Cai Levy – Yes
        Jack Cadenhead – Yes
        Amie Colclazier – Yes
        Claudia Willis - Yes

7.  Consider and take action on a motion approving the renewal of the lease-purchase of **Auditorium Renovations** for the fiscal year ending June 30, 2015 as required under the provisions of the Equipment Lease Purchase Agreement dated January 14, 2008 between the District and **Zion's First National Bank.**

Amie Colclazier made the motion seconded by Cai Levy that item 7 be approved.

Jamie Mills – Yes
Cai Levy – Yes
Jack Cadenhead – Yes
Amie Colclazier – Yes
Claudia Willis - Yes

8.  Consider and take necessary action to dispose of old school records.

Motion was made by Jack Cadenhead and seconded by Amie Colclazier that item 8 be approved.

Jamie Mills – Yes
Cai Levy – Yes
Jack Cadenhead – Yes
Amie Colclazier – Yes
Claudia Willis - Yes

9.  Consider and take necessary action to approve "Temporary Appropriations" for fiscal year 2014-2015.

| | |
|---|---|
| General Fund | 12,654,617.00 |
| Building Fund | 1,315,657.00 |
| Child Nutrition Fund | 1,051,787.00 |
| Patterson Scholarship | 500.00 |
| Lancaster Scholarship | 500.00 |

Cai Levy made the motion seconded by Claudia Willis that item 9 be approved.

Jamie Mills – Yes
Cai Levy – Yes
Jack Cadenhead – Yes
Amie Colclazier – Yes
Claudia Willis - Yes

6:16-cv-00182-RAW    Document 5-2    Filed in ED/OK on 05/19/16    Page 4 of 6

10. Consider and take necessary action to declare miscellaneous copiers, yard equipment, obsolete technology items, and athletic uniforms as surplus.

Jamie Mills made the motion seconded by Cai Levy that item 10 be approved.

Jamie Mills – Yes
Cai Levy – Yes
Jack Cadenhead – Yes
Amie Colclazier – Yes
Claudia Willis - Yes

11. Discussion of and possible action on an amendment to the Seminole High School Student-Parent Handbook concerning wireless communication devices.

12. Discussion of and possible action on a policy to be added to the Seminole High School Student-Parent Handbook concerning attire at commencement ceremonies.

13. Discussion of and possible action on amendments to the Seminole High School Student-Parent Handbook concerning school dances and prom rules.

14. Discussion of and possible action on amendments to the Seminole High School Student-Parent Handbook concerning the school dress code.

15. Discussion of and possible action on amendments to the Seminole School Board Policy Handbook concerning faculty dress and appearance.

16. Discussion of and possible action on amendments to the Seminole School Board Policy Handbook concerning consideration of transfer applications.

The board discussed items 11-16. No action was taken on any of the items.

17. PROPOSED EXECUTIVE SESSION TO DISCUSS THE EMPLOYMENT OF THOSE CERTIFIED AND/OR NON-CERTIFIED PERSONNEL LISTED IN AGENDA ITEMS 21, 22 and 23 PURSUANT TO 25 O.S.SEC. 307 (B)(1).

18. Consider and take necessary action to convene in executive session.

Jack Cadenhead made the motion seconded by Amie Colclazier that the board convene in executive session.

Jamie Mills – Yes
Cai Levy – Yes
Jack Cadenhead – Yes
Amie Colclazier – Yes
Claudia Willis - Yes

19.    Consider and take necessary action to acknowledge the return of the board to open session.

       Cai Levy made the motion seconded by Amie Colclazier that the board return to open session.

       Jamie Mills – Yes
       Cai Levy – Yes
       Jack Cadenhead – Yes
       Amie Colclazier – Yes
       Claudia Willis - Yes

20.    Board president's executive session statement.

       President Jamie Mills made the statement that the only things discussed in executive session
       were agenda items 21, 22, and 23.

21.    Consider and take necessary action to approve the following assignments:
       A.  Angela Willmett - Principal at Betty L. Smith Early Childhood Center
       B.  Jaycie Cossey -  Northwood Counselor

       Jack Cadenhead made the motion seconded by Amie Colclazier that item 21 be approved.

       Jamie Mills – Yes
       Cai Levy – Yes
       Jack Cadenhead – Yes
       Amie Colclazier – Yes
       Claudia Willis - Yes

22.    Consider and take necessary action to accept the superintendent's recommendation to employ
       the certified personnel as listed below:
       A.  Lisa Battige - Northwood – temporary contract
       B.  Richard Butler – High school – temporary contract
       C.  Jessica Cagle – Northwood – temporary contract
       D.  Dara Campbell – High school – temporary contract
       E.  Lisa Campbell – Middle school – temporary contract
       F.  Jennifer Fixico – Wilson – temporary contract
       G.  Whitney Gonzales – High school
       H.  Kaleb Gordon – High school – temporary contract
       I.   Kristi Hammond – Northwood
       J.   Shane Hodgins – Northwood – temporary contract
       K.  Aubrey Holsapple – Wilson – temporary contract
       L.  Brian Johnson – Northwood
       M.  Lucinthia Johnson – Northwood – temporary contract
       N.  Valerie Jones – Northwood – temporary contract
       O.  Samantha Manuel – High school – temporary contract
       P.   Beth Moreno – BLS – temporary contract
       Q.  Dianna O'Connell – High school – temporary contract
       R.  Eric Phillips – High school

S.  Gina Riley – Middle school – temporary contract
T.  Kena Utter – Wilson – temporary contract
U.  Shannon Hodgins – Northwood – temporary contract
V.  Thomas Scott – High school – temporary contract
W. Shane Stanfill – High school – temporary contract
X.  Laura Headley – High school – temporary contract
Y.  Donna Summy – Northwood – temporary contract

Amie Colclazier made the motion seconded by Cai Levy that item 22 be approved.

Jamie Mills – Yes
Cai Levy – Yes
Jack Cadenhead – Yes
Amie Colclazier – Yes
Claudia Willis - Yes

23.    Consider and take necessary action to accept the superintendent's recommendation to employ
the certified/non-certified personnel as listed below:
A.  Teresa Smith – classroom aide
B.  Wendell Reese – teacher's assistant
C.  Bobby Sanford – summer cross country coach, summer freshman basketball coach
D.  Chontaye Walter – summer basketball coach
E.  Phillip Botsford – summer help
F.  Alta Shiplett – summer help
G.  Eric Phillips – driver's ed – July

Cai Levy made the motion seconded by Claudia Willis that item 23 be approved.

Jamie Mills – Yes
Cai Levy – Yes
Jack Cadenhead – Yes
Amie Colclazier – Yes
Claudia Willis - Yes

24.    Adjourn.

Jamie Mills made the motion seconded by Amie Colclazier to adjourn the meeting.

Jamie Mills – Yes
Cai Levy – Yes
Jack Cadenhead – Yes
Amie Colclazier – Yes
Claudia Willis - Yes

APLT. APP. 059

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| KENA UTTER, AUBREE HOLSAPPLE, and DARA CAMPBELL, | ) ) ) | |
| **Plaintiffs** | ) ) | |
| -vs- | ) ) | **CIV-16-00182-RAW** |
| AMIE COLCLAZIER, JACK CADENHEAD, MICKEY UPTON, and INDEPENDENT SCHOOL DISTRICT NO. I-01 OF SEMINOLE COUNTY, STATE OF OKLAHOMA, a/k/a SEMINOLE SCHOOL DISTRICT, | ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## ANSWER

COMES NOW, Defendants, Amie Colclazier, Jack Cadenhead, Mickey Upton, and Independent School District No. I-01 of Seminole County, State of Oklahoma, a/k/a Seminole School District and submit the following answer to Plaintiffs' Amended Petition.

1.  Defendants admit the allegations contained in Paragraphs 2, 4, 5, 6, 7, 8, 9, 10, 27, 35, 47, and 49 - 52 of Plaintiffs' Amended Petition.

2.  Defendants deny the allegations contained in Paragraphs 1, 3, 13, 15,17,19, 21,23, 25, 30, 36-46,48-58,65, 66, 72-77 of Plaintiffs' Amended Petition.

G:\Seminole\Utter\Pldgs\Answer.wpd

3.  Paragraphs 11, 12, 14, 16, 18, 20, 22, and 24 of Plaintiffs' Amended Petition are mere citations of law instead of factual allegations and therefore do not need a response.

4.  Defendants have no knowledge of the allegations contained in Paragraph 28, 32, 33, and 34 of the Plaintiffs' Amended Petition and therefore deny same.

5.  Defendants admit that Plaintiffs were recommended for rehire, but otherwise deny the allegations contained in Paragraph 26 of Plaintiffs' Amended Petition.

6.  Defendants admit that Plaintiff Dara Campbell was employed as a teacher. Defendants have no knowledge of the rest of the allegations contained in Paragraph 29 of Plaintiffs' Amended Petition and therefore deny same.

7.   Defendants admit that Plaintiff Kena Utter is an "eligible employee" under the FMLA. Defendants have no knowledge of the rest of the allegations contained in Paragraph 31 of Plaintiffs' Amended Petition and therefore deny same.

8.  Defendants admit at the June 11, 2015 board meeting, the Board Members, representing a majority of the five member board and acting under color of state law, voted to terminate and/or not to renew Plaintiffs' contracts and did so without any written notice and without any due process hearing, but otherwise deny the allegations contained in Paragraph 40 of Plaintiffs' Amended Petition.

9.  Defendants admit that the Superintendent of Seminole Public Schools resigned at the close of the June 11, 2015, board meeting, but otherwise deny the allegations contained in Paragraph 46 of Plaintiffs' Amended Petition.

APLT. APP. 061

10.     Defendants filed a Partial Motion To Dismiss and defer to respond to Counts I (Paragraphs 59-61(a)-(c)), II (Paragraphs 62-64), IV (Paragraphs 67-68(a)-(I)), and V (Paragraphs 69-71(a)-(d)) of Plaintiffs' Amended Petition until this court has ruled upon the motion.

### AFFIRMATIVE DEFENSES

1.     Plaintiffs fail to state a claim upon which relief can be granted.

**WHEREFORE**, having fully answered, Defendants pray that Plaintiffs take nothing by their Amended Petition, that their prayer for relief be denied, and that their claims be dismissed together with costs and attorneys fees.

S/Laura L. Holmgren-Ganz
Laura L. Holmes, OBA # 14748
Laura L. Holmgren-Ganz, OBA #12342
Attorneys For Defendants, School District, Amie
Colclazier, Jack Cadenhead and Mickey Upton
The Center For Education Law, P.C.
900 N. Broadway, Suite 300
Oklahoma City, OK 73102
Telephone: (405) 528-2800
Facsimile: (405) 528-5800
E-mail: LHolmes@cfel.com
E-mail: LGanz@cfel.com

G:\Seminole\Utter\Pldgs\Answer.wpd                    -3-

APLT. APP. 062

## **Certificate of Service**

I hereby certify that on May 20, 2016, I filed the attached document with the

Clerk of Court.  Based on the records currently on file in this case, the Clerk of Court will

transmit a Notice of Electronic Filing to those registered participants of the Electronic Case

Filing System: Heath Merchen

S/Laura L. Holmgren-Ganz
Laura L. Holmgren-Ganz

APLT. APP. 063

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENA UTTER, AUBREE HOLSAPPLE, and DARA CAMPBELL, | ) ) ) |
| Plaintiffs | ) ) |
| -vs- | ) CIV-16-00182-RAW ) |
| AMIE COLCLAZIER, JACK CADENHEAD, MICKEY UPTON, and INDEPENDENT SCHOOL DISTRICT NO. I-01 OF SEMINOLE COUNTY, STATE OF OKLAHOMA, a/k/a SEMINOLE SCHOOL DISTRICT, | ) ) ) ) ) ) ) |
| Defendants. | ) |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
PARTIAL MOTION TO DISMISS**

Come now the Plaintiffs, by and through their attorney of record, Heath Merchen, and submit the following response to Defendants' Partial Motion to Dismiss and Plaintiffs' Brief in Support.

**STANDARD OF REVIEW**

In assessing a motion to dismiss, the court must accept the factual allegations as true and consider them in the light most favorable to the plaintiff. *Tomlinson v. El Paso Corp.*, 653 F.3d 1281, 1285-86 (10th Cir. 2011) (citing *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), *cert. denied*, 132 S.Ct. 1574 (2012)). A request for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) requires the court to determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

APLT. APP. 064

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In the present case, as is explained more fully below, Plaintiffs have more than adequately alleged facts that support their claims for breach of contract, failure to comply with the Teacher Due Process Act, and violations of the Plaintiffs' constitutionally protected property and liberty interests.

## ARGUMENT AND AUTHORITY

### Defendants Violated Plaintiffs' Rights Under
### The Collective Bargaining Agreement and Under the Teacher Due Process Act

Plaintiffs have alleged multiple violations of the negotiated agreement in addition to those related to the Teacher Due Process Act, 70 O.S. 6-101.20 *et. seq*.  Specifically, as stated in the Petition, the collective bargaining agreement expressly requires that the board "abide by all state and federal statutes, rulings and regulations."  The regulations incorporated into the contract by this language include OKLA. ADMIN. CODE § 210:35-3-48 2016 (a)(3) which provides: "The local board and its individual members shall refrain from involvement in or interference with the administrative functions of the school."   The contract further specifies that evaluations (constituting the process by which a teacher's performance is assessed) may be conducted only by the principal. (Article XI, Section 11.2, of the negotiated agreement states that "Each evaluation shall be based upon the evaluator's actual observation and knowledge of the teacher evaluated while performing his/her job function.  Teachers will be evaluated by principals, as required by law.")

The board's action in evaluating the Plaintiffs' performance during the term of their contract independent of the principal, then acting upon their own unlawful evaluation by removing Plaintiffs' names from the rehire list, constitute contractual violations separate and apart from allegations related to the Teacher Due Process Act.  Similarly, the Defendants' failure to comply

2

with the Oklahoma Open Meeting Act, 25 O.S. § 301 *et seq.* with respect to Plaintiffs removal

from the rehire list constitutes a separate and distinct contractual violation.  The Defendants'

motion is predicated solely upon the application of the Teacher Due Process Act and ignores the

remainder of the contractual violations alleged by Plaintiffs.

Further, as stated in the Plaintiffs' Petition, Plaintiffs have alleged a violation of the

Oklahoma Open Meeting Act, 25 O.S. § 301 *et seq.* which would serve to invalidate the board's

removal of the Plaintiffs' names from the rehire list.  As the minutes on June 11, 2015 in the

Defendants' Motion reflect, the board received a list of names from the superintendent for contract

renewal.  As is alleged in Plaintiffs' Petition, prior to that board meeting, the three board members

intentionally and willfully discussed their plan and desire to remove the Plaintiffs from the list and

did so outside of any public meeting or executive session, violating the Open Meeting Act (*See*

1981 OK AG 69 (holding that the Open Meeting Act prohibits informal meetings where a majority

of the board meet separately with one another outside of a public meeting, resulting in later formal

board action)).   Under the terms of the act itself, "Any action taken in willful violation of this act

shall be invalid." 25 O.S. § 313.

Under the Open Meeting Act, the board's action of removing the Plaintiffs' names from

the rehire list is invalid and therefore the entire list of teachers, including Plaintiffs, will be

considered approved for rehire on the same contract terms that existed previously (though their

statutory status changes).  Once the board's removal of Plaintiffs' names from the rehire list is

invalidated, Plaintiffs would be and are probationary teachers entitled to the full protections of the

Teacher Due Process Act.

Plaintiffs have raised multiple contractual violations which are unaddressed by

Defendants' motion.  As for the violations related to the Teacher Due Process Act, once the board's

3

removal of Plaintiffs' names from the rehire list is invalidated, the Plaintiffs will be and are entitled to the full protections accorded by the act.

### Defendants Violated Plaintiffs
### Substantive Due Process Interests

Under the United State Supreme Court ruling in *Perry v. Sindermann*, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed.2d 570 (1972), the Plaintiffs had an objective and reasonable expectation that their contracts would be renewed based on their successful teaching experience with the school district, the principal's recommendation for rehire, the superintendent's recommendation for rehire, and the absence of any lawful motive for the board to remove their names from the rehire list.

The *Sindermann* court held that a non-tenured professor at Odessa Junior College in Texas had a property interest in the renewal of his employment where the college did not have a formal tenure system, the professor had served at the college with distinction, and where other factors led to an objective expectation of continued employment, 408 U.S. at 601, 92 S.Ct. at 2694. Specifically, the Court stated:

> A teacher ... who has held his position for a number of years, might be able to show from the circumstances of his service—and from other relevant facts—that he has a legitimate claim of entitlement to job tenure. Just as this Court has found there to be a 'common law of a particular industry or of a particular plant' that may supplement a collective-bargaining agreement, [citations omitted], so there may be an 'unwritten common law' in a particular university that certain employees shall have the equivalent of tenure. *This is particularly likely in a college or university ... that has no explicit tenure system even for senior members of its faculty, but that nonetheless may have created such a system in practice.*

*Id. at 603, 92 S.Ct. 2694 (emphasis added). See also Wells v. Dallas Indep. Sch. Dist.,* 793 F.2d 679 (5th Cir.1986) (upholding district court's finding that professor did have a property interest in continued employment); *Lucas v. Chapman,* 430 F.2d 945 (5th Cir.1970) (finding that a professor's "long employment in a continuing relationship through the use of renewals of short-

4

term contracts was sufficient to give him the necessary expectancy of re-employment that constituted a protectable interest"); *Ferguson v. Thomas,* 430 F.2d 852 (5th Cir.1970) (holding that a non-tenured professor may acquire a protectable property interest in continued employment if he has a reasonable expectation of the same); *Yates v. Bd. of Regents,* 654 F.Supp. 979 (E.D.Tex.1987) (finding that the court could "not rule as a matter of law that plaintiff had no property interest in continued employment").

As in *Sindermann*, there is no explicit system for a temporary teacher to earn probationary status in the Seminole School District. Rather, it is understood that, barring financial hardship or discontinuation of a program, a teacher with successive successful temporary contracts who receives positive evaluations and is recommended for rehire by the superintendent, will achieve probationary status and due process protections (the equivalent of tenure). There is no other reported case or decision, in fact no case on record, where the Seminole School Board (or any other Oklahoma school board) has, without citing financial need or program discontinuation, refused to rehire a temporary teacher after receiving a recommendation to rehire from the principal and superintendent.

In the present case, the expectation of rehire was shared by the two non-colluding board members, the superintendent, the assistant superintendent and the Plaintiffs' principals, creating an even more objective expectation in rehire and "tenure" than existed in *Sindermann*. (In *Sindermann*, the employee's supervisor and administrators sided with the board, not the employee.) The expectation was so strong, in fact, that as Plaintiffs have alleged in their Petition and as is reflected in the board minutes, the superintendent and assistant superintendent immediately resigned in protest after the board's vote. Furthermore, as stated above, the colluding board members in the present case gave no explanation or rationale for their action on the record,

5

and the ancillary evidence of their underlying motivation demonstrates both unlawful and retaliatory intent. Conversely, each of the cases cited by the Defendants involved purely subjective expectations of continued employment or tenure where the employer's administrators and governing board were acting in accord.

Beyond the reasonable expectation of rehire, however, is the fact that even where the government could deny an applicant a benefit for any number of legitimate reasons, the government may not base the denial on a reason that violates the applicant's federally-protected rights. *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) and *Smith v. Losee,* 1973 485 F.2d 334 (10th Cir. 1973). More particularly, the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on the teacher's exercise of first and fourteenth amendment rights. *Id.*

In *Losee* as in the case at bar, the employer gave no justifiable grounds for nonrenewing the untenured employee's contract and the employee alleged retaliation for exercise of his first amendment rights. The Court found a constitutionally-protected interest had been violated, stating as follows:

> In finding No. 23, the trial court found that "[t]here were no justifiable grounds for denying plaintiff permanent status on the faculty of Dixie Junior College or for denying him employment at the college after the end of the 1968-1969 academic year." The defendants in this case did not urge any "justifiable grounds" for Smith's dismissal. They were, and still are, apparently suffering under the misapprehension that Smith, by reason of his lack of permanent status on the college's faculty, could be dismissed for any reason whatsoever, even for the relatively harmless exercise of his constitutional rights. Such, of course, is not the law. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L. Ed.2d 570 (1972).

*Id*. at 340.

A school board may act only in furtherance of legitimate state interests and cannot fail to rehire by predicating its decision on the teacher's exercise of free speech or the exercise of other

APLT. APP. 069

federally-protected rights. The individual board member's actions must be based on permissible intentions and on knowledge of the statutory and constitutional rights of the teachers affected. *See Mason v. Oklahoma Turnpike Authority,* 115 F.3d 144 (10th Cir. 1997) (Holding that the first amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance).

Plaintiffs had an objective expectation of being rehired based on the factors enunciated in *Sindermann* as well as a right to continue employment free of retaliation for exercise of their constitutional and federally-protected statutory rights. The Defendants, having provided no pre- or post-deprivational process, have violated Plaintiffs' constitutional rights.

## Defendants Violated Plaintiffs' Constitutionally-Protected Liberty Interests

The Defendants' motion and brief fails to distinguish between two separate and distinct types of constitutional liberty interests. Specifically, the "stigma plus" liberty interest theory is distinct and carries with it a different standard than the "reputation plus" theory of liberty interest at issue in the present case. The reputation-plus theory is implicated when the government makes a "charge against [the employee] that might seriously damage his standing and associations in the community," *Roth,* 408 U.S. at 573, 92 S.Ct. 2701, and does so in connection with a termination or other change in employment status. *See O'Donnell v. Barry,* 148 F.3d 1126, 1140 (D.C.Cir.1998). The stigma theory relates to situations where a government action "foreclosed [the employee's] freedom to take advantage of other employment opportunities." *Roth,* 408 U.S. at 573, 92 S.Ct. 2701. Under the "reputation-plus" theory, an individual loses her liberty interest in pursuing her chosen profession when "defamation [is] accompanied by a discharge from government employment or at least a demotion in rank and pay." *O'Donnell v. Barry,* 148 F.3d 1126, 1139–41 (D.C.Cir.1998). *See also Dee v. Borough of Dunmore,* 549 F.3d 225 (3rd Cir. 2008)

APLT. APP. 070

(holding suspension coupled with public statements that employee failed to meet training requirements were sufficient to establish violation of liberty interest).

Each of the cases cited by the Defendants focus on the stigma plus standard, requiring the heightened level of harm that forecloses other employment. In the "reputation plus" standard, however, it is a combination of government action and defamation that implicates the constitutional liberty interest of the employee. *See O'Donnell v. Barry,* 148 F.3d 1126, 1140 (D.C.Cir.1998) ("Although the conceptual basis for reputation-plus claims is not fully clear, it presumably rests on the fact that official criticism will carry much more weight if the person criticized is at the same time demoted or fired."). *See also Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1106 (D.C.Cir.1985) (holding that damage to one's reputation plus termination from employment would jeopardize that individual's future employment opportunities with the government and thus constitutes a due process violation). This "reputation plus" standard was recognized in the 10th circuit by the nonbinding and unpublished decision of *Hadley v. Moon,* 1994 38 F.3d 1220 (10th Cir. 1994), a copy of which is attached. *See also Corbitt v. Andersen,* 778 F.2d 1471, 1474-75 (10th Cir.1985) (holding that damage to reputation plus the impairment of future employment constitutes a due process violation).

The board member's statements in the present case constitute defamation that, when coupled with the Defendants removal of Plaintiffs' names from the rehire list, deprive Plaintiffs of their constitutionally protected liberty interests. When notice and an opportunity to be heard are not provided, a plaintiff may bring "a due process claim for deprivation of a liberty interest in reputation." *Hill v. Borough of Kutztown,* 455 F.3d 225, 236 (3d Cir.2006) ("a public employee who is defamed in the course of being terminated or constructively discharged satisfies the 'stigma-plus' test even if, as a matter of state law, he lacks a property interest in the job he lost."

APLT. APP. 071

*Id.* at 238). *See also Pendleton v. City of Haverhill,* 156 F.3d 57, 64 (1st Cir.1998) (Damage to one's reputation plus loss of a job may state a constitutional claim—if the employer is a public entity). It is further important to note that Plaintiffs also allege retaliation for exercise of first amendment freedoms as well as retaliation for exercise of rights under the Family Medical Leave Act, each of which constitute cognizable harm separate and apart from defamation alone.

In the present case the statements regarding the Plaintiffs' "poor teaching," undefined "misconduct," and "ineffective teaching" were made as a justification for the board's removal of the Plaintiffs from the rehire list. As Plaintiffs have alleged, those statements are false and defamatory. When coupled with the Defendants' refusal to rehire, these circumstances meet the "reputation plus" test required to establish a constitutional liberty interest. Further, in the present case the defamatory statements also accompany retaliation for exercise of first amendment rights and retaliation for the exercise of rights under the Family Medical Leave Act, infringing on substantive constitutional and statutory rights beyond the Plaintiffs' interest in contract renewal.

## SUMMARY

Plaintiffs respectfully request that Defendants' Partial Motion to Dismiss be denied for the following reasons:

1. Plaintiffs have asserted numerous contractual violations unrelated to the Teacher Due Process Act which the Defendants' brief fails to address.

2. The Plaintiffs qualify for protection under the Teacher Due Process Act because the board violated the Open Meeting Act when it removed their names from the rehire list. Therefore their names should have been included, meaning they were rehired and have the protections afforded probationary teachers under the Teacher Due Process Act.

APLT. APP. 072

3. The Plaintiffs had an objective expectation in attaining the "tenure" like protection afforded by probationary status based on the representations of their administrators, the superintendent's inclusion of their names on the rehire list, their successful teaching history, their exemplary evaluations, the lack of any lawful justification for removing their names from the rehire list, and the expectations of the superintendent, assistant superintendent, principals and non-colluding board members that Plaintiffs would be rehired.

4. The Plaintiffs meet the "reputation plus" liberty interest test because of the combination of defamatory statements by the board and Plaintiffs removal from the rehire list.

Respectfully submitted,

/sHeath Merchen_____
Heath Merchen, OBA #19391
Oklahoma Education Association
323 E. Madison
Oklahoma City, OK  73105
Telephone: (405)528-7785
Facsimile:  (405)523-4392
hmerchen@okea.org
Attorney for Plaintiffs

**CERTIFICATE OF MAILING**

This is to certify that on July 15, 2016, a true and correct copy of the above and foregoing pleading was electronically filed with the court and mailed, postage prepaid, to the following:

Laura L. Holmes, OBA #14748
Laura L. Holmgren-Ganz, OBA #12342
900 N. Broadway, Suite 300
Oklahoma City, OK 73102
LHolmes@cfel.com
LGanz@cfel.com

s/Heath Merchen_____
Attorney for Plaintiffs

10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENA UTTER, AUBREE HOLSAPPLE, and DARA CAMPBELL,  )  )  )  | |
| **Plaintiffs**  )  )  | |
| -vs-  )  )  | **CIV-16-00182-RAW** |
| AMIE COLCLAZIER, JACK CADENHEAD, MICKEY UPTON, and INDEPENDENT SCHOOL DISTRICT NO. I-01 OF SEMINOLE COUNTY, STATE OF OKLAHOMA, a/k/a SEMINOLE SCHOOL DISTRICT,  )  )  )  )  )  )  )  )  | |
| **Defendants.**  )  | |

## DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' PARTIAL MOTION TO DISMISS

Defendants, Independent School District No. I-01 of Seminole County, Oklahoma, a/k/a Seminole School District ("District"), Amie Colclazier, Jack Cadenhead and Mickey Upton ("Individual Defendants") (collectively referred to as "Defendants"), submit this reply to Plaintiffs's Response to Defendants' Partial Motion to Dismiss.

## ARGUMENT AND AUTHORITY

**Proposition I: Plaintiffs' Counts I , II and V Fail to State a Claim Because Temporary Teachers Are Not Entitled Due Process for Nonrenewal of Their Contracts.**

Plaintiffs allege that Defendants violated multiple sections of the Teacher Due Process Act ("TDPA") and the Collective Bargaining Agreement ("CBA"). Yet, Plaintiffs admit that they were employed as temporary teachers during the 2014-2015 school year. (Amended

APLT. APP. 074

Petition ¶ 5, Doc. No. 3-3). Plaintiffs admit that they were employed for the 2014-2015 school year and that their contracts were due to be renewed at the June 11, 2015, School Board meeting. (Amended Petition ¶¶ 13 & 35, Doc. No. 3-3). In other words, their contracts had expired prior to the June 11, 2015 Board Meeting. Plaintiffs also allege that the CBA followed state law. (Amended Petition ¶ ¶10 & 12, Doc. No. 3-3). The Teacher's Due Process Act states that it **does not** apply to temporary teachers. 70 O.S. §6-101.23.[1] Thus, according to Plaintiffs' Amended Petition, the CBA, and state law, Plaintiffs were not entitled to due process.  Finally, even if the court considers the additional allegations that Plaintiffs now raise in their Response to Defendants' Partial Motion to Dismiss, Plaintiffs were not deprived of their due process under the TDPA, the Open Meeting Act, or the 14th Amendment.[2]

Plaintiffs fail to shed any light as to any legal basis for due process hearing for a property interest under Section 1983. As previously stated, neither the CBA, Plaintiffs' individual contracts or state law create a property interest in Plaintiffs' continued

---

[1] Any due process rights that Plaintiffs would have had only existed **during** their employment year for 2014-2015. Such rights expired on the last day of the 2014-2015 school year which Plaintiffs have admitted in their Amended Petition.

[2] Plaintiffs allege that Individual Defendants violated the Open Meeting Act, which they vehemently deny. However, even voiding the action taken by the Board, the "vote of nonrenewal", would not change Plaintiffs employment status because their contracts automatically terminated at the end of the school year. The court should note that Plaintiffs' Count III is not part of Defendants' Partial Motion to Dismiss and is irrelevant as to this motion.

APLT. APP. 075

employment. Likewise, case law cited by Plaintiffs is distinguishable. Unlike *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, L.Ed.2d 570 (1972), District does not have a *de facto* tenure system. Rather, Plaintiffs' temporary contracts, the CBA, and state law clearly state that there is **no expectation to continued employment**. Unlike *Wells v. Dallas Ind. Sch. Dist.*, 793 F.2d 679 (5th Cir. 1986), Plaintiffs did not have a multi-year contract with District. Their contracts specifically stated that they were one year temporary contracts for only the 2014-2015 school year. *Lucas v. Chapman*, 430 F.2d 945 (5th Cir. 1970), concerned a veteran teacher/administrator who had been employed with the same school district for eleven years on temporary contracts. In this case, Plaintiffs had only been employed with District for two years. In both *Ferguson v. Thomas,* 430 F2d 852 (5th Cir. 1970) and *Yates v. Bd. of Regents,* 654 F.Supp. 979 (E.D. Tex. 1987), the colleges' policies could only nonrenew teachers' contracts or terminate teachers "for cause".  Not so in our case – they were temporary contracts with automatic termination dates.  Both *Perry,* 408 U.S. 593*, Smith v. Losee,* 485 F.2d 334 (10th Cir. 1973), and  *Mason v. Oklahoma Turnpike Authority,* 115 F.3d 144 (10th Cir. 1997), are First Amendment cases. Although Plaintiff Utter claims Defendants deprived her of her First Amendment rights, that claim is not part of the basis for Defendants' Partial Motion to Dismiss. Thus, at this juncture of the case, Plaintiff's argument is irrelevant.

APLT. APP. 076

**Proposition II:  Plaintiffs Fail to Establish Any Liberty Interests.**

Plaintiffs **now** claim that Defendants deprived them of their liberty interest under the "reputation-plus" theory, yet their Amended Petition claims that Defendants actions were stigmatizing. (Amended Petition ¶68 (c) & (d), Doc. No. 3-3). Since Plaintiffs' Reply to Defendants' Motion to Dismiss fails to address a "stigmatizing-plus" liberty claim as they claimed in their Amended Petition (Amended Petition ¶68 (c) & (d), Doc. No. 3-3), it is deemed admitted that no such claim exist.

Under the "reputation-plus" theory, a claim is "actionable only where the terminating employer has disseminated the reasons for the termination and such dissemination is defamatory . . . The reasons, moreover, must not 'pertain[] solely to plaintiff's job performance' because 'dismissal for job performance . . . does not carry with it the sort of opprobrium sufficient to constitute a deprivation of liberty.'" *McGinnis v. District of Columbia,* 65 F.Supp.3d 203, 220 (D.D.C. 2014).  Plaintiffs hang their "reputation-plus" liberty claim on *O'Donnell v. Barry*, 148 F.3d 1126 (D.C.Cir. 1998). In *O'Donnell*, the court found no liberty interest had been violated because: (1) the defamation and the discharge did not occur together; and, (2) the "stigma" or other disability that foreclosed plaintiff's freedom to take other job opportunities fell short. *Id.* at 1140-1141. "Even if the demotion did set him back a step on his career path (which may or may not be true), that would fall markedly short of showing that his ability to pursue his chosen profession has been seriously affected, if not destroyed." *Id.* at 1141-1142.

APLT. APP. 077

In this case, Plaintiffs allege that Defendants disseminated to a third party that "they had good reasons" and that Plaintiffs were "not effective at their jobs". (Amended Petition ¶¶53 and 68 (c) & (d), Doc. No. 3-3). Plaintiffs claim lost wages but fail to claim that any alleged statements by Defendants foreclosed or severely limited their ability to pursue careers in education.(Amended Petition ¶68(h), Doc. No. 3-3). Since the only alleged statements by Defendants were job performance related and Plaintiffs only claim lost wages as damages, they fail to meet the "reputation-plus" liberty test. Their claim of deprivation of liberty under Section 1983 should be dismissed.

The case law cited by Plaintiffs is distinguishable from this case. In the cases cited by Plaintiffs, either the employer made public statements about plaintiff's dishonesty; falsely accused plaintiff of being a sex offender or drug possession; falsely accused that plaintiff was not professionally qualified as a professional engineer or a psychologist; or, smeared plaintiff's reputation on multiple occasions all over town. In *Corbitt v. Anderson,* 778 F.2d 1471 (10th Cir. 1985), defendant went behind plaintiff's back to potential employers and the state board examiner's office suggesting plaintiff was unprofessional. The court stated that, "we are dealing with something more than a damaged reputation . . . Anderson not only defamed Corbitt, but created a stigma that 'foreclosed his freedom to take advantage of other employment opportunities.'" *Id.* at 1474-1475. In this case, Plaintiffs' allege that Defendants commented on their job performance - - that is not enough to meet a liberty claim. Nor have Plaintiffs alleged that Defendants shut the door on their careers as teachers. In other words,

-5-

Plaintiffs have not been denied of their liberty interest under Section 1983. Plaintiffs' Count IV claim for deprivation of due process of their liberty interest under Section 1983 should be dismissed.

## **CONCLUSION:**

Plaintiffs' Counts I, II, IV and V of their Amended Petition should be dismissed because:

1.  Plaintiffs were teachers on temporary contracts and are NOT entitled to due process procedures under the TDPA, individual temporary contracts or the collective bargaining agreement;

2.  Since Plaintiffs had temporary contracts, no property interest existed under Oklahoma law, and they have no claim under 42 U.S.C. §1983 for deprivation of due process of property;

3.  Plaintiffs' nonrenewal/termination of contracts and any alleged statements by Board Members were not stigmatizing in accordance with *Roth* and did not deny Plaintiffs of their freedom to take advantage of other employment opportunities; and,

4.  Plaintiffs' nonrenewal/termination of contracts and any alleged comments by Board Members, do not meet the standards for a "reputation-plus" liberty claim.

Thus, for the reasons, stated above, Defendants, Amie Colclazier, Jack Cadenhead, Mickey

APLT. APP. 079

Upton, and Independent School District No. I-01 of Seminole County, State of Oklahoma,

a/k/a Seminole School District, respectfully move this Court to dismiss Counts I, II, IV and

V of Plaintiff's Amended Petition.

THE CENTER FOR EDUCATION LAW, P.C.

s/Laura L. Holmgren-Ganz

Laura L. Holmes, OBA #14748
Laura L. Holmgren-Ganz, OBA #12342
900 N. Broadway, Suite 300
Oklahoma City, OK 73102
Telephone: (405) 528-2800
Facsimile: (405) 528-5800
LHolmes@cfel.com
LGanz@cfel.com
Attorneys for Defendants

**Certificate of Service**

I hereby certify that on July 29, 2016, I filed the attached document with the Clerk of

Court. Based on the records currently on file in this case, the Clerk of Court will transmit

a Notice of Electronic Filing to those registered participants of the electronic Case Filing

System: Heath Merchen.

S/Laura L. Holmgren-Ganz

Laura L. Holmgren-Ganz

G:\Seminole\Utter\Pldgs\Def. Reply.wpd

-7-

APLT. APP. 080

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1.  KENA UTTER,<br>2.  AUBREE HOLSAPPLE, and<br>3.  DARA CAMPBELL,<br><br>           Plaintiffs,<br><br>           v.<br><br>1.  AMIE COLCLAZIER,<br>2.  JACK CADENHEAD,<br>3.  MICKEY UPTON, and<br>4.  INDEPENDENT<br>SCHOOL DISTRICT NO. I-01 OF<br>SEMINOLE COUNTY, STATE OF<br>OKLAHOMA, a/k/a SEMINOLE SCHOOL<br>DISTRICT,<br><br>           Defendants. | Case No. CIV-16-182-RAW |

## ORDER

Plaintiffs filed this action on April 19, 2016 in the District Court of Seminole County

Oklahoma against the Seminole School District and three individual board members.

Defendants removed this action to this court on May 13, 2016.  Now before the court is

Defendants' motion to dismiss counts 1, 2, 4 and 5 of Plaintiffs' eight claims [Docket No. 5].

Additionally, Defendants request that the § 1983 claims against the individual defendant board

members in their official capacity be dismissed.  Claims brought against a state official in his or

her official capacity are construed as claims against the State and are barred by the Eleventh

Amendment.[1]  The court therefore dismisses the § 1983 claims against the individual board members in their official capacities.

The following claims are at issue herein: (Count 1) breach of contract against the School District; (Count 2) violation of Oklahoma's Teacher Due Process Act, 70 OKLA. STAT. §§ 6-101.20 *et seq.* (hereinafter "TDPA") against the School District; (Count 4) § 1983 violation of due process rights in liberty interests against all Defendants; and (Count 5) § 1983 and Oklahoma Constitutional violation of due process rights in property interests against all Defendants.

***STANDARD OF REVIEW***

For purposes of the motions to dismiss, the court accepts as true all of the factual allegations in Plaintiffs' Amended Petition and construes those facts in the light most favorable to Plaintiffs.  See Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc., 521 F.3d 1278, 1284 (10th Cir. 2008).  Of course, the court does not accept as true conclusory statements or legal conclusions.  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

To survive the motions to dismiss, the Amended Petition "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Plaintiffs must nudge their "claims across the line from conceivable to plausible."  Twombly,

---

[1] Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002); Griess v. Colorado, 841 F.2d 1042, 1045 (10th Cir. 1988).

2

550 U.S. at 570.  The plausibility standard requires "more than a sheer possibility that a

defendant has acted unlawfully."  Iqbal, 556 U.S. at 678.  "Where a complaint pleads facts that

are merely consistent with a defendant's liability, it stops short of the line between possibility

and plausibility of entitlement to relief."  Id. (quoting Twombly, 550 U.S. at 557) (internal

quotations omitted).  In other words, the well-pleaded facts must "permit the court to infer more

than the mere possibility of misconduct."  Id. at 679.

> [T]he Twombly / Iqbal standard is a middle ground between heightened fact pleading,
> which is expressly rejected, and allowing complaints that are no more than labels and
> conclusions or a formulaic recitation of the elements of a cause of action, which the Court
> stated will not do.  In other words, Rule 8(a)(2) still lives.  Under Rule 8, specific facts
> are not necessary; the statement need only give the defendant fair notice of what the
> claim is and the grounds upon which it rests.

Burnett v. Mortgage Elec. Registration Sys., Inc., 706 F.3d 1231, 1235-36 (10th Cir. 2013)

(quoting Khalik v. United Air Lines, 671 F.3d 1188, 1191 (10th Cir. 2012)).

In a case against multiple defendants, "it is particularly important . . . that the complaint

make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with

fair notice as to the basis of the claims against him or her, as distinguished from collective

allegations . . . ."  Robbins v. Oklahoma, 519 F.3d 1242, 1247, 1248 (10th Cir. 2008) (emphasis

in original).  Otherwise, the Complaint would fail to provide fair notice and to present a plausible

right to relief.


***ALLEGATIONS***

Plaintiffs were employed by the School District for the 2014 – 2015 school year on

temporary contracts.  Docket No. 3, Exh 3, p. 2.  At the June 11, 2015 board meeting, the three

individual board member defendants voted to not renew Plaintiffs' contracts.  Id. p. 12-13.

Plaintiffs' contracts were not renewed.  Id.  Following the board meeting, one or more of the

APLT. APP. 083

individual board member defendants stated to third parties that "they had good reason" for

terminating[2] Plaintiffs and that the Plaintiffs "were not effective at their jobs." Id. at 14.


## *ANALYSIS*

### Oklahoma Teacher Due Process Act

Plaintiffs claim that the School District failed to comply with the TPDA by failing to: (1)

initiate a hearing for nonrenewal; (2) receive a recommendation to dismiss and to mail Plaintiffs

a copy thereof; (3) provide notice of underlying facts; (4) provide written admonishment; (5)

provide the statutorily required pre-termination hearing; and (6) provide a name-clearing hearing

when Plaintiffs' contracts were not renewed for performance related reasons.  The TPDA

provides in pertinent part:

> A. The dismissal, suspension and nonreemployment provisions of the Teacher Due
> Process Act of 1990 *shall not apply* to:
> 1. Substitute teachers;
> 2. Adult education teachers; and
> 3. Teachers who are employed on temporary contracts.

70 OKLA. STAT. § 6-101.23 (emphasis added).  As Plaintiffs alleged, they were employed on

temporary contracts.  The nonreemployment provisions of the TPDA do not apply to them.

Accordingly, this claim is dismissed.


### Breach of Contract

Plaintiffs claim that the School District breached their contracts by failing to renew them,

arguing that the collective bargaining agreement provided for compliance with the TPDA.  As

---

[2] Throughout the Amended Petition, Plaintiffs refer to Defendants "terminating and/or
nonrenewing" their temporary contracts.  Plaintiffs were not "terminated" mid-contract.  Their
temporary contracts were completed, and then Defendants chose not to offer them new contracts,
temporary or otherwise.

APLT. APP. 084

the court held above, the School District did not violate the TPDA.  Moreover, an Oklahoma

teacher on a temporary contract has no expectation of a continuing contract status.  See DeHart

v. Independent Sch. Dist. No. 1 of Tulsa Cnty., 259 P.3d 877 (Okla. Civ. App.) (reviewing the

issue of whether a teacher's contract was actually temporary or whether the school district had

created a regular continuing contract of employment); see also Scheer v. Independent Sch. Dist.

No. 1-26 of Ottowa Cnty., 948 P.2d 275, 278 (Okla. 1997) ("There is no legally protectable

interest in tenure after two years.").

There is no allegation here that the School District had somehow created regular

continuing contracts with any of the Plaintiffs.  Plaintiffs acknowledge that they held temporary

contracts.  Instead they argue that in deciding to not renew Plaintiffs' temporary contracts, the

School District did not comply with the collective bargaining agreement which required

compliance with the TPDA.  The court does not agree.  The School District did not violate the

TPDA in the nonrenewal of Plaintiffs' contracts.  The breach of contract claim is dismissed.


**Due Process Rights in Property Interests**

Plaintiffs claim that the School District and the individual board member defendants

violated their Fourteenth Amendment and Oklahoma Constitutional rights to due process,

arguing that they have a property interest in their continued employment.  Property interests are

not created by the Constitution, but rather "by independent sources such as a state or federal

statute, a municipal charter or ordinance, or an implied or express contract."  Teigen v. Renfrow,

511 F.3d 1072, 1078-79 (10th Cir. 2007) (citation omitted).  As the court held above, Plaintiffs

did not have a property interest in renewal of their temporary contracts.  Accordingly, this claim

is also dismissed.

APLT. APP. 085

**Due Process Liberty Interests**

Plaintiffs also claim that the School District and the individual board member defendants violated their Fourteenth Amendment due process rights and liberty interests when one or more of the individual board member defendants stated to third parties that "they had good reason" for terminating Plaintiffs and that the Plaintiffs "were not effective at their jobs."  This claim fails for two reasons.  First, Plaintiffs fail to make clear exactly *who* did *what* to *whom* in accordance with Twombly and Iqbal.  Plaintiffs do not state which individual board member defendant made these statements.  The Amended Petition, therefore, fails to provide the individual defendants with fair notice and to present a plausible right to relief.

Second, these statements – that the board members "had good reason" not to renew Plaintiffs' contracts or that Plaintiffs "were not effective at their jobs" – are not, as Plaintiffs argue, actionable under the "reputation-plus" theory,[3] as they do not amount to charges that might seriously damage Plaintiffs' standing and associations in the community.  See Board of Regents of State Colleges v. Roth, 408 U.S. 564 (1972); Hadley v. Moon, 38 F.3d 1220 (10th Cir. 1994) (recognizing that damage to one's reputation plus termination violates an employee's due process rights).  Reasons that pertain solely to a plaintiff's job performance do not satisfy this test because "dismissal for unsatisfactory job performance . . . does not carry with it the sort of opprobrium sufficient to constitute a deprivation of liberty."  McGinnis v. District of Columbia, 65 F.Supp.3d 203, 220 (D.D.C. 2014) (internal quotations and citation omitted).  This claim is dismissed.

---

[3] Plaintiff concedes that this claim fails under the "stigma theory," but argues that it survives under the less stringent "reputation-plus" theory.

APLT. APP. 086

*CONCLUSION*

For the reasons stated herein, Defendants' partial motion to dismiss [Docket No. 5] is hereby GRANTED.  Counts 1, 2, 4 and 5 are hereby dismissed.  Additionally, the § 1983 claims against the individual board members in their official capacities are dismissed.  Counts 3, 6, 7 and 8 remain.

**IT IS SO ORDERED** this 27th day of October, 2016.

_____
**THE HONORABLE RONALD A. WHITE**
**UNITED STATES DISTRICT JUDGE**
**EASTERN DISTRICT OF OKLAHOMA**

APLT. APP. 087

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENA UTTER, AUBREE HOLSAPPLE,** | ) | |
| **and DARA CAMPBELL,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **-vs-** | ) | **CIV-16-00182-RAW** |
| | ) | |
| **AMIE COLCLAZIER, JACK CADENHEAD,** | ) | |
| **MICKEY UPTON, and INDEPENDENT** | ) | |
| **SCHOOL DISTRICT NO. I-01 OF** | ) | |
| **SEMINOLE COUNTY, STATE OF** | ) | |
| **OKLAHOMA, a/k/a SEMINOLE SCHOOL** | ) | |
| **DISTRICT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' MOTION FOR RECONSIDERATION AND
## CLARIFICATION OF THE COURT'S ORDER OF DISMISSAL

Come now the Plaintiffs, by and through their attorney of record, Heath Merchen, and
request that the court reconsider and clarify its order of dismissal entered October 27, 2016. While
the Court dismissed all claims related to the Teacher Due Process Act, the Court's Order did not
address a number of the Plaintiffs' breach of contract claims that were independent of the Teacher
Due Process Act. Additionally, the Board members are being sued in their personal, individual
capacity for the 1983 related First Amendment violations and for violations of the Family Medical
Leave Act. While the court dismissed claims against the Board Members in their professional
capacity, Plaintiffs contend the claims against the Board Members in their individual capacity must
remain.

Plaintiffs have alleged that the Defendants breached the negotiated agreement by acting as
evaluators in violation of Article XI Section 11.2 of the negotiated agreement. *See* Plaintiffs'

Amended Petition at 16, Paragraph 61(c). Whether this provision has been violated is a question of fact for the jury and is not dependent on application of the Teacher Due Process Act. Similarly, this claim is not dependent upon an underlying constitutional right, but is an independent contractual violation.

Additionally, Plaintiffs have alleged that the Defendants breached the negotiated agreement by failing to abide by regulatory restrictions on direct board involvement in school administrative functions. *See* Plaintiffs' Amended Petition at 15, Paragraph 61(a). Here again, whether that contractual provision has been violated is a question of fact for the jury and is not dependent on application of the Teacher Due Process Act. Similarly, this claim is not dependent upon an underlying constitutional right, but is an independent contractual violation.

Furthermore, while the court dismissed the Board Members in their professional capacity, as the complaint sets forth, "Each Defendant Board Member is being sued in their individual capacity as well as in their official capacity as school board members." Plaintiffs' Amended Petition at 3, paragraph 7. The claims against the Board Members in their individual capacity under Section 1983 for First Amendment retaliation as well as claims under the Family Medical Leave Act should survive. *See Cornforth v. University of Oklahoma Bd. Of Regents*, 263 F.3d 1129 (10th Cir. 2001) (holding that board members can be held individually liable under the Family Medical Leave Act) and *Casey v. West Las Vegas Independent School Dist.*, 473 F.3d 1323 (10th Cir. 2007) (Holding that Eleventh Amendment immunity did not protect individual board members from 1983 liability for First Amendment violations).

Plaintiffs, while not waiving any right to later appeal the Court's original order, asks that the court clarify the existing dismissal order and recognize that the following claims remain:

1. Plaintiffs' breach of contract claims related to violation of negotiated agreement provisions limiting the evaluation of teacher performance to the principal who has personally observed the teacher;

2. Plaintiffs' breach of contract claims related to violation of the negotiated agreement provisions incorporating Okla. Admin. Code § 210:35-3-48 (2016), prohibiting board members from involvement in or interference with the administrative functions of the school;

3. Plaintiffs' claims against the School District and the individual Defendants personally for violations of Oklahoma's Open Meetings Act, OKLA. STATE. tit. 25 O.S. § 303;

4. Plaintiffs' claims against the School District and the individual Defendants personally under 42 U.S.C., § 1983 for violations of the First Amendment Freedom of Speech;

5. Plaintiffs' claims against the School District and the individual Defendants personally under the Family Medical Leave Act, 29 U.S.C., § 2601; and

6. Plaintiffs' claims against the individual Defendants personally for intentional interference with prospective business interests.

.

/sHeath Merchen_____
Heath Merchen, OBA #19391
Oklahoma Education Association
323 E. Madison
Oklahoma City, OK  73105
Telephone: (405)528-7785
Facsimile:  (405)523-4392
hmerchen@okea.org

Attorney for Plaintiffs

3

APLT. APP. 090

## CERTIFICATE OF MAILING

This is to certify that on November 14, 2016, a true and correct copy of the above and foregoing pleading was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

> Laura L. Holmes, OBA #14748
> Laura L. Holmgren-Ganz, OBA #12342
> 900 N. Broadway, Suite 300
> Oklahoma City, OK 73102
> LHolmes@cfel.com
> LGanz@cfel.com
> Attorneys for District

s/Heath Merchen_____
Heath Merchen, OBA #19391
Oklahoma Education Association
323 E. Madison
Oklahoma City, OK  73105
Telephone: (405)528-7785
Facsimile: (405)523-4392
hmerchen@okea.org
Attorney for Plaintiffs

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENA UTTER, AUBREE HOLSAPPLE,** | ) | |
| **and DARA CAMPBELL,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **-vs-** | ) | **CIV-16-00182-RAW** |
| | ) | |
| **AMIE COLCLAZIER, JACK CADENHEAD,** | ) | |
| **MICKEY UPTON, and INDEPENDENT** | ) | |
| **SCHOOL DISTRICT NO. I-01 OF** | ) | |
| **SEMINOLE COUNTY, STATE OF** | ) | |
| **OKLAHOMA, a/k/a SEMINOLE SCHOOL** | ) | |
| **DISTRICT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT

Laura L. Holmes
Laura L. Holmgren-Ganz
900 N. Broadway, Suite 300
Oklahoma City, OK 73102
Telephone: (405) 528-2800
Facsimile: (405) 528-5800
LHolmes@cfel.com
LGanz@cfel.com
Attorneys for District, Amie Colclazier,
Jack Cadenhead, and  Mickey Upton

APLT. APP. 092

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF MATERIAL FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STANDARD OF REVIEW ON MOTION FOR SUMMARY JUDGMENT. . . . . . . . . 8

ARGUMENT AND AUTHORITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        Proposition I: Campbell's Speech Was Not The Motivating Factor
        For Not Re-Hiring Her For the 2015-2016 School Year.. . . . . . . . . . . . . . 9

        Proposition II:  Defendants Did Not Retaliate Against Utter
        For Her Intermittent FMLA Leave.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        A. Utter failed to give proper notice to Defendants.. . . . . . . . . . . . . . . . . 13
        B. Defendants did not re-hire Utter for reasons unrelated
        to her FMLA claim.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        Proposition III: Individual Defendants Are Entitled To Qualified Immunity.
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        Proposition IV:  Individual Defendants Did Not Tortiously Interfere With
        Plaintiffs' Contracts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        Proposition V:   Individual Defendants Did Not Violate
        The Open Meeting Act.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

APLT. APP. 093

## TABLE OF AUTHORITIES

### Cases

*A.M. v. Holmes,* ___ F.3d ___, 2016 WL 3999756 (10th Cir. 2016). . . . . . . . . . . . . . . 16

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510,
      91 L.Ed.2d 202, 211 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Bones v. Honeywell International, Inc.,* 366 F.3d 869 (10th Cir. 2004).. . . . . . . . . . 13, 14

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202
      (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Brown v. State Farm Fire and Cas. Co.*, 58 P.3d 217, 223 (Okla.Civ.App.2002). . . . . 18

*Carpenter v. Boeing Co.*, 456 F.3d 1183, 1192 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . 9

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552,
      91 L.Ed.2d 265, 273 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1093, (10th Cir. 2006).. . . 18

*Clark County Sch. Dist. v. Breeden,* 532 U.S. 268,273, 121 S.Ct. 1508,
      149 L.Ed.2d 509 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . 10

*Hulen v. Yates*, 322 F.3d 1229, 1237 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . 11

*Martin v. Johnson,* 1998 OK 127, ¶ 30, 975 P.2d 889, 896. . . . . . . . . . . . . . . . . . . 18, 19

*McBride v. Citgo Petroleum Corp.,* 281 F.3d 1099 (10th Cir. 2002). . . . . . . . . . . . . 14, 15

*McCook v. Spriner School Dist.,* 2002 WL 1788529, 44 Fed Appx 896,
      168 Ed. Law Rep. 710. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Modica v. Taylor,* 465 F.3d 174 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

APLT. APP. 094

*Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1325 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . 14, 15

*Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). . . . . . . . . 17

*Proctor v. UPS,* 502 F.3d 1200, 1208-09 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . 11

*Ray v. American Nat. Bank & Trust Co. of Sapulpa*, 1994 OK 100, ¶ 15
    894 P.2d 1056, 1060. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Richmond v. Oneok, Inc.,* 120 F.3d 205 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . 11, 12

*Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). . . . . . . . 17

*Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). . . . . . . 17

*Voiles v. Santa Fe Minerals, Inc.*, 1996 OK 13, ¶ 18, 911 P.2d 1205, 1210. . . . . . . . . . 18

*Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 16

**Statutes**

25 O.S. §302. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
25 O.S. §304(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
25 O.S. §304(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
25 O.S. §306. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
25 O.S. §313. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
25 O.S. §314(B)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
29 U.S.C.§§2611(3), 2614(2)(B) and 2618. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
29 U.S.C. §2612(e)(2)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
29 U.S.C. §2613. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
29 U.S.C. §2618. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
29 U.S.C. §2615(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
70 O.S. §5-117. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
70 O.S. §5-117 (2) & (3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
70 O.S.§5-117(14). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Rules**

Fed. R. Civ. P. 56(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Fed. R. Civ. P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

APLT. APP. 095

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56, Fed. R. Civ. P., Defendants Independent School District No. I-01of Seminole County, a/k/a Seminole School District ("District"), Amie Colclazier ("Colclazier"), Jack Cadenhead ("Cadenhead"), and Mickey Upton ("Upton") ("Individual Defendants") move for summary judgment in their favor as to the claims set forth in Plaintiffs' Amended Petition in Counts 3,6,7 and 8, on the grounds that the pleadings and other evidentiary materials on file herein and filed with this Motion and Brief show that there is no substantial controversy as to any material fact and that Defendants are entitled to judgment as a matter of law.

## STATEMENT OF THE CASE

This action arises out of District's board meeting held on June 11, 2015, in which the rehiring of continuing contract teachers and the employment of temporary teachers for the 2015-2016 school year was on District's board meeting agenda. Plaintiffs were temporary teachers for the 2014-2015 school year whose contracts had expired in May 2015. During the 2014-2015 school year, there was a school bond issue which concerned building a new high school. The town and District's board members' opinions were split  about the proposed location of building the new high school. Campbell was in favor of the bond issue and posted her position on Facebook. On March 3, 2015, the bond issue failed. When District hired Utter, Principal Cheatwood ("Cheatwood") and Utter made an agreement that Utter could come in late the mornings that her autistic son had a morning melt-down. However, District's board members were unaware of the agreement.

In the summer of 2014, Colclazier, Cadenhead and Upton began receiving complaints about Plaintiffs from students, parents, staff, and patrons. On multiple occasions, Colclazier, Cadenhead

and Upton had independently expressed their concerns about Plaintiffs to Jeff Pritchard, District's Superintendent ("Pritchard"), and asked him to check on the validity of complaints that they had received. Pritchard talked to Plaintiffs' principals but did not report back with any information about Plaintiffs to Individual Defendants.  Prior to the June 11, 2015 District board meeting, Colclazier, Cadenhead and Upton individually informed Pritchard of their concerns on hiring Plaintiffs. Upton also expressed his concern about hiring Caleb Gordon ("Gordon"), a high school math teacher. Plaintiffs and Gordon were all temporary contract teachers.

Both Pritchard and Plaintiffs' principals had recommended them for hire for the 2015-2016 school year. During the June 11, 2015 board meeting, two separate motions were made concerning the renewal of teacher contracts for the 2015-2016 school year. In the first motion, Cadenhead moved that all of the employees listed in Item 34 (the list included Plaintiffs, Gordon and other teachers) be rehired with the exception of Campbell, Holsapple, and Utter. The first motion excluded Plaintiffs but included Gordon, the high school math teacher and it passed unanimously. In the second motion, Board member Claudia Willis moved that Campbell, Holsapple and Utter be re-hired for the 2015-2016 school year. The second motion failed in a 3-2 board decision (Colclazier, Cadenhead, and Upton  voted "no" on the second motion).  Subsequently, all three Plaintiffs had multiple job offers and were hired by other school districts and a local college within weeks after District's June 11, 2015, Board meeting.

All Plaintiffs asserted breach of contract, deprivation of their due process rights, violation of the Open Meeting Act ("OMA"), and tortious interference with their employment contracts with District for the 2015-2016 school year.  Additionally, Campbell claims deprivation of her First Amendment right under 42 U.S.C. §1983 ("Section 1983"), and Utter claims retaliation for her use

of leave under the Family Medical Leave Act ("FMLA")under Section 1983. In its ruling on Defendants' Partial Motion to Dismiss, the Court dismissed Plaintiffs' claims for breach of contract and deprivation of their due process rights and granted qualified immunity to Individual Defendants in their official capacity. Thus, Plaintiffs' remaining claims Campbell's claim of First Amendment retaliation, Utters claim of retaliation for her use of leave under FMLA, violation of the OMA, and tortious interference with their employment contracts with District for the 2015-2016 school year.

Defendants are entitled to judgment as a matter of law as the undisputed evidence shows that Plaintiffs were temporary teachers whose contracts expired in May 2015. The determination not to rehire Campbell for the 2015-2016 school year was for reasons unrelated to her stand on the bond issue and was not retaliatory for her First Amendment exercise. The determination not to rehire Utter for the 2015-2016 school year was for reasons unrelated to her FMLA claim and not retaliatory for her use of intermittent leave under FMLA. Furthermore, Plaintiffs cannot establish the necessary elements of a claim for tortious interference with a contract or that Individual Defendants violated the OMA.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

For purposes of summary judgment, the following facts are undisputed:

1.      District is a public school located in and a political subdivision of the State of Oklahoma. (Doc. No. 3-3, Amended Petition ¶ 7).

2.      Colclazier, Cadenhead and Upton were school board members of District during the 2014-2015 school year. (Doc. No. 3-3, Amended Petition ¶ 6).

3.      Utter, Holsapple and Campbell were temporary teachers with District during the 2014-2015 school year. Their contracts expired in May 2015. (Doc. No. 3-3, Amended Petition ¶

Appellate Case: 17-7002   Document: 01019800618   Date Filed: 04/26/2017   Page: 105

5: Defendants' Exhibit ("D.Ex.")1, Pritchard Deposition, 34:21-35:2;D.Ex.18 Plaintiffs' Contracts).

4.    Over the course of one year, Colclazier, Cadenhead and Upton received complaints from students, parents, staff and patrons about Plaintiffs. Individual Defendants received complaints about Utter in regards to other teachers having to covering her class, constantly coming in thirty minutes late to work every day and leaving her students without instruction, and failing to have lesson plans prepared for her substitute teachers. They also received complaints about Holsapple's failure to give early notice on a third grade reading test and the trauma caused to children who did not progress to fourth grade, an insensitive attitude, inability to work with special needs students, and shopping on-line during work hours. In September 2014, they began receiving complaints about Campbell being disorganized, unsupportive of FFA and 4H programs, showing animals, and negative Facebook postings about being a Seminole Vocational-Agriculture teacher. (D.Ex.2,Colclazier Deposition 18: 1-10,19:6-16, 20:4-23,21:1-4,36 - 37:19, 42:3-46, 51:14-52; D.Ex.3,Cadenhead Deposition 19:25-20:13, 22:19-23:1, 31:17-32:12, 33:1-5,37:21-25,38:1-13, 39:11-16,46:15-48:11; D.Ex.4, Upton Deposition, 13:10-14:1,10-15:4,16:3-15,23:11- 24:12; D.Ex.17, Cadenhead Affidavit ¶¶2-6).

5.    Cadenhead's daughter attended Wilson Elementary from 2013-2016 where Utter and Holsapple worked. (D.Ex.3, Cadenhead Deposition 21:15-22).

6.    Principal Cheatwood agreed that Utter could come to school late on the mornings that her autistic son had morning melt-downs. (D.Ex.5,Cheatwood Deposition 12:21-14:20).

7.    Utter's son morning melt-downs averaged between 20-30 minutes to a

APLT. APP. 099

maximum of one hour. She never took a full day off from work to deal with her son's melt downs. (D.Ex.6, Utter Deposition 21:5-23, 23:9-14).

8.      Colclazier, Cadenhead, and Upton were unaware of Utter's FMLA claim. (D.Ex.2, Colclazier Deposition 35:11-15; D.Ex.3, Cadenhead Deposition 63:18-21; D.Ex.4, Upton Deposition 16:11-15).

9.      Utter was absent 20.6 days (17 full days and 5 half days for sick leave and 2 full days for personal leave) during the 2013-2014 school year and 24.75 days (21 full days and 6 half days for sick leave and 1 full day for personal leave) during the 2014-2015 school year that were unrelated to her FLMA leave. (D.Ex.7, Utter's Attendance Record).

10.     Under the Collective Bargaining Agreement ("CBA"), there are 175 instructional days. (D.Ex. 8, Seminole CBA ).

11.     On December 17, 2014 at a Special Meeting, the Board called for a bond issue to build a new high school in a different location than the existing high school site. An election on the proposed bond was held on March 3, 2015, and the bond issue failed to pass. (D.Ex.9, Special Meeting Minutes dated 12-17-14).

12.     Campbell posted a "Vote Yes" sign on the school bond issue in her yard and made similar postings on Facebook. (D.Ex.11, Campbell Deposition 38:11-18).

13.     Plaintiffs received teacher evaluations from their site principals for the 2014-2015 school year.(D.Ex.12,Osborn Deposition,6:1-8,14:21-15:5; D.Ex.5,Cheatwood Deposition,7:25-8:9).

14.      Plaintiffs received their full salaries from District for the 2014-2015 school year.(D.Ex. 10, District's Payroll Records for Plaintiffs).

15.      According to District's policy 1.6.6, District board is responsible "to apprise the general effectiveness of the schools". (D.Ex.13, District's Policy).

16.      Under the 2014-2015 Collective Bargaining Agreement ("CBA") with Seminole Teachers Association, teacher evaluations are a "mutual endeavor among all teachers, the administrative staff and the Board of Education to improve the quality of the educational program". (D.Ex.8, Seminole CBA).

17.      Colclazier, Cadenhead, and Upton, individually communicated with Pritchard about their concerns of rehiring Plaintiffs for the 2015-2016 school year. Upton also expressed his concern about hiring Caleb Gordon ("Gordon"), one of District's high school math teachers, for the 2015-2016 school year. Over the course of one year, Individual Defendants separately brought forth various concerns about Plaintiffs to Pritchard. In 2014, Colclazier spoke with Pritchard about Holsapple's third grade reading test incident. After the Spring 2015 FFA fundraiser, Colclazier spoke with Pritchard regarding several parent and student complaints that she had received about Campbell being unsupportive with students showing animals. In September 2014, Cadenhead learned about complaints regarding Campbell and shared such complaints with Pritchard on multiple occasions. Also at the beginning of the 2014-2015 school year, Cadenhead received complaints about Utter and Holsapple that had initially started in the previous year. Cadenhead spoke with Pritchard a

couple of times about the complaints on Utter and Holsapple towards the end of the 2014-2015 school year. Over the 2014-2015 school year, Colclazier and Cadenhead shared the complaints that they had received about Plaintiffs. Prior to June 11, 2015, Cadenhead and Upton had a couple of conversations about their concerns about Plaintiffs. On Friday, June 5, 2015, Cadenhead stopped by Pritchard's office expressing his concerns about re-hiring Plaintiffs and asked Pritchard to investigate. That same day, Colclazier called Pritchard expressing her concerns about re-hiring Plaintiffs. She also asked him to investigate the complaints that she had received. Sometime prior to June 11, 2015, Upton called Pritchard after work to discuss his concerns about re-hiring Plaintiffs and Caleb Gordon because of complaints that he had received about all four teachers. Pritchard did not report back to any Individual Defendants with his findings about Plaintiffs. Colclazier called Pritchard again on June 8, 2016 to see if he had investigated her concerns about Plaintiffs. Pritchard failed to provide Colclazier with any information. (D.Ex.2, Colclazier Deposition,18:1-10,19: 6-16,20: 4-23,  21:1-4,36:1-37:19,  42:3- 44:25, 46:1-25,51:14-52:25: D.Ex.3, Cadenhead Deposition 19:l.-20:13, 22:19-23:1, 31:17-32:12, 33:1-5, 37:21-38:13, 39:11-16,46:15-48:11;and, D.Ex. 4,Upton Deposition 13:10-14:1,10-25, 15:1-4,16: 3-15,23:11-24:12; D.Ex. 17, Cadenhead Affidavit, ¶¶ 2-6).

18.     On the Agenda for the June 11, 2015 District board meeting was the rehiring of teachers for the 2015-2016 school year. (D.Ex.14, 6-11-15 District Agenda).

19.     According to the minutes of the June 11, 2015, District Board meeting item 34,

Appellate Case: 17-7002   Document: 01019800618   Date Filed: 04/26/2017   Page: 109

reflects that two separate motions were made as to the hiring of teachers for the 2015-2016 school year. In the first motion, Cadenhead moved to re-hire teachers for the 2015-2016 school year. His motion included Gordon but excluded Plaintiffs and unanimously passed. In the second motion, Claudia Willis moved to re-hire Plaintiffs for the 2015-2016 school year. The motion failed in a 3-2 vote with Colclazier, Cadenhead and Upton voting "no" on the second motion. (D.Ex.15, District Meeting Minutes of 6-11-15).

20.      Soon after District's June 11, 2015 board meeting, all Plaintiffs had multiple job offers and were hired by other local school districts and local college. (D.Ex.6,Utter Deposition   45:7-46:25;   D.Ex.16,HolsappleDeposition   24:15-25:25,27:12-25: D.Ex.11,Campbell Deposition 47:4-48:19).

21.      Plaintiffs filed a criminal complaint with the Seminole Police Department against Individual Defendants for violation of the OMA. The police investigated their complaint, but the District Attorney found no basis for the claim and no charges were filed. (D.Ex. 16,Holsapple Deposition 31:.24-33:22: D. Ex.11, Campbell Deposition 58: 22-60:17).

## STANDARD OF REVIEW ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the record establishes that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party asserting that a fact is or is not in dispute must cite to the record including depositions, affidavits, answers to interrogatories, or other materials, and must show that the materials cited by the other party do not establish a genuine dispute, or

APLT. APP. 103

must show that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c).

A moving party is entitled to summary judgment as a matter of law when the non-moving party has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof". *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). In order to defeat a motion for summary judgment which is properly supported by the evidence, the non-moving party must show that there is a genuine issue of material fact and not merely the existence of some alleged factual dispute between the parties. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). Mere assertions and conjecture or the existence of a scintilla of evidence in support of a non-movant's position is insufficient to show a genuine issue of material fact; an issue of material fact is genuine only if the non-movant presents facts such that a reasonable jury could find in favor of the non-movant. *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1192 (10th Cir. 2006).

## ARGUMENT AND AUTHORITY

**Proposition I: Campbell's Speech Was Not The Motivating Factor For Not Re-Hiring Her For The 2015-2016 School Year.**

Campbell alleges that Defendants retaliated against her for exercising her First Amendment right to freedom of speech under Section 1983. Campbell claims that Defendants retaliated against her position on the school bond issue ( vote "yes") and voted against re-hiring her for the 2015-2016 school year (Doc No. 3-3, Amended Petition ¶75).

The "*Garcetti/Pickering*" test is applied to determine whether a public employee can establish a prima facie case of First Amendment retaliation. *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301 (10th Cir. 2009); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007). The *Garcetti/Pickering* test involves five (5) elements: 1) whether the plaintiff spoke pursuant to his official duties; 2) whether the plaintiff's speech touches upon a matter of public concern; 3) the balance between the employee's interest in commenting upon such matters against the interest of the State, as employer, in promoting the efficiency of the public services it performs through its employees; 4) whether the plaintiff can demonstrate that the protected speech was a substantial or motivating factor in the employer's decision to take an adverse employment action against the plaintiff; and 5) whether the employer can show that the adverse employment action would have occurred even in the absence of the protected speech. *Dixon*, 553 F.3d at 1301-02; *Brammer-Hoelter*, 492 F.3d at 1202-03. The first three prongs are issues of law to be decided by the court; the fourth and fifth prongs are factual issues to be decided by the fact finder unless there is no question of material fact. *Dixon*, 553 F.3d at 1303.

For purposes of Defendant's Motion for Summary Judgment only, Defendant admits that Campbell's alleged speech regarding the school bond issue involved a matter of public concern. However, Campbell's claim cannot survive the *Garcetti/Pickering* analysis because she cannot establish that Defendants were motivated by her speech to take any adverse employment action.

APLT. APP. 105

In order to establish retaliation, the plaintiff must show that her speech was a substantial or motivating factor in the detrimental or adverse employment decision. *Brammer-Hoelter*, 492 F.3d at 1203. A plaintiff has to "produce evidence linking the employer's action to the employee's speech." *Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005). Speculation, hunches, rumor, and innuendo are insufficient to establish the necessary causal link. *Id.* at 1189. A plaintiff can not sustain the burden on this element "simply by showing that the elimination of the protected activity may have been welcomed by the defendants." *Id.*

While adverse action in close temporal proximity to protected speech may warrant an inference of retaliatory motive, temporal proximity is insufficient, without more, to establish that the speech was a substantial or motivating factor. *Id.* "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'". *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268,273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). Otherwise, the plaintiff mst produce additional evidence to establish causation. *Proctor v. UPS,* 502 F.3d 1200, 1208-09 (10th Cir. 2007). In fact, the Tenth Circuit has held that a three (3) month period between an employee exercising his right and employee's termination is insufficient to show temporal proximity. *Richmond v. Oneok, Inc.,* 120 F.3d 205 (10th Cir. 1997). An employee exercising her rights under the First Amendment does not serve to protect the

employee from legitimate employment actions. *Maestas*, 416 F.3d at 1190.

In this case, Campbell's public statements on the school bond issue were not the motivating factor for the decision regarding her re-employment and were not in temporal proximity to Defendants' decision. District's board called for the bond election on December 17, 2014 with an election date of March 3, 2015. Campbell's speech, "Vote Yes", occurred between the time span of December 17, 2014 and March 3, 2015. Defendant's vote not to re-hire Campbell occurred on June 11, 2015 - - three (3) plus months after Campbell's First Amendment activity. Like *Richmond*, there is no temporal proximity to establish Campbell's prima facie case.

Starting in September 2014, Colclazier, Cadenhead and Upton began receiving complaints from students, parents, and patrons about Campbell's lack of support of certain aspects of District's Ag program, including lack of support of the high school FFA program and 4-H program, lack of support of showing animals, and negative Facebook postings about her job were the motivating factors. On multiple occasions, Cadenhead spoke to Pritchard about the complaints on Campbell. Campbell's position on the District's bond issue **was not** the motivating factor for Defendants not re-hiring Campbell for the 2015-2016 school year; rather, her failure to support District's Ag programs, her negative attitude, and patron complaints were the motivating factors for Defendants' decision. In other words, regardless of Campbell's position on the bond issue, Defendants would have taken the same action - - not re-hiring Campbell for 2015-2016. The uncontroverted facts show that Defendants did

not deprive Campbell of her First Amendment rights under Section 1983. Summary judgment should be granted in favor of Defendants and against Campbell for her First Amendment claim.

**Proposition II:   Defendants Did Not Retaliate Against Utter For Her Intermittent FMLA Leave.**

### A. Utter failed to give proper notice to Defendants.

Utter claims that Defendants retaliated against her for her intermittent leave under the Family Medical Leave Act ("FMLA").(Doc. No. 3-3, Amended Petition ¶75). During Utter's interview with District, Utter notified Cheatwood that her son was autistic and sometimes had morning melt-downs. Cheatwood agreed that on such mornings that Utter's son had a melt-down, Utter could come in late as long as she notified Cheatwood. Pritchard allowed site principals to deal with FMLA claims. Individual Defendants were unaware of Utter's FMLA claim.

Under the FMLA, District is a political subdivision and is an employer under the act. 29 U.S.C.§§2611(3), 2614(2)(B) and 2618. Under Oklahoma law, only District's school board is empowered to make employment decisions and set policy. 70 O.S. §5-117. An employee must give timely notice to her employer. If leave is unforeseeable, information imparted to employer must be sufficient to give reasonable notice of employee's request as is practicable. 29 U.S.C. §2612(e)(2)(B). See *Bones v. Honeywell International, Inc.,* 366 F.3d 869 (10th Cir. 2004). If an employee's request concerns a family member such as a child, an employer may require certification by a health care provider of the family member. 29

U.S.C. §2613. Additionally, special rules apply to instructional teachers at schools. 29 U.S.C. §2618.

In this case, Utter never informed District's Board of her request for intermittent leave for her son. There was only a verbal agreement between Utter and Cheatwood. Utter was a first grade teacher at District. As an instructional teacher, the amount and timing of her intermittent leave could potentially affect her students. As an employer, District's Board never knew about her request nor had the opportunity to determine if medical certification was necessary or to consider the potential impact of Utter's intermittent leave upon her students. Since Utter failed to properly notify her employer of her FMLA request, she cannot assert a claim under the FMLA. Summary judgment should be granted in favor of Defendants and against Utter.

## B. Defendants did not re-hire Utter for reasons unrelated to her FMLA claim.

The FMLA, "makes it unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the Act". 29 U.S.C. §2615(a); see also *Bones v. Honeywell Intern., Inc.,* 366 F.3d 869, 877 (10th Cir. 2004)*.* To establish a retaliation claim under FMLA, plaintiff must show that "(1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the two actions". *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1325 (10th Cir. 1997).  However, if a defendant shows that a plaintiff would have been terminated in the absence of the FMLA request or leave, then no FMLA claim exists.

14

*McBride v. Citgo Petroleum Corp.,* 281 F.3d 1099 (10th Cir. 2002). The Tenth Circuit has held "that an employee who requests or is on FMLA leave has no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request or leave that he or she did before submitting the request". *Id.* at 1108. On multiple occasions, the Tenth Circuit has granted summary judgment to employers who terminated employees for reasons unrelated to a FLMA requests or leave. *Bones v. Honeywell Intern., Inc.,* 366 F.3d 869, 877 (10th Cir. 2004)*; McBride v. Citgo Petroleum Corp.,* 281 F.3d 1099 (10th Cir. 2002)*; Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1325 (10th Cir. 1997)*.*

During Utter's employment with District from 2013-2015, Utter was absent 20.6 days in 2013-2014 (17 full days and 5 half days for sick leave and 2 full days for personal) and 24.75 days during 2014-2015 (21 full days and 6 half days for sick leave and 1 full day for personal). Utter admits that she never took a full day because of her son's melt-downs. Utter's absences were unrelated to her FMLA leave. There are 175 instructional days for each school year according to the CBA. In the 2013-2014 school year, Utter missed 11% of the instructional teaching time, and in the 2014-2015 school year, she missed 14% of the instructional teaching time. At the beginning of the 2014-2015 school year, Individual Defendants began receiving complaints about Utter's absences that other teachers had to cover her class and Utter failed to have lesson plans for her substitute teachers. Individual Defendants were unaware of Utter's arrangement with Cheatwood about coming in late when Utter's son had a morning melt-down. Individual Defendants asked Pritchard to investigate

the complaints about Utter; unfortunately, Pritchard never reported back to Individual Defendants any information regarding Utter's absences and tardies.

The uncontroverted evidence shows that the basis of Defendants' vote of nonrenewal of Utter's employment for 2015-2016, concerned the complaints they had received about Utter. High absenteeism, other teachers covering Utter's class, and Utter's failure to leave lesson plans for her substitutes. Individual Defendants had no knowledge of Utter's arrangement with Cheatwood regarding Utter's son morning melt-downs. Since Individual Defendants had no knowledge of Utter's FMLA leave, they cannot retaliate against her for her FMLA leave. Utter was not re-hired for the 2015-2016 school year for reasons unrelated to her FMLA leave. Since the uncontroverted facts show that Defendants actions would have occurred regardless of Utter's FMLA claim, Defendants are entitled to summary judgment in their favor and against Utter as to her FMLA claim.

**Proposition III:      Individual Defendants Are Entitled To Qualified Immunity.**

The defense of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person should have known." *A.M. v. Holmes,* ___ F.3d ___, 2016 WL 3999756 (10th Cir. 2016), quoting *Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir. 2010).   Board members may assert the defense of qualified immunity. See*, McCook v. Spriner School Dist.,* 2002 WL 1788529, 44 Fed Appx 896, 168 Ed. Law Rep. 710, (Superintendent and individual board members were entitled to qualified immunity from

a Section 1983 claim that father's speech at board meeting caused his son's expulsion and excluded parents from school property); *Modica v. Taylor,* 465 F.3d 174 (5th Cir. 2006) (Individual Defendants are entitled to qualified immunity for FMLA claim).

When a defendant raises the defense of qualified immunity, a plaintiff must establish that the defendant's conduct violated a federal constitutional or statutory right and that the right was clearly established at the time of the conduct. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Hulen v. Yates*, 322 F.3d 1229, 1237 (10th Cir. 2003).

In order for Plaintiffs to recover against Individual Defendants in their individual capacity, Plaintiffs must 1) adequately allege a violation of a constitutional right 2) which must be clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (holding that the two step procedure should not be an inflexible requirement).

As more thoroughly discussed above, the uncontroverted facts show that Plaintiffs have failed to establish the violation of any constitutional right (Campbell's First Amendment and Utter's FMLA claim) by Individual Defendants. Even if the Court finds that there were constitutional violations, the law is not "clearly established." The uncontroverted facts fails to show that Individual Defendants' conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. Campbell's speech

and Utter's FMLA claim were not the motivating factors for Individual Defendants not re-

hiring them for the 2015-2016 school year. Since Individual Defendants had no notice of

Utter's FMLA leave, the law was not clearly established, as to the Individual Defendants, as

to whether Utter even had a FMLA claim. Accordingly, Colclazier, Cadenhead and Upton

in their individual or personal capacity are entitled to qualified immunity and summary

judgment should be granted in their favor and against Plaintiffs as to the Section 1983 claims

asserted against them.

**Proposition IV: Individual Defendants Did Not Tortiously Interfere With Plaintiffs' Contracts.**

Plaintiffs allege that Cadenhead, Colclazier and Upton, unlawfully interfered with

their contractual relationship with District and as a result, they suffered damages.(Doc.No.

3-3, Amended Petition ¶77). To recover in an action for interference with contract or

business relations, a plaintiff must show that: 1) he or she had a business or contractual right

that was interfered with; 2) the interference was malicious and wrongful, and that such

interference was neither justified, privileged nor excusable; and, 3) damage was proximately

sustained as a result of the interference. *Champagne Metals v. Ken-Mac Metals, Inc.*, 458

F.3d 1073, 1093, (10th Cir. 2006); *Brown v. State Farm Fire and Cas. Co.*, 58 P.3d 217, 223

(Okla.Civ.App.2002). Generally, an agent of a principal to a contract cannot be held liable

for interfering with a contract between the principal and a third party. *Voiles v. Santa Fe*

*Minerals, Inc.*, 1996 OK 13, ¶ 18, 911 P.2d 1205, 1210; *Ray v. American Nat. Bank & Trust*

*Co. of Sapulpa*, 1994 OK 100, ¶ 15, 894 P.2d 1056, 1060; *Martin v. Johnson,* 1998 OK 127,

APLT. APP. 113

¶ 30, 975 P.2d 889, 896.

Additionally, it is not unlawful for one to interfere with the contractual relation of another if this is done by fair means, if its accomplished by honest intent and it is done to better one's own business and not to principally harm another." *Id*. at 896. Thus, a corporate officer's interference with a corporate contract will be privileged when the interference is undertaken in good faith and for a bona fide organizational purpose. *Id.* Therefore, every breach of contract does not give rise to a claim of tortious interference with a contract merely because an employee or agent of a party to the contract was involved in the breach. Moreover, the interference with contract tort is not intended to protect against an employee acting in good faith but using poor business judgment. *Id.*

Under Oklahoma law, only the school board may hire and fire its teachers. 70 O.S.§5-117(14). Individual Defendants are on District's board of education and comprise a majority of the five-member board of education. The parties to Plaintiffs' employment contracts are District's school board and each of Plaintiffs individually. Any action approved by the three (3) Individual Defendants is District's action. In a 3-2 vote, Individual Defendants voted not to re-hire Plaintiffs for the 2015-2016 school year, and such decision became District's decision. Since there is no third party, there can be no tortious interference claim. For this reason, Individual Defendants are entitled to summary judgment as to the tortious interference claim.

If the court finds that tortious interference could have existed, then the determinative

issue is whether the actor's interference was justified, privileged, or excusable. The board of education of a school district is empowered to make rules and operate a school as the board deems best suited to the needs of the school district. 70 O.S. §5-117 (2) & (3). According to District's policy, one of the boards duties is "to apprise the general effectiveness of the schools". The CBA provides that a teacher evaluation is a "mutual endeavor among all teachers, the administrative staff and the Board of Education to improve the quality of the educational program" (Art. XI, §11.1 CBA).

Over the course of a year, Cadenhead, Colclazier and Upton received complaints about Plaintiffs' job performance. As members of District's Board of Education, they were charged with the duty of assessing the effectiveness of District's school, which included teachers. Plaintiffs received evaluations from their principals and full pay for 2014-2015. Based on the information received, Cadenhead, Colclazier and Upton voted against re-hiring Plaintiffs for the 2015-2016 school year. Individual Defendants actions were undertaken in good faith and for the bona fide organizational purpose of providing quality education to District's students. The uncontroverted facts show that their actions regarding Plaintiffs' employment were undertaken in good faith and privileged. Therefore, Individual Defendants are entitled to summary judgment on Plaintiffs' claim for tortious interference with their contracts.

**Proposition V:       Individual Defendants Did Not Violate The Open Meeting Act.**

Plaintiffs allege that Defendants violated the Oklahoma Open Meeting Act ("OMA")

on June 11, 2015 and seek declaratory relief. Plaintiffs assert that Individual Defendants agreed outside of the board meeting to vote against hiring Plaintiffs for the 2015-2016 school year (Doc.No.3-3, Amended Petition ¶66).

The OMA states that "[i]t is the public policy of the State of Oklahoma to encourage and facilitate an informed citizenry's understanding of the governmental processes and governmental problems." 25 O.S. §302. A public school board is a "Public Body" under the OMA. 25 O.S. §304(1).  Under the Act, a " 'Meeting' means the conduct of business of a public body by a majority of its members being personally together or, as authorized by Section 307.1 of this title, together pursuant to videoconference". 25 O.S. §304(2). Additionally, "[n]o informal gatherings or any electronic or telephonic communications . . . among a majority of the members of a public body shall be used to decide any action or to take any vote on any matter". 25 O.S. §306.  Under the OMA, "any action taken in willful violation of this act shall be invalid". 25 O.S. §313. Only declaratory judgment or injunctive relief are available for any civil action filed under the OMA. 25 O.S. §314(B)(1).

In this case, Plaintiffs were temporary teachers whose contracts expired in May 2015. Over the 2014-2015 school year, on multiple occasions, Colclazier and Cadenhead shared the complaints that they had received about Plaintiffs with Pritchard. In the summer of 2014, Colclazier spoke with Pritchard about Holsapple's third grade reading test incident. In September 2014, Cadenhead began receiving complaints about Campbell and spoke to Pritchard about Campbell on multiple occasions. At the beginning of the 2014-2015 school

year, Cadenhead began receiving complaints about Utter and Holsapple. Later in the school year, Cadenhead spoke a couple of times to Pritchard about Utter and Holsapple. After the Spring 2015 FFA fundraiser, Colclazier spoke with Pritchard regarding several parent and student complaints that she had received about Campbell being unsupportive with students showing animals.

Colclazier, Cadenhead, and Upton, individually communicated with Pritchard about their concerns of re-hiring Plaintiffs for the 2015-2016 school year. On Friday, June 5, 2015, Cadenhead stopped by Pritchard's office expressing concerns about re-hiring Plaintiffs and asked Pritchard to investigate. That same day, Colclazier called Pritchard expressing her concerns about re-hiring Plaintiffs. She also asked him to investigate the complaints that she had received. Sometime prior to June 11, 2015, Upton called Pritchard after work to discuss his concerns about re-hiring Plaintiffs and Gordon because of complaints that he had received about all four teachers. Pritchard did not report back to any Individual Defendants with his findings about the four teachers. Colclazier called Pritchard again on June 8, 2016 to see if he had investigated her concerns about Plaintiffs. Pritchard failed to provide Colclazier with any information.

Over the course of a year, Individual Defendants independently received complaints about Plaintiffs from students, parents, staff, and patrons. On multiple occasions, Cadenhead, Colclazier and Upton separately contacted Pritchard prior to the June 11, 2015 board meeting, expressing their concerns about re-hiring Plaintiffs and Gordon, a high school math

teacher, who were all temporary teachers. They never meet together in person, by telephone, text, email, or other social media means to discuss Plaintiffs' employment. Independently, Individual Defendants asked Pritchard to investigate the complaints about Plaintiffs and Gordon.

Rehiring of teachers for the 2015-2016 school year was on District's Agenda for District's June 11, 2015 board meeting. Individual Defendants were present at the June 11, 2015 District Board Meeting. There were two separate motions on the renewal of teacher contracts for the 2015-2016 school year. In the first motion, Cadenhead moved to re-hire teachers for the 2015-2016 school year. Cadenhead's motion included Gordon but excluded Plaintiffs and unanimously passed. In the second motion, Claudia Willis moved to re-hire Plaintiffs for the 2015-2016 school year. The second motion failed in a 3-2 vote with Cadenhead, Colclazier, and Upton voting against the motion. Individual Defendants voted differently on Plaintiffs and Gordon than what concerns they had expressed to Pritchard. In other words, Individual Defendants had not predetermined their vote prior to the June 11, 2015 board meeting because their vote reflects a different outcome than what they had expressed to Pritchard prior to the board meeting.

Plaintiffs also filed a criminal complaint with the Seminole Police Department against the Individual Defendants for violation of the OMA. The police investigated their complaint, but the District Attorney found no basis for their claim and no charges were filed. The uncontroverted facts show that actions taken by Individual Defendants did not violate the

OMA. The vote not to re-hire Plaintiffs for 2015-2016 school year is valid. Thus, Individual Defendants are entitled to summary judgment against Plaintiffs as to the Open Meeting Act claim.

Alternatively, if this court finds that the OMA was violated by Individual Defendants, the law provides that any action taken in willful violation of the OMA is invalidated. According to the June 11, 2015 board minutes, a motion was made to re-hire Plaintiffs for 2015-2016. That motion failed such that no action was taken. Since no action was taken by District's Board of Education regarding Plaintiffs re-employment, there is no action to invalidate based on a determination that the OMA was violated. Moreover, invalidating the vote which sought to rehire Plaintiffs  does not result in the re-employment of Plaintiffs because their contracts expired prior to the June 11, 2015 District board meeting. Thus, Defendants are entitled to summary judgment as to Plaintiffs' claim regarding violation of the OMA.

## CONCLUSION

The uncontroverted material facts in this case show that:

1.    Plaintiffs were temporary teachers in 2014-2015 and their contracts had expired in May 2015;

2.    Campbell's speech was not the motivating factor for not rehiring her for 2015-2016, there was no temporal proximity between Campbell's speech and Defendants vote to not to re-hire, and Defendants did not violate her First

Amendment rights;

3.      Utter failed to give Defendants proper FMLA notice, Individual Defendants

        had no knowledge of Utter's FMLA claim and are not employers under the

        FMLA, and Defendants did not retaliate against Utter for her FMLA leave;

4.      Cadenhead, Colclazier and Upton are entitled to qualified immunity as to all

        of Plaintiffs' Section 1983 claims;

5.      Cadenhead, Colclazier and Upton did not tortiously interfere with Plaintiffs'

        contracts with District; and,

6.      Cadenhead, Colclazier and Upton did not meet outside of District's board

        meeting and did not violate the Open Meeting Act.

For these reasons, Defendants are entitled to summary judgment as to all remaining

claims in the case.

                                   THE CENTER FOR EDUCATION LAW, P.C.

                                    S/Laura L. Holmgren-Ganz
                                   Laura L. Holmes, OBA #14748
                                   Laura L. Holmgren-Ganz, OBA #12342
                                   900 N. Broadway, Suite 300
                                   Oklahoma City, OK 73102
                                   Telephone: (405) 528-2800
                                   Facsimile: (405) 528-5800
                                   LHolmes@cfel.com
                                   LGanz@cfel.com
                                   Attorneys for District, Amie Colclazier, Jack
                                   Cadenhead, and  Mickey Upton

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2016, I filed the attached document with the Clerk of Court.  Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the electronic Case Filing System: Heath Merchen

S/Laura L. Holmgren-Ganz
Laura L. Holmgren-Ganz

APLT. APP. 121

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF OKLAHOMA
 2
 3   KENA UTTER, AUBREE HOLSAPPLE,
     and DARA CAMPBELL,
 4
         Plaintiffs,
 5
     vs.                              No. CIV-16-00182-RAW
 6
 7   AMIE COLCLAZIER, JACK
     CADENHEAD, MICKEY UPTON and
 8   INDEPENDENT SCHOOL DISTRICT
     NO. 1-01 OF SEMINOLE COUNTY,
 9   STATE OF OKLAHOMA a/k/a
     SEMINOLE SCHOOL DISTRICT,
10
         Defendants.
11
12       VIDEOTAPE DEPOSITION OF JEFF PRITCHARD
            Taken on Behalf of the Plaintiffs
13     On September 23, 2016, beginning at 1:34 p.m.
                In Seminole, Oklahoma
14
15                   APPEARANCES:
16   Appearing on behalf of the PLAINTIFFS
17           Heath Merchen
             OKLAHOMA EDUCATION ASSOCIATION
18           323 East Madison
             Oklahoma City, Oklahoma 73154
19           405-528-7785
             Hmerchen@okea.org
20
     Appearing on behalf of the DEFENDANTS
21
             Laura Holmgren-Ganz
22           THE CENTER FOR EDUCATION LAW
             900 North Broadway, Suite 300
23           Oklahoma City, Oklahoma 73102
             405-528-2800
24           Lganz@cfel.com
25   (Appearances cont'd on next page)
```

1

Defendant's
Exhibit No. 1

1   two or three times, but that's about it.

2       **Q**      How would you characterize your

3   relationship with him, positive or negative?

4       **A**      Kind of neutral.

5       **Q**      With respect to Kena Utter, were you aware

6   that her child is autistic?

7       **A**      I wasn't aware of that until this came up,

8   and if I recall correctly, the conversation I had

9   with Denese Cheatwood then, she mentioned that to

10  me, that -- yeah, that there was some things that

11  she had told her, that her child was autistic, which

12  caused her to be late sometimes.

13      **Q**      And did Ms. Cheatwood tell you that she

14  agreed to allow her to be late when necessary to

15  care for her disabled child?

16      **A**      If I recall correctly, yes.

17      **Q**      Did you have any objection to that?

18      **A**      No.  We allow the principals to deal with

19  their staff on those type of things.

20      **Q**      Is that normally the way you would handle

21  accommodation issues for any kind of disability --

22      **A**      Yes.

23      **Q**      -- or family medical leave?

24      **A**      Yes.

25      **Q**      Did the board members ever ask you why

**26**

1    can't remember the particulars, exactly, but yeah.

2         **Q**    So the June 11th board meeting wasn't the

3    first time that there had been some questioning as

4    to a possible hiring of a --

5         **A**    Right.  This was the first time there was

6    ever not a recommendation taken, yeah.

7              Sorry if I wasn't clear on that.

8         **Q**    Who is ultimately responsible for hiring

9    teachers?

10        **A**    Me.

11        **Q**    Well, it has to go before the board to

12   take a vote; correct?

13        **A**    Right.  The board actually -- the process

14   is, the superintendent recommends them and then the

15   board actually votes to hire them.

16        **Q**    So the board has to make the final vote --

17        **A**    Right.

18        **Q**    -- or blessing on the recommendation;

19   correct?

20        **A**    Right.

21        **Q**    Now, there has been some confusion in

22   previous depositions regarding teacher's pay.  When

23   do teachers contracts, temporary contracts, when do

24   they expire?

25        **A**    They expire, according to our form that

**34**

1  they receive, actually the last day of May is what
2  is put on the form.
3       Q    So May is the last day that the
4  teachers -- that the contract expires.  When are the
5  teachers paid through?  When do their salaries --
6  how are they paid?
7       A    They're given their last two checks,
8  after -- I think it's maybe on June 15th, maybe,
9  when they receive their last checks to fill out
10  their contract.  I think that's when they got their
11  July and August checks, I believe.
12       Q    So they were paid through the end of
13  summer; is that correct?
14       A    Through the end of their contract.  The
15  first -- whatever it takes to get to 12 months.  If
16  the first check was in September, then they would
17  have received their summer checks through August.
18            The reason I'm unclear on that is because
19  it varies by -- like administrators, their contracts
20  might start on August 1st or July 1st, so whatever
21  it takes when someone stops to finish out that
22  particular contract year.
23       Q    Okay.  So if a teacher started, her first
24  paycheck was in August --
25       A    Uh-huh.

35

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF OKLAHOMA
 2
 3    KENA UTTER, AUBREE HOLSAPPLE,
      and DARA CAMPBELL,
 4
              Plaintiffs,
 5    vs.                            No. CIV-16-00182-RAW
 6    AMIE COLCLAZIER, JACK
      CADENHEAD, MICKEY UPTON and
 7    INDEPENDENT SCHOOL DISTRICT
      NO. 1-01 OF SEMINOLE COUNTY,
 8    STATE OF OKLAHOMA a/k/a
      SEMINOLE SCHOOL DISTRICT,
 9
              Defendants.
10
          VIDEOTAPE DEPOSITION OF AMIE COLCLAZIER
11          TAKEN ON BEHALF OF THE PLAINTIFFS
            ON SEPTEMBER 19, 2016 AT 9:11 AM
12              IN SEMINOLE, OKLAHOMA
13                  APPEARANCES
14    On behalf of the PLAINTIFFS:
      Heath Merchen
15    OKLAHOMA EDUCATION ASSOCIATION
      323 East Madison
16    Oklahoma City, Oklahoma  73154
      405.528.7785
17    hmerchen@okea.org
18    On behalf of the DEFENDANTS:
      Laura Ganz
19    THE CENTER FOR EDUCATION LAW
      900 North Broadway, Suite 300
20    Oklahoma City, Oklahoma  73102
      405.528.2800
21    lganz@cfel.com
22
23    VIDEOTAPED BY:  Marti English
24    REPORTED BY:   Jody Graham, CSR, RPR, RMR, CRR
25
```

1

Defendant's
Exhibit No. 2
APLT. APP. 126

1    **Q**    Do you recall having discussions with anyone

2    prior to the June 11th, 2015 board meeting regarding

3    Aubree Holsapple?

4    **A**    Yes.

5    **Q**    Who did you have discussions with?

6    **A**    I had discussions with a client and employee

7    of mine.  I had discussions with Jeff Pritchard.  I

8    had discussions -- I may have had -- I'm pretty sure

9    that those are the discussions I had with regard to

10   Aubree.

11   **Q**    Did you have discussions with Jack Cadenhead

12   regarding Aubree Holsapple?

13   **A**    I don't know that I specifically had

14   conversations with Jack regarding Aubree Holsapple.

15   **Q**    Did you have discussions with Jack regarding

16   rehiring or not rehiring teachers in the June 11th

17   vote?

18   **A**    I do recall speaking -- could you ask your

19   question again?

20   **Q**    Did you have a conversation with Jack

21   Cadenhead prior to the June 11th meeting about whether

22   to rehire or not rehire certain teachers?

23   **A**    I had a conversation with Jack Cadenhead

24   prior to June 11th about the legality involved and the

25   legal ramifications of the class of temporary teachers

**18**

```
 1    at the end of their two-year period.  That's the
 2    conversation I recall having.
 3         Q     Did you discuss which three teachers you
 4    were concerned with?
 5         A     No, I did not.
 6         Q     Did you have any discussions with any party
 7    prior to June 11th, 2015 about Dara Campbell?
 8         A     Yes, I did.
 9         Q     What conversations did you have?
10         A     I had conversations at a fundraiser for FFA
11    with some parents and students that came up to me
12    there.  I also had a conversation with Jeff Pritchard
13    as to some of my concerns that were definitely geared
14    toward getting her some help and support.  Even
15    earlier.  And then I had conversations with Jeff
16    Pritchard closer to June 11th.
17         Q     Did you discuss Dara Campbell with Jack
18    Cadenhead?
19         A     I did not specifically discuss Dara Campbell
20    with Jack Cadenhead, but I had heard comments that
21    Jack Cadenhead had made over the year or so that
22    second year regarding Dara Campbell.
23         Q     What comments did you hear?
24         A     I had heard that he had said that -- and I
25    didn't hear these directly from Jack, but I had heard
```

**19**

```
 1    that he was concerned about whether or not she was
 2    very organized and that she didn't seem very
 3    interested in showing animals.
 4         Q    Did you have any conversations with any
 5    party prior to the June 11th meeting about Kena Utter?
 6         A    I did.  I did.
 7         Q    What were those conversations?
 8         A    I had had conversations with Jeff Pritchard
 9    about Kena Utter, and I had had a conversation with
10    Carolyn Upton about Kena.
11         Q    And who is Carolyn Upton?
12         A    Carolyn Upton is a first grade teacher.
13         Q    And what was the nature of those
14    conversations?
15         A    Grave concern being expressed for the
16    students in that classroom not getting what they
17    needed because of chronic -- chronically being late
18    every day, like 30 minutes or so, and that the kids
19    were left with nothing to do during that period of
20    time and that that getting an important start to the
21    morning was critical for that age group, along those
22    lines.  And that's why I relayed those concerns to
23    Jeff Pritchard.
24         Q    Did you discuss those concerns with Kena
25    Utter's principal?
```

20

1    A    No, I did not.

2    Q    Did you hear back from Jeff Pritchard
3  regarding those concerns?

4    A    No, I did not.

5    Q    Did you discuss your concerns about Aubree
6  Holsapple with Ms. Holsapple's principal?

7    A    No, I did not.

8    Q    Did you discuss your concerns about Dara
9  Campbell with Dara Campbell's principal?

10   A    No, I did not.

11   Q    The bond issue that occurred earlier in
12 2015, can you explain to me what that bond issue
13 addressed?

14   A    Well, the bond issue was for the building of
15 a new high school facility out on Harvey Road.  What
16 components that school was going to have or not have
17 is debatable.  What could afford to be built for what
18 they were projecting in terms of revenue is debatable.
19 But for all intents and purposes it's the Harvey Road
20 project.

21   Q    And what was your position on that bond
22 issue?

23   A    My position, I was against the Harvey Road
24 bond issue.

25   Q    Why were you against it?

21

1    **A**    I had spoken with Jeff Pritchard about Dara

2    Campbell in April suggesting to him and sharing with

3    him not on a "you have to get right back with me," but

4    sharing with him kind of "this needs to be looked

5    into," the comments that were made to me at the FFA

6    fundraiser.

7    **Q**    Who made those comments to you?

8    **A**    Students.  I had two sets of parents.  I

9    don't know if they were married or not.  I assume they

10   came from two families.

11   **Q**    Do you recall their names?

12   **A**    I don't know their names.  I'm not real

13   active in FFA.  I help with fundraisers, but I don't

14   know the kids.  My last child graduated in '13 so it's

15   as though my knowledge of students and families has

16   just dropped off to next to nothing.

17        But I passed the information on to Jeff

18   immediately, "Really look into this and take this into

19   consideration."  Because I really felt like he needed

20   to address some of this.  If we had a teacher that

21   wasn't interested in helping them show animals and

22   kept deferring and deferring that, here she was

23   nearing her second year; and I had a bunch of students

24   telling me that, that she kept just putting them off

25   and putting them off that way.

**36**

1    Q    When you said "a bunch of students," how
2  many?
3    A    These students were saying there were more
4  than just them, but there were three students and four
5  parents.  But I don't know if all those parents just
6  went with those students.  This was in the high school
7  cafeteria which was set up in kind of an L shape; and
8  the table I was sitting at with my husband where we
9  had been bidding on student workers, we were kind of
10 at the back corner of the deep L shape.
11       And so it was very easy for them to kind of
12 congregate around us and our table.  We were kind of
13 stuck.  And I encouraged them to talk to the principal
14 about it.  I encouraged them to talk to the
15 superintendent about it.
16       And I contacted Jeff.  Just kind of a
17 heads-up, not a "let me know how this turns out," but
18 a heads-up.  And that's something that I did
19 routinely.
20   Q    And what was Mr. Pritchard's response when
21 you contacted him about this issue?
22   A    He said, "All right.  I'll look into it."
23   Q    Are you aware of any other time in the
24 history of the Seminole School District where teachers
25 have been recommended for rehire by their principal

37

1      **A**     I can't remember who all we discussed so

2   far.

3      **Q**     If you can go ahead and list the people you

4   talked to or who spoke to you about these teachers or

5   anyone you contacted.

6      **A**     I did not contact people.  I was contacted

7   by people.  But with respect to Aubree Holsapple, I

8   was contacted by Keturah Ladd.

9      **Q**     Is Keturah Ladd a parent or a staff member?

10      **A**     She is a grandparent of a student.

11      **Q**     What was the nature of her concern?

12      **A**     She -- her grandson had been in the third

13   grade summer reading program, and it was that time

14   where students were going to be held back in the third

15   grade if they could not perform at a certain reading

16   level.  And her grandson had been identified as one

17   that would likely be held back.  But the school

18   counselor and the principal had represented to

19   Ms. Ladd and her daughter, the grandson's parent that

20   this summer program could be the key.

21          The summer program ran through a certain

22   date in June.  And the counselor and the principal

23   both told the grandmother, "Oh, he's doing great.

24   He's working so hard.  He did great here."  Never once

25   mentioned that they already had the test scores

**42**

```
 1   back -- the preliminary test scores back indicating
 2   that he had not moved ahead far enough to go ahead and
 3   make it into the fourth grade.
 4          And so between something like June 19th and
 5   August 10th that family reasonably believed based on
 6   "he did great" that this young man was going to move
 7   ahead to the fourth grade.  And that was just one of
 8   the situations she encountered with the school
 9   counselor.
10      Q    So you believe that student had a reasonable
11   belief that he was going to be promoted?
12      A    Yes.
13      Q    That was based on the representations of the
14   principal and the staff member?
15      A    And the staff member, Aubree Holsapple.
16      Q    And you believe the students and parents had
17   a right to some kind of notice that this wasn't going
18   to happen?
19      A    Since they, in fact, already had that
20   information, since the school already had that
21   information.  Instead it was the eve of school
22   starting, and finding that his name was not on the
23   roster up there with the fourth grade students was
24   very difficult and traumatic for this young man.
25          And so that was kind of a big deal.  I had
```

**43**

1   heard that from Keturah.  I had also spoken with -- I

2   had also heard something from Lacey Davis.

3      **Q**      What did you hear from Lacey Davis?

4      **A**      I had heard that Aubree Holsapple was

5   refusing to test special ed kids.

6      **Q**      Did she give you any specific example?

7      **A**      No.

8      **Q**      Did you do any further investigation into

9   that allegation?

10      **A**      No, I did not.  I turned that over to Jeff

11   Pritchard.

12      **Q**      And was Lacey Davis a parent or a staff

13   member?

14      **A**      Staff member.  And that she was doing online

15   shopping all the time, personal online shopping all

16   the time.  And that was turned over to Jeff, as well.

17   The situation with Keturah Ladd, that was turned over

18   long before the bond issue.  That was turned over at

19   the end of the summer.  Before Mr. Pritchard even

20   started work on the bond issue, that was turned over.

21          And then the Lacey Davis comments and

22   matters, those were turned over probably as soon as I

23   heard them.  I can't be sure when.  But I can tell

24   you -- yeah, that's who I spoke with on Aubree

25   Holsapple.

44

1    **Q**    Did you speak with anyone else regarding

2    Aubree Holsapple?

3    **A**    I may have, but I -- those are the ones I

4    remember.

5    **Q**    Were there any other factors that influenced

6    your vote to rehire or not rehire Aubree Holsapple

7    other than the statements of those two people?

8    **A**    The statement from Jeff Pritchard that

9    Denese Cheatwood did not understand the ramifications

10   of keeping someone past two years temporary if they

11   weren't doing well and weren't a good fit.

12   **Q**    With respect to Dara Campbell, can you list

13   out the individuals who spoke to you about her?

14   **A**    I don't know their names.

15   **Q**    Do you know the names of anyone who did

16   speak to you regarding concerns about Dara Campbell?

17   **A**    No.  I can let you know if I'm able to find

18   out.

19   **Q**    Please.

20   **A**    I can look at a yearbook or something like

21   that.  That might help.  That wouldn't give me

22   parents, but it would give me names of the kids.

23   **Q**    Thank you.  With respect to Kena Utter, can

24   you list everyone who spoke to you about concerns

25   related to Kena Utter?

**45**

```
 1        A     Kena Utter, I spoke with -- Kena, I spoke
 2   with Carolyn Upton.
 3        Q     And what specifically did Carolyn Upton say?
 4        A     That she was late 30 minutes every day and
 5   that that was the most important minutes of that
 6   student's day and that entire class was missing out,
 7   that these were little kids needing to learn how to
 8   read and this was a big deal.
 9        Q     Do you know what she taught?
10        A     I don't.  And by "she," do you mean Carolyn
11   or Kena?
12        Q     Yes, Carolyn.
13        A     I don't.
14        Q     And is Upton, is she related to Mickey
15   Upton?
16        A     I think she may have been at one time.  Her
17   last name is something else now.  She divorced -- was
18   divorced from a relative of Mickey's 15 years ago or
19   more ago.  Her last name is Green now.  Carolyn Green.
20   Sorry.
21        Q     Was there anyone else who spoke to you or
22   who you spoke to regarding Kena Utter?
23        A     I would say no, just she falls under that
24   same category, though, of Jeff not having confidence
25   in Denese's hiring practices and recommendations.
```

46

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF OKLAHOMA
 2

 3   KENA UTTER, AUBREE HOLSAPPLE,
     and DARA CAMPBELL,
 4

                    Plaintiffs,
 5   vs.                               No. CIV-16-00182-RAW
 6   AMIE COLCLAZIER, JACK
     CADENHEAD, MICKEY UPTON and
 7   INDEPENDENT SCHOOL DISTRICT
     NO. 1-01 OF SEMINOLE COUNTY,
 8   STATE OF OKLAHOMA a/k/a
     SEMINOLE SCHOOL DISTRICT,
 9

                    Defendants.
10
             VIDEOTAPE DEPOSITION OF JACK CADENHEAD
11             TAKEN ON BEHALF OF THE PLAINTIFFS
                ON SEPTEMBER 13, 2016 AT 9:01 AM
12                  IN SEMINOLE, OKLAHOMA
13                      APPEARANCES
14   On behalf of the PLAINTIFFS:
     Heath Merchen
15   OKLAHOMA EDUCATION ASSOCIATION
     323 East Madison
16   Oklahoma City, Oklahoma  73154
     405.528.7785
17   hmerchen@okea.org
18   On behalf of the DEFENDANTS:
     Laura Ganz
19   THE CENTER FOR EDUCATION LAW
     900 North Broadway, Suite 300
20   Oklahoma City, Oklahoma  73102
     405.528.2800
21   lganz@cfel.com
22   ALSO PRESENT:  Dara Campbell
23   VIDEOTAPED BY:  Marti English
24   REPORTED BY:   Jody Graham, CSR, RPR, RMR, CRR
25
```

1

Defendant's
Exhibit No. 3

1    individuals who, you know, had -- who were -- who had

2    worked closely with her.

3        Q    Who contacted you?

4        A    I don't really -- I mean, I'll say that -- I

5    don't really want to reveal that because it involves

6    attorney/client privilege.  I represent -- I represent

7    some of the individuals that contacted me and talked

8    to me.  And it was in the context of attorney/client

9    conversation.  And I just -- I don't think I'm in a

10   position to reveal that.

11       Q    Did you represent the individual in a case

12   against Aubree Holsapple?

13       A    No.

14       Q    Did you represent the individual in a case

15   against the Seminole School District?

16       A    No.

17       Q    But you maintain whoever reported it, you

18   represented them in some capacity related to the

19   hiring or not rehiring of Aubree Holsapple?

20       A    No.  But it was in the -- it was in the

21   context of a conversation that revolved around my

22   representation of -- of this individual.  And I

23   just -- I don't want to -- I don't want to reveal

24   that.

25       Q    On what facts did you base your vote not to

                                                    **19**

1   rehire Aubree Holsapple?

2       **A**     For me -- and there was information that --

3   that was reported to me regarding her poor performance

4   when it comes to dealing with special education kids,

5   when it comes to -- when it came to monitoring

6   testing.

7       **Q**     Specifically what poor performance was

8   reported to you regarding special education students?

9       **A**     Not willing to even work with special

10  education kids.

11      **Q**     What examples were given to you?

12      **A**     Exactly what I said, not willing to work

13  with special education kids.

14      **Q**     Were any specific examples of dates, times

15  or incidents given to you?

16      **A**     No.  Not me.

17      **Q**     Were any specific incidents of dates, times

18  or incidents of other poor teaching given to you

19  regarding Aubree Holsapple?

20      **A**     No.

21      **Q**     Did you make the decision to not rehire

22  Aubree Holsapple based on your personal evaluation of

23  her teaching?

24      **A**     No.

25      **Q**     What did you base it on?

20

1      **A**      What I testified here to.  I mean, I didn't

2   have any personal dealings with her.

3      **Q**      So you based your decision on rumors that

4   you heard about her?

5              MR. GANZ:  Object to the form of the

6   question.

7      **Q**      (BY MR. MERCHEN) Did you base your

8   decision regarding Aubree Holsapple on rumors that

9   you heard about Aubree Holsapple's teaching?

10      **A**      No.

11      **Q**      Did you personally ever observe Aubree

12   Holsapple's teaching?

13      **A**      Well, she wasn't a teacher.  I mean, she was

14   the counselor at Wilson.

15      **Q**      Did you personally ever observe Aubree

16   Holsapple performing her duties?

17      **A**      I mean, here and there.  I mean, my child

18   went there, went to school there so, I mean, I saw

19   her.  But I would -- I would answer that no, but with

20   some qualification because it's not as if I never

21   witnessed her doing anything because, I mean, I was in

22   that school building.

23      **Q**      Do you believe you are qualified to judge

24   Aubree Holsapple's competence as a counselor?

25      **A**      Well, it's my -- I mean, it's my

21

1  responsibility as a school board member to -- I mean,
2  it's the board's responsibility to enter into
3  contracts with employees so, I mean, yes, it's my
4  lawful duty to do that.
5      **Q**   Did you interact with Aubree Holsapple's
6  principal regarding your concerns?
7      **A**   No.
8      **Q**   Did you interact with Aubree Holsapple
9  regarding your concerns?
10     **A**   No.
11     **Q**   Did you personally ever give Aubree
12 Holsapple the chance to respond to your concerns?
13     **A**   Not -- I mean, I did not visit with her
14 directly and ask her to do that.  I mean, that's not
15 my place.
16     **Q**   Did you verify any of the rumors that you
17 heard about Aubree Holsapple with her principal?
18     **A**   Not with her principal, no.
19     **Q**   Did you verify any of the rumors you heard
20 about Aubree Holsapple with her superintendent?
21     **A**   I -- I asked the superintendent and I told
22 the superintendent the information I was receiving and
23 gave him the opportunity to get back with me on
24 verifying those things and to bring any contradictory
25 information that would contradict the information that

                                                              22

1  I had.  And he never got back to me.

2      **Q**    What was his response when you raised those

3  issues?

4      **A**    Didn't have a response.

5      **Q**    Did you --

6      **A**    That he would notify the principals, yeah.

7      **Q**    Did you discuss your opinion of Aubree

8  Holsapple's teaching with Mickey Upton?

9      **A**    No.

10      **Q**    Did you have a conversation with Mickey

11  Upton about the vote not to rehire or to rehire Aubree

12  Holsapple?

13      **A**    I don't believe so.

14      **Q**    Did you have any phone conversations with

15  Mickey Upton regarding Aubree Holsapple, Dara Campbell

16  or Kena Utter?

17      **A**    Maybe one.

18      **Q**    What was that conversation?

19      **A**    Just maybe concerns that I had heard, but

20  not about the vote, not about voting a certain way.

21      **Q**    What was said during that conversation?

22      **A**    I don't recall.  Probably something that he

23  or I had -- had heard from other employees.

24      **Q**    Do you remember what he had heard from other

25  employees?

**23**

```
1        Q      Did you ever tell her that she was not doing
2   a good job in your eyes?
3        A      No.
4        Q      Did you tell her evaluator that she was not
5   doing a good job in your eyes?
6        A      Her principal?
7        Q      Yes.
8        A      No.
9        Q      Did you ever share your concerns about her
10  program with her directly?
11       A      No.
12       Q      Did you ever give her a chance to defend
13  herself against your concerns?
14       A      Like, me to her personally?
15       Q      Yes, sir.
16       A      No.
17       Q      On June 11th, 2015 did you participate in
18  the Seminole School Board vote to rehire Kena Utter?
19       A      Yes.
20       Q      How did you vote?
21       A      No.
22       Q      Why?
23       A      I just -- I didn't think she was a good fit
24  for the district.
25       Q      Why?
```

31

```
1        A    I had information that was provided to me
2   through the proper chain of command.
3        Q    What information was provided to you?
4        A    Concerns about being late for school on a
5   regular basis, not being prepared when it came to --
6   when she was going to be gone from school for
7   substitutes, leaving -- I mean, being prepared for
8   substitutes when she was going to be gone.
9             Her colleagues had to fill in for her and
10  leave their own classrooms to cover for her.  There
11  was just a lot of concerns that were -- that was
12  shared with me through the proper chain of command.
13       Q    What was the proper chain of command?
14       A    Talking to their supervisor -- principal
15  first, then superintendent and then me as a board
16  member.
17       Q    So you talked to her principal about these
18  concerns?
19       A    No, no.
20       Q    Did the principal share these concerns with
21  you?
22       A    No.
23       Q    Did you talk to the superintendent about
24  these concerns?
25       A    Yes.
```

32

```
1       Q     What was her superintendent's response?

2       A     Didn't have a response.  I mean, he said

3   that he would talk to the principal and come back with

4   any contradictory information if there was any.  And I

5   never heard from him on it.

6       Q     Did you interact with her principal

7   regarding the issue?

8       A     No.

9       Q     Did you base your vote on your belief that

10  she was coming to school late repeatedly?

11      A     I mean, that was -- that was just one of the

12  concerns.

13      Q     Was that part of the reason that you voted

14  not to rehire her?

15      A     I mean, it's part of it.

16      Q     Was the fact that she was coming to school

17  late part of the reason that you voted not to rehire

18  her?

19      A     Yes, I would say so.

20      Q     Did you ever contact her administrator or

21  her principal regarding why she would come to school

22  late?

23      A     I never contacted the principal about this,

24  no.

25      Q     Did you ever contact Ms. Utter about why she
```

33

```
 1   And he also said he doesn't recall specific
 2   conversations that he had with her.
 3            MR. MERCHEN:  If you have objections, I'm
 4   going to ask that you reserve those for time of trial
 5   or once you've reviewed the transcript, Counsel.
 6            MR. GANZ:  I -- it's just to form.  Asked
 7   and answered.  Move on.
 8        Q    (BY MR. MERCHEN) Were there any other
 9   parties who you did not have an attorney/client
10   relationship with that shared information with you
11   regarding Aubree Holsapple, Dara Campbell or Kena
12   Utter?
13        A    We're talking about all three now?
14        Q    Yes, sir.  Any one of the three.
15        A    Yes.
16        Q    Who?
17        A    I mean, there were -- if we're talking about
18   all three, I mean, there were -- there were several, I
19   mean, parents and other individuals, including
20   students.
21        Q    Can you provide names of these other
22   individuals?
23        A    Not at the moment.  I'm -- I can tell you,
24   you know -- there were several.  I mean --
25   regarding -- regarding Dara Campbell, Anna Surefield,
```

37

1  Cole Cheatwood.

2       **Q**    What did Anna Surefield tell you?

3       **A**    I don't remember.  I don't remember.  She's

4  just a parent that expressed a lot of concerns for the

5  program.  She had a child in the program.  Then, I

6  mean, the -- yeah.

7       **Q**    What did Cole Cheatwood tell you?

8       **A**    I don't remember.  He was just one that

9  expressed concerns constantly.  You know, my child --

10  we have a 4-H program, and Cole was the leader of our

11  4-H program at the time.  And he was later President

12  of the ag booster club.  You know, there was -- there

13  were so many concerns.

14       **Q**    Prior to the June 11th, 2015 board meeting

15  did you share with Mr. Mickey Upton your concerns

16  about Aubree Holsapple, Dara Campbell or Kena Utter,

17  any one of them?

18       **A**    I had probably -- I probably talked to him

19  about stuff that I -- stuff -- I mean, as I've already

20  testified to, I probably talked about concerns that I

21  heard from parents and employees.

22       **Q**    Did you speak with him about your concerns

23  about rehiring any one of the three?

24       **A**    Not -- not like, you know, specifically like

25  you're asking, like, "Oh, I'm going to vote this way."

38

```
 1    Not like that.  But just information that I was given,
 2    sure.
 3         Q     Were you aware that he felt the same way?
 4         A     No.  Not -- no, I wasn't.
 5         Q     Did you have conversations with Amie
 6    Colclazier about Aubree Holsapple, Dara Campbell or
 7    Kena Utter and whether or not they should be rehired?
 8         A     Same response as with Mickey.  And I think
 9    I've already -- I think we already talked about this.
10    But same response as with Mickey.
11         Q     How many conversations did you have with
12    Jeff Pritchard regarding Dara Campbell, Aubree
13    Holsapple or Kena Utter?
14         A     Regarding Dara, had several conversations
15    with Mr. Pritchard throughout the school year.
16    Regarding Ms. Holsapple and Ms. Utter, not as many.
17         Q     Do you recall the nature of those
18    conversations?
19         A     What I've already talked to you about, what
20    I've already -- what I've already testified to.
21         Q     Did you tell Mr. Pritchard that you intended
22    to vote not to rehire these three?
23         A     I think that I -- I don't recall exactly;
24    but I believe I told him that, "You know, with what I
25    know now, with the information I have, I don't know
```

39

1    **Q**    I'm asking you to share your specific

2    concerns regarding Mr. Weldon, whatever those --

3    **A**    I've shared -- I've shared.  I've shared

4    them.  What I've shared with you is what I have this

5    morning for you.

6           MR. MERCHEN:  Counsel, could we take a

7    five-minute recess and talk in the hallway for a

8    second?

9           MS. ENGLISH:  We're off the record at

10   9:56 a.m.

11          (A recess was taken from 9:56 AM to

12   10:08 AM.)

13          MS. ENGLISH:  We are back on the record at

14   10:08 a.m.

15   **Q**    (BY MR. MERCHEN) Mr. Cadenhead, you had

16   shared that you were generally concerned with Dara

17   Campbell's job performance.  Can you share with me

18   the specific nature of your concerns with Dara

19   Campbell's job performance?

20   **A**    Just, I mean, from the concerns that were

21   shared with me and the concerns that I witnessed

22   personally, was the ag program just wasn't going where

23   I wanted to see it go.

24   **Q**    Can you be more specific about what she

25   wasn't doing that you wanted her to do?

46

1        **A**     Well, I mean, for example, you know, my
2   child is in elementary school, is a part of the 4-H
3   club.  There was virtually no support from her for
4   that, and it showed.  And just, I mean, an example, I
5   mean, since she's been gone, we've thrived and our ag
6   program has thrived.
7            Our FFA was recognized as a three-star state
8   Superior Chapter.  Our 4-H program, we had -- we had
9   kids just this last weekend at our county fair showing
10  animals, showing poultry, entering projects into
11  the -- into the fair, going to the state -- going to
12  the state fair.  And you have to have support from
13  your older kids, you've got to have support from your
14  FFA advisor and your ag -- your school ag instructor
15  to see that happen.
16       **Q**     So is it accurate to say that the concerns
17  you had centered on elementary level interaction?
18       **A**     No, no.  It also -- I mean, I'm just giving
19  you -- I'm just giving you that specific example.  And
20  then -- and there was discouraging kids, discouraging
21  high school kids to be involved in livestock showing,
22  getting involved in --
23       **Q**     Can you give me an example of discouraging
24  high school kids?
25       **A**     Well, I mean, downplaying the -- downplaying

                                                        **47**

1   the -- what's involved in such a thing.  I mean, on

2   social media.

3        Q    Can you give me a specific example?

4        A    Sure.  I mean, Dara posted on social media

5   about how, you know -- you know, "It's easy just to

6   throw a collar on an animal and show it -- lead it

7   around a ring," you know.

8             And that's not what -- that's not what that

9   is.  And downplaying that project that so many kids

10  participate in and put so many hours of time into,

11  that's discouraging.

12       Q    Any other specific concerns?

13       A    No.  Not that I can recall to share today.

14       Q    Now, I had previously asked you questions

15  about information you received regarding the three

16  teachers, and you responded that there were some

17  client confidences that prohibited you from

18  responding.  At this point is there anything

19  additional you can share with me that would not

20  constitute a client confidence breach?

21       A    I've shared with you everything -- I mean,

22  I've shared with you the gist of everything already.

23  I mean, my -- my client who was also a teacher is

24  Lacey Davis.

25       Q    Okay.

                                                    48

```
 1  break?
 2          MR. GANZ:  Sure.
 3          MS. ENGLISH:  We're off the record at
 4  10:33 a.m.
 5          (A recess was taken from 10:33 AM to
 6  10:36 AM.)
 7          MS. ENGLISH:  We're back on the record at
 8  10:36 a.m.
 9          MR. MERCHEN:  I have no further questions.
10  I'll turn it over to you, Counsel.
11                  CROSS EXAMINATION
12  BY MS. GANZ:
13      Q   I just have a couple questions.
14  Mr. Cadenhead, did you vote not to rehire or renew
15  Dara Campbell's 2015-2016 contract because of her
16  position on the bond issue?
17      A   No.
18      Q   Were you aware that Kena Utter had an
19  arrangement with her principal to be late because of
20  her child?
21      A   No.
22          MR. GANZ:  No further questions.
23          MR. MERCHEN:  Mr. Cadenhead, you have the
24  right to review your deposition and approve it prior
25  to its official submission.  You also have the right
```

63

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF OKLAHOMA
2

3   KENA UTTER, AUBREE HOLSAPPLE,
    and DARA CAMPBELL,
4
              Plaintiffs,
5   vs.                            No. CIV-16-00182-RAW
6   AMIE COLCLAZIER, JACK
    CADENHEAD, MICKEY UPTON and
7   INDEPENDENT SCHOOL DISTRCT NO.
    1-01 OF SEMINOLE COUNTY, STATE
8   OF OKLAHOMA a/k/a SEMINOLE
    SCHOOL DISTRICT,
9
              Defendants.
10
              VIDEOTAPE DEPOSITION OF MICKEY UPTON
11            TAKEN ON BEHALF OF THE PLAINTIFFS
              ON SEPTEMBER 6, 2016 AT 1:14 PM
12                IN SEMINOLE, OKLAHOMA
13                    APPEARANCES
14  On behalf of the PLAINTIFFS:
    Heath Merchen
15  OKLAHOMA EDUCATION ASSOCIATION
    323 East Madison
16  Oklahoma City, Oklahoma  73154
    405.528.7785
17  hmerchen@okea.org
18  On behalf of the DEFENDANTS:
    Laura L. Holmes
19  Laura Ganz
    THE CENTER FOR EDUCATION LAW
20  900 North Broadway, Suite 300
    Oklahoma City, Oklahoma  73102
21  405.528.2800
    lganz@cfel.com
22  lholmes@cfel.com
23  ALSO PRESENT:  Dara Campbell, Kena Utter
24  VIDEOTAPED BY:  Stesha Snow
25  REPORTED BY:   Jody Graham, CSR, RPR, RMR, CRR
```

1

Defendant's
Exhibit No. 4

1    **Q**      And when it was just about them, how did you
2    vote?
3    **A**      No.
4    **Q**      And by "no," you mean you voted not to
5    rehire them?
6    **A**      Correct.
7    **Q**      Why?
8    **A**      I didn't think they were good enough to
9    teach at Seminole schools.
10   **Q**      When you say "not good enough", on what
11   facts did you base that determination?
12   **A**      I had received or had noticed things that I
13   thought didn't make them an effective teacher or
14   counselor.
15   **Q**      Specifically what did you receive?
16   **A**      I talked to a teacher at Wilson School.
17   **Q**      What was the teacher's name?
18   **A**      Carolyn Green.
19   **Q**      What did you learn from Carolyn Green?
20   **A**      She said she didn't think that some of these
21   teachers up for rehire were very good at what they
22   did.
23   **Q**      Did she name any teachers specifically?
24   **A**      She named our counselor, Holsapple.
25   **Q**      What did she say about Holsapple?

13

```
 1        A    She wasn't doing a very good job.

 2        Q    Did she say why?

 3        A    I don't know.

 4        Q    Did you contact Ms. Holsapple's principal to

 5   see if that was accurate?

 6        A    No.

 7        Q    Did you contact the superintendent to see if

 8   that was accurate?

 9        A    Eventually, I did.

10        Q    Tell me about that conversation.

11        A    So I called the principal -- or, excuse me,

12   I called the superintendent, Jeff, and I said that

13   there were some teachers that were coming up for

14   rehire that I didn't feel comfortable with.

15        Q    And what was his response?

16        A    He said was it the same group of teachers

17   that Amie had called him about, Amie Colclazier.  And

18   I said I didn't know what Amie had called him about.

19        Q    What else was said?

20        A    He said, "Okay.  Thanks."

21        Q    Now, you said a "group of teachers".  What

22   other teachers had you heard about?

23        A    I spoke with Brian Guthrie.

24        Q    Okay.  What did Brian tell you?

25        A    He seemed to think that Ms. Holsapple had
```

14

1     been given special treatment in her hiring.

2         Q     Explain that.

3         A     I believe she had an emergency

4     certification.

5         Q     Okay.  And did you believe that should

6     affect her rehire?

7         A     Well, I was led to believe that the position

8     wasn't advertised.

9         Q     Okay.

10        A     So --

11        Q     Did he give you any other information about

12    her?

13        A     No.

14        Q     Were there any other teachers that people

15    contacted you about?

16        A     Well, I spoke with Jack Cadenhead.

17        Q     Okay.  And what did you and Jack discuss?

18        A     Well, I -- Jack spoke to me in his position

19    as a parent.

20        Q     Okay.  What did Jack discuss with you?

21        A     He said that he didn't think that our

22    counselor at Wilson and our first grade teacher were

23    very effective.  I don't remember the exact words, but

24    he didn't think they were doing a very good job.

25        Q     So when you voted to rehire them, did you

**15**

1    base that vote on what you had heard?

2        A    I'm sorry.  What's the question?

3        Q    When you voted not to rehire the three

4    teachers, did you base that vote on these items that

5    you had heard?

6        A    Yes.

7        Q    Were there any other factors on which you

8    based your vote?

9        A    So my superintendent didn't give me anything

10   else with which to make a decision.

11       Q    Tell me what that means.

12       A    He didn't even ask me who I was going to

13   vote against.  He didn't give me any information to

14   make a proper decision.  So all I had to go off of was

15   what I had.

16       Q    Is there a reason you didn't contact the

17   principals?

18       A    So while that's not un-allowed, I think it's

19   frowned upon.

20       Q    Why would it be frowned upon?

21       A    I don't know why.

22       Q    Okay.  What is your relationship like with

23   Jack Cadenhead?

24       A    He has been on the board with me.

25       Q    Are you friends?

16

```
1          A      No.

2          Q      Did anyone else contact you other than

3     Mr. Cadenhead?

4          A      No.

5          Q      Okay.  Kena Utter, did anyone contact you

6     prior to the June 11th, 2015 board meeting about Kena

7     Utter?

8          A      Yes.

9          Q      Who?

10         A      Jack Cadenhead.

11         Q      And what did Jack Cadenhead say?

12         A      Very similar to before, that she was not

13    effective at what she did and she wasn't doing a good

14    job as her -- in her position.

15         Q      Did he give you any specific examples of why

16    she wasn't doing a good job or how?

17         A      He did not.

18         Q      Did you ask for any?

19         A      No.

20         Q      Did you base your vote on what Jack

21    Cadenhead had told you?

22         A      Partially, yes.

23         Q      What was the other part?

24         A      Carolyn Green.

25         Q      Was there anyone other than Carolyn Green
```

**23**

```
 1    and Jack Cadenhead that contacted you regarding these

 2    three teachers?

 3         A    Brian Guthrie.

 4         Q    Brian Guthrie.  Anyone else?

 5         A    My son.

 6         Q    What did your son say?

 7         A    That none of the students liked the ag

 8    teacher.

 9         Q    Did he say why?

10         A    I don't remember what he recalled.  I

11    didn't -- I didn't really pay a lot of attention to it

12    because his perspective is not -- he's 16.

13         Q    Okay.  Did anyone else contact you?

14         A    No.

15         Q    Before the vote did you review the personnel

16    files of the three teachers that we've been

17    discussing?

18         A    No.

19         Q    Did you contact anyone in the administration

20    about their performance?

21         A    Well, I contacted my superintendent.

22         Q    And what specifically did you discuss with

23    your superintendent about Dara Campbell?

24         A    So I didn't discuss anything specific about

25    Dara Campbell.
```

**24**

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF OKLAHOMA
 2
 3     KENA UTTER, AUBREE HOLSAPPLE,
       and DARA CAMPBELL,
 4
 5          Plaintiffs,

 6     vs.                            No. CIV-16-00182-RAW

 7     AMIE COLCLAZIER, JACK
       CADENHEAD, MICKEY UPTON and
 8     INDEPENDENT SCHOOL DISTRICT
       NO. 1-01 OF SEMINOLE COUNTY,
 9     STATE OF OKLAHOMA a/k/a
       SEMINOLE SCHOOL DISTRICT,
10
11          Defendants.

12        VIDEOTAPE DEPOSITION OF DENESE CHEATWOOD
              Taken on Behalf of the Plaintiffs
13      On September 23, 2016, beginning at 9:36 a.m.
                 In Seminole, Oklahoma
14
15                     APPEARANCES:
16     Appearing on behalf of the PLAINTIFFS
17             Heath Merchen
               OKLAHOMA EDUCATION ASSOCIATION
18             323 East Madison
               Oklahoma City, Oklahoma 73154
19             405-528-7785
               Hmerchen@okea.org
20
       Appearing on behalf of the DEFENDANTS
21
               Laura Holmgren-Ganz
22             THE CENTER FOR EDUCATION LAW
               900 North Broadway, Suite 300
23             Oklahoma City, Oklahoma 73102
               405-528-2800
24             Lganz@cfel.com
25     (Appearances cont'd on next page)
```

1

Defendant's
Exhibit No. 5

```
 1        Q      Okay.  Now, in your role as principal, did
 2   you supervise Aubree Holsapple?
 3        A      Yes, I did.
 4        Q      What role was she serving?
 5        A      She was my school counselor.
 6        Q      And how long did you supervise her?
 7        A      Two years.
 8        Q      How closely did you work with
 9   Ms. Holsapple?
10        A      Pretty closely.
11        Q      Can you describe what she did for you?
12        A      She was pretty much my right-hand man.
13   She did a lot of special education, you know, as far
14   as records, arranging meetings with parents, the IEP
15   meetings and things like that.  She did guidance
16   activities with our students, and she was in charge
17   if I was gone.
18        Q      Did you ever have any disciplinary
19   concerns with Ms. Holsapple?
20        A      No, I did not.
21        Q      How would you characterize Ms. Holsapple's
22   work performance?
23        A      She was excellent.  She did a very good
24   job.
25        Q      Was your evaluation consistent with that
```

7

```
 1          A    He told me that three board members had
 2     contacted him.
 3          Q    Did he identify which three board members?
 4          A    Yes.
 5          Q    And who were they?
 6          A    Amie Colclazier, Mickey Upton, and Jack
 7     Cadenhead.
 8          Q    Did you have any conversations about
 9     whether or not those allegations were true of
10     Mr. Pritchard?
11          A    Yes.
12          Q    What did you say?
13          A    Well, no, for Aubree.  I mean, that just
14     wasn't true.  She didn't handle special education
15     other than paperwork and sitting in as an
16     administrator, you know, on some of the IEPs, but
17     that's the teacher and the parents doing the talking
18     there.  All she does is sign the document saying she
19     was there, so that was not a true statement about
20     her.
21               Mr. Pritchard and I had talked several
22     times about Kena's attendance and, you know, her
23     being late.  It wasn't an issue.  I mean, I knew
24     from the get-go when I hired Kena that she had a son
25     with autism, and she told me that mornings were very
```

**12**

```
 1    tough for Cooper, and that, you know, sometimes she
 2    might run behind a little, and I just told her, you
 3    know, "Text me, call me.  We'll take care of it,"
 4    so...
 5          Q     Did you know at the time she was hired
 6    that her child was disabled?
 7          A     Yes, I did.
 8          Q     And at the time she was hired, did she ask
 9    for accommodations so she could come in late when
10    she had to care for him?
11          A     Yes.  She told me sometimes mornings are
12    difficult, and so -- I mean, it was something that
13    we talked about and discussed, and I agreed to it,
14    you know, but it really wasn't that much of an
15    issue.
16          Q     And did you view her tardiness as
17    problematic?
18          A     No.  I would not view it that way.
19          Q     Did anyone else voice concerns about Kena
20    Utter's attendance or tardiness?
21          A     One teacher.
22          Q     Who was that?
23          A     Lacey Davis.
24          Q     And what did she say?
25          A     She just, you know, told me Kena is late
```

13

1   all the time.  You know, some of the teachers are

2   thinking about going to Mr. Pritchard, you know,

3   just that kind of thing.

4          **Q**    And how did you deal with that complaint?

5          **A**    I just told her what happened between Kena

6   and I was a personnel issue and it was confidential,

7   but thank you for coming to me with your concern,

8   basically.

9          **Q**    And did you keep that confidential because

10  of the nature of her child's disability reasons?

11         **A**    Yes, I did.  I felt like that was Kena's

12  place to tell them.

13         **Q**    And when you discussed the issue with

14  Mr. Pritchard, what did you share with

15  Mr. Pritchard?

16         **A**    That Kena's child had autism.  There might

17  be a few mornings, you know, when it was a little

18  tough, especially when we were going through a new

19  transition, and then he said that was between me and

20  my teacher.

21         **Q**    Did he voice any concerns or objections?

22         **A**    No, he didn't.

23         **Q**    Did any board members ever contact you

24  regarding Kena Utter before?

25         **A**    No.

**14**

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF OKLAHOMA
 2
 3   KENA UTTER, AUBREE HOLSAPPLE,
     and DARA CAMPBELL,
 4
              Plaintiffs,
 5   vs.                          No. CIV-16-00182-RAW
 6   AMIE COLCLAZIER, JACK
     CADENHEAD, MICKEY UPTON and
 7   INDEPENDENT SCHOOL DISTRICT
     NO. 1-01 OF SEMINOLE COUNTY,
 8   STATE OF OKLAHOMA a/k/a
     SEMINOLE SCHOOL DISTRICT,
 9
              Defendants.
10
              VIDEOTAPE DEPOSITION OF KENA UTTER
11            TAKEN ON BEHALF OF THE DEFENDANTS
               ON SEPTEMBER 6, 2016 AT 9:17 AM
12                 IN SEMINOLE, OKLAHOMA
13                     APPEARANCES
14   On behalf of the PLAINTIFFS:
     Heath Merchen
15   OKLAHOMA EDUCATION ASSOCIATION
     323 East Madison
16   Oklahoma City, Oklahoma  73154
     405.528.7785
17   hmerchen@okea.org
18   On behalf of the DEFENDANTS:
     Laura L. Holmes
19   Laura Ganz
     THE CENTER FOR EDUCATION LAW
20   900 North Broadway, Suite 300
     Oklahoma City, Oklahoma  73102
21   405.528.2800
     lganz@cfel.com
22   lholmes@cfel.com
23   ALSO PRESENT:  Dara Campbell
24   VIDEOTAPED BY:  Stesha Snow
25   REPORTED BY:   Jody Graham, CSR, RPR, RMR, CRR
```

1

Defendant's
Exhibit No.6
APLT. APP. 166

```
 1   philosophy of education, how I felt about teaching and
 2   what my goals were as a teacher.  We also discussed --
 3   my son Cooper has some issues, and I wanted them to be
 4   aware that there may be some times that he melts down
 5   in the morning, and I may have to call and let them
 6   know I'm coming as quickly as I can.
 7          He has some autistic spectrum disorder
 8   issues that sometimes can lead to huge meltdowns,
 9   especially during routine change.
10      Q    You talked about Cooper having meltdowns,
11   and you talked about having discussion with Principal
12   Cheatwood.  Did you come to any type of agreement as
13   to how you were going to handle that?
14      A    Yes.  I would call her and let her know if
15   something arose and then get there as quickly as I
16   could.
17      Q    Do you know if Ms. Cheatwood informed anyone
18   else regarding your agreement regarding Cooper?
19      A    I do not know.
20      Q    What was your start date at Seminole?
21      A    I don't recall the start date.  It was the
22   same start date that everybody else had.  It wasn't
23   late or early.  I don't recall the date.
24      Q    Okay.  What school year did you start?
25   That's a better way to approach it.
```

12

1    **Q**    Does he still experience meltdowns?

2    **A**    Yes.

3    **Q**    So this is a continuing challenge?

4    **A**    Yes.  You do not outgrow autism.

5    **Q**    When Cooper would have a meltdown,

6    approximately how long would it last?

7    **A**    That could -- that -- it ranges.  You might

8    get him settled down in 15 or 20 minutes.  It may be

9    an hour.  It's different every time.  And the severity

10   of it is also different.

11   **Q**    So when Cooper would have a meltdown, you

12   said that you would contact Principal Cheatwood?

13   **A**    If it was going to result in me being a few

14   minutes late, yes.

15   **Q**    Would you contact her on the school phone,

16   her cell phone?  How would you --

17   **A**    Both.  Either way I could get ahold of her.

18   **Q**    Did you speak to her directly, or did you

19   send her a text or --

20   **A**    Both.  It was different every time.

21   Sometimes she -- I would text.  Sometimes it would be

22   phone calls.  Sometimes I would call the office.  Just

23   however I could reach her.

24   **Q**    During 2014-2015 did you have any complaints

25   or comments expressed by parents about you being late?

21

1      **A**      No, ma'am.

2      **Q**      Did you have any complaints or comments

3   expressed by co-workers in 2014-2015 about being late?

4      **A**      Not to me.

5      **Q**      2014-2015, did any administration have any

6   complaints about you being late?

7      **A**      No, ma'am.

8      **Q**      During 2014-2015 did you hear about

9   anyone -- maybe not complaining directly to you; but,

10  you know, vis-a-vis through the grapevine someone

11  complaining about you being late?

12     **A**      No, ma'am.

13     **Q**      You said in the past you worked at Shawnee

14  Public Schools prior to working for Seminole.  Did you

15  have similar arrangements with Shawnee?

16     **A**      At that time Cooper -- I was married at that

17  time so I had help.  So things were a little

18  different.

19     **Q**      So your husband --

20     **A**      He was younger.

21     **Q**      Okay.  So would your husband take care of

22  him in the morning if for some reason --

23     **A**      And he was a baby at that time, and things

24  were a lot easier than a rage from a ten-year-old.

25  Things were a lot different.

                                                      22

1    **Q**    So I take it then that you didn't have any

2   arrangements with your prior -- with Shawnee Public

3   Schools prior to Seminole; is that correct?

4    **A**    If there was an issue, I did call them and

5   let them know that I would be running late.

6    **Q**    So they were also aware of Cooper's

7   challenges?

8    **A**    Yes.

9    **Q**    During 2014-2015 when Cooper would have a

10  meltdown did it ever get to a point where it was just

11  a day where maybe he just needed Mom at home that day

12  and school just wasn't going to be in the picture?

13   **A**    I didn't ever call in for that for a entire

14  day, no.

15   **Q**    Were there other reasons you called in?

16   **A**    If somebody was sick or we had appointments,

17  yes.

18   **Q**    Did Principal Cheatwood in 2014-2015 ever

19  discuss with you about co-workers or parents

20  complaining about you being late?

21   **A**    No.

22   **Q**    What discussions did you have with Principal

23  Cheatwood about 2015-2016 school year?

24   **A**    I was under the impression I would be back.

25   **Q**    When did you learn about that?

**23**

```
 1    posting anything on Facebook or tweet anything or
 2    Instagram or texting anything as to the reasons as to
 3    why you were not going to be renewed?
 4         A    No.
 5         Q    When did you start seeking new employment?
 6         A    When did I -- I'm sorry?
 7         Q    When did you start seeking re-employment
 8    when you found out you were not going to be hired at
 9    Seminole?
10         A    The next day.
11         Q    Where did you apply?
12         A    I didn't have to apply.  I had 17 offers the
13    next morning.
14         Q    Who did you have offers from?
15         A    I had phone calls from Wewoka, Oklahoma City
16    Public Schools, Moore Public Schools, Pleasant Grove,
17    Earlsboro, Tecumseh.  I don't recall all of them.
18         Q    So they called you?
19         A    Yes, ma'am.
20         Q    They contacted you directly?
21         A    Yes, ma'am.
22         Q    What did they say?  What were your
23    conversations?
24         A    Some of them had left messages on my phone
25    that they would -- they would be interested in talking
```

**45**

```
 1    to me about employment, they had seen the news and had
 2    heard what had happened and would be happy to have me.
 3         Q    Did Shawnee reach out to you?
 4         A    Yes.
 5         Q    That -- so they were one of the 17 that
 6    called you?
 7         A    Yes.
 8         Q    Do you recall who contacted you from
 9    Shawnee?
10         A    Jackie Noble.
11         Q    And what is her position?
12         A    She's a principal.
13         Q    At what school?
14         A    Will Rogers.
15         Q    Is that where you work today?
16         A    Yes, ma'am.
17         Q    So when Principal Noble offered you a
18    position, what were the terms of the offer?
19         A    Can you rephrase that?
20         Q    What position did she offer you?
21         A    First grade.  It changed to second grade,
22    but --
23         Q    So it started out as first grade?
24         A    Started as first grade.  Changed to second
25    grade.
```

46

9/29/2016                                  **SEMINOLE PUBLIC SCHOOLS**                                Page 1
9:22:45 AM                                         **Employee Leave**

Report Options: Date Range: 8/1/2013 - 5/29/2014; Transaction Type(s): Employee Taken, + Adjustment, - Adjustment, Accrual; Type(s) of Leave: Not Docked, Docked At Sub Rate, Docked At Salary

Filter Criteria:    EmployeeID = 80725

**Employee ID: 80725**     **Name:** Kena Utter                              **Site:** 105

**Position: CT 210 CERTIFIED TEACHER**                   **Hours/Day:** 6

| Date | Hours | Days | Description | Trans. Type | Reason | Substitute | Dock Type | Dock Amt |
|---|---|---|---|---|---|---|---|---|
| 5/15/2014 | -6 | -1 | SICK LEAVE | Taken | | Janice Curry | Sub | $57.00 |
| 5/2/2014 | -6 | -1 | SICK LEAVE | Taken | | Janice Curry | Sub | $57.00 |
| 4/25/2014 | -6 | -1 | SICK LEAVE | Taken | | Janice Curry | Sub | $57.00 |
| 4/21/2014 | -4 | -0.6667 | SICK LEAVE | Taken | | Janice Curry | Sub | $38.00 |
| 4/11/2014 | -6 | -1 | SICK LEAVE | Taken | | Tiffany Cadenhead | Sub | $62.04 |
| 3/28/2014 | -6 | -1 | SICK LEAVE | Taken | | Janice Curry | Sub | $57.00 |
| 3/27/2014 | -6 | -1 | SICK LEAVE | Taken | | Tiffany Cadenhead | Sub | $62.04 |
| 3/6/2014 | -6 | -1 | SICK LEAVE | Taken | | Janice Curry | Sub | $57.00 |
| 2/27/2014 | -4 | -0.6667 | SICK LEAVE | Taken | | Rachel Biller | Sub | $38.00 |
| 2/26/2014 | -5 | -0.8333 | SICK LEAVE | Taken | | Rachel Biller | Sub | $47.50 |
| 2/20/2014 | -4 | -0.6667 | SICK LEAVE | Taken | | Russell Baker | | $0.00 |
| 2/18/2014 | -5 | -0.8333 | SICK LEAVE | Taken | | | Sub | $47.50 |
| 2/18/2014 | -1 | -0.1667 | SICK LEAVE | Taken | | | | $0.00 |
| 2/13/2014 | -4 | -0.6667 | SICK LEAVE | Taken | | Tiffany Cadenhead | Sub | $41.36 |
| 2/11/2014 | -6 | -1 | SICK LEAVE | Taken | | Janice Curry | | $0.00 |
| 1/30/2014 | -6 | -1 | SICK LEAVE | Taken | | Janice Curry | | $0.00 |
| 1/27/2014 | -6 | -1 | SICK LEAVE | Taken | | Philip Botsford | | $0.00 |
| 12/4/2013 | -6 | -1 | PERSONAL LEAVE | Taken | | Rachel Biller | | $0.00 |
| 11/15/2013 | -6 | -1 | SICK LEAVE | Taken | | | | $0.00 |
| 11/12/2013 | -6 | -1 | SICK LEAVE | Taken | | | | $0.00 |
| 10/30/2013 | -6 | -1 | SICK LEAVE | Taken | | | | $0.00 |
| 10/16/2013 | -6 | -1 | PERSONAL LEAVE | Taken | | Rachel Biller | | $0.00 |
| 10/10/2013 | -6 | -1 | SICK LEAVE | Taken | | Amy Stover | | $0.00 |
| 10/1/2013 | -4 | -0.6667 | SICK LEAVE | Taken | | Sharon Hollis | | $0.00 |
| 9/18/2013 | -6 | -1 | SICK LEAVE | Taken | | | | $0.00 |
| 8/27/2013 | -3 | -0.5 | SICK LEAVE | Taken | | | | $0.00 |
| 8/1/2013 | 12 | 2 | PERSONAL LEAVE | + Adj | BEGINNING BALANCE | | | $0.00 |
| 8/1/2013 | 60 | 10 | SICK LEAVE | + Adj | BEGINNING BALANCE | | | $0.00 |

                                                        **Total Dock Amount:**    $621.44

**Leave Balance Totals in Days**

| Description | Beginning Balance | Accrued | Taken | Pos Adjust | Neg Adjust | Current Balance | Dock Sub/Sal% | Dock Salary |
|---|---|---|---|---|---|---|---|---|
| PERSONAL LEAVE | 0 | 0 | 2 | 2 | 0 | 2 | 0 | 0 |
| SICK LEAVE | 0 | 0 | 20.6667 | 10 | 0 | 11 | 10.6667 | 0 |

Defendant's
Exhibit No. 7
APLT. APP. 173

SEP/29/2016 6:16 CV-00182-RAW Document 26-7 Filed in ED/OK on 11/14/16 Page 2 of 2
Appellate Case: 17-7002 Document: 01019800618 Date Filed: 04/26/2017 P. Page: 180

**SEMINOLE PUBLIC SCHOOLS**
**Employee Leave**

Report Options: Date Range: 8/1/2014 - 5/28/2015; Transaction Type(s): Employee Taken, + Adjustment, - Adjustment, Accrual; Type(s) of Leave: Not Docked, Docked At Sub Rate, Docked At Salary

Filter Criteria:     EmployeeID = 80725

| Employee ID: 80725 | | Name: Kena Utter | | | | Site: 105 | | |
|---|---|---|---|---|---|---|---|---|
| Position: CT 210 CERTIFIED TEACHER | | | | | Hours/Day: 6 | | | |
| Date | Hours | Days | Description | Trans. Type | Reason | Substitute | Dock Type | Dock Amt |
| 5/4/2015 | -6 | -1 | SICK LEAVE | Taken | | | Sub | $57.00 |
| 4/24/2015 | -6 | -1 | SICK LEAVE | Taken | | Tiffany Cadenhead | Sub | $75.00 |
| 4/20/2015 | -6 | -1 | SICK LEAVE | Taken | | Tiffany Cadenhead | Sub | $75.00 |
| 4/17/2015 | -3 | -0.5 | SICK LEAVE | Taken | | | Sub | $28.50 |
| 4/10/2015 | -6 | -1 | SICK LEAVE | Taken | | | Sub | $57.00 |
| 4/6/2015 | -6 | -1 | SICK LEAVE | Taken | | Janice Curry | Sub | $57.00 |
| 3/25/2015 | -4 | -0.6667 | SICK LEAVE | Taken | | Tiffany Cadenhead | Sub | $50.00 |
| 3/2/2015 | -6 | -1 | SICK LEAVE | Taken | | Gloria J. Barrett | Sub | $57.00 |
| 2/20/2015 | -6 | -1 | SICK LEAVE | Taken | | Valerie Burnett | Sub | $75.00 |
| 2/19/2015 | -6 | -1 | SICK LEAVE | Taken | | Valerie Burnett | Sub | $75.00 |
| 2/18/2015 | -6 | -1 | SICK LEAVE | Taken | | Valerie Burnett | Sub | $75.00 |
| 2/17/2015 | -6 | -1 | SICK LEAVE | Taken | | Valerie Burnett | Sub | $75.00 |
| 2/10/2015 | -4 | -0.6667 | SICK LEAVE | Taken | | Shawnee Weidner | Sub | $50.00 |
| 1/26/2015 | -6 | -1 | SICK LEAVE | Taken | | Sherry Fry | Sub | $75.00 |
| 1/16/2015 | -6 | -1 | SICK LEAVE | Taken | | Tiffany Cadenhead | Sub | $75.00 |
| 1/15/2015 | -5.5 | -0.9167 | SICK LEAVE | Taken | | Tiffany Cadenhead | Sub | $68.75 |
| 1/15/2015 | -0.5 | -0.0833 | SICK LEAVE | Taken | | Tiffany Cadenhead | | $0.00 |
| 1/6/2015 | -6 | -1 | SICK LEAVE | Taken | | Tiffany Cadenhead | | $0.00 |
| 12/10/2014 | -6 | -1 | SICK LEAVE | Taken | | Valerie Burnett | | $0.00 |
| 11/25/2014 | -6 | -1 | SICK LEAVE | Taken | | Tiffany Cadenhead | | $0.00 |
| 11/24/2014 | -6 | -1 | SICK LEAVE | Taken | | Tiffany Cadenhead | | $0.00 |
| 11/18/2014 | -3.5 | -0.5833 | SICK LEAVE | Taken | | Frances Botsford | | $0.00 |
| 10/28/2014 | -6 | -1 | PERSONAL LEAVE | Taken | | Janice Curry | | $0.00 |
| 10/27/2014 | -6 | -1 | SICK LEAVE | Taken | | Janice Curry | | $0.00 |
| 10/2/2014 | -6 | -1 | SICK LEAVE | Taken | | Janet C. Brackett | | $0.00 |
| 9/30/2014 | -6 | -1 | SICK LEAVE | Taken | | Tiffany Cadenhead | | $0.00 |
| 9/29/2014 | -6 | -1 | SICK LEAVE | Taken | | Tiffany Cadenhead | | $0.00 |
| 9/23/2014 | -4 | -0.6667 | SICK LEAVE | Taken | | Tiffany Cadenhead | | $0.00 |
| 9/2/2014 | -4 | -0.6667 | SICK LEAVE | Taken | | Janet C. Brackett | | $0.00 |

Total Dock Amount:     $1,025.25

**Leave Balance Totals in Days**

| Description | Beginning Balance | Accrued | Taken | Pos Adjust | Neg Adjust | Current Balance | Dock Sub/Sal% | Dock Salary |
|---|---|---|---|---|---|---|---|---|
| PERSONAL LEAVE | 2 | 0 | 1 | 0 | 0 | 2 | 0 | 0 |
| SICK LEAVE | 10 | 0 | 24.75 | 0 | 0 | 11 | 14.75 | 0 |

APLT. APP. 174

## ARTICLE V: CONTRACT YEAR/CONTRACT DAY

A.  The 2014-2015 contract year for teachers shall be one hundred eighty-two (182) working days (175 instructional days, 5 professional days and 2 preparation days).

B.  The contract day for teachers shall begin fifteen minutes before the beginning of a teacher's assigned teaching schedule and shall end after the end of the day's assigned teaching schedule. Teachers will be available for students and parents after school until the halls in the teacher's immediate area are clear of students unless assigned duties and professional responsibilities require otherwise. Duties outside the teaching schedule shall be assigned on a rotating equitable basis. A minimum of forty minutes will be provided for planning daily, and a minimum of 35 consecutive minutes to eat lunch. Before school duty assignments will be compensated at the rate of five ($5.00) dollars per/15 minute period if the assignment is for services rendered before the designated daily reporting time of the teacher. Volunteers will be solicited for the assignments. If there are not sufficient volunteers for the assignments, teachers will be assigned to the duty(s) on a rotating and equitable basis.

C.  Attendance at meetings and conferences called by the principal or superintendent may extend the contract day.

D.  At the beginning of each school year, the principal, after receiving input from teachers, shall establish a lunch duty schedule. Said schedule shall assign duties to teachers on a rotating, equitable basis. Teachers shall be provided with as much duty free time as the daily schedule will allow.

Defendant's
Exhibit No. 8
APLT. APP. 175

## ARTICLE XI: TEACHER EVALUATION

11.1 Definition

Evaluation is defined as a mutual endeavor among all teachers, the administrative staff, and the Board of Education to improve the quality of the educational program. The school district and the teachers jointly accept the responsibility for the improvement of instruction. All teachers are expected to demonstrate an appropriate level of performance in relation to their job descriptions, statements of objectives and approved performance criteria. Evaluation is a system for documenting the criteria and the evidence of performance of teachers.

11.2 Procedure for Teacher Evaluation

A. The performance of all teachers will be evaluated using the criteria submitted by the Evaluation Committee, as required by law, and approved by the Board of Education. Each evaluation shall be based upon the evaluator's actual observation and knowledge of the teacher evaluated while performing his/her job function. Teachers will be evaluated by Principals, as required by law. Teachers who are assigned to more than one teaching site may be evaluated at the discretion of the administration. One principal per traveling teacher shall be designated by the Office of the Superintendent to conduct the minimum evaluation(s) as required by statute.

B. Every probationary teacher will be evaluated at least twice a year. Once prior to November 15 and once prior to February 10. Every career teacher will be evaluated at least once each year.

C. Written evaluations will be completed on an approved evaluation form and will be followed with a conference between the evaluator and the teacher. The form shall be signed by both parties. If the evaluator calls for a plan for improvement, such plan will be developed jointly by the evaluator and the teacher. The plan will state the deficiency or deficiencies, how improvement is to be accomplished, the target date for improvement, evaluation of performance, and the date accessed. Failure to satisfactorily correct the area(s) that do not meet criteria, or needs improvement within the time allowed may lead to a recommendation for the teacher's dismissal or non-reemployment.

D. The evaluation report and plan for improvement, if one is developed, will be filed in the staff member's personnel file. The file is accessible to the staff member, the Board of Education, the administrative staff of the district, the administrative staff to which the teacher applies for employment, and only those others designated by the teacher.

MINUTES FOR
BOARD OF EDUCATION
INDEPENDENT SCHOOL DISTRICT NO. 1
SEMINOLE COUNTY, OKLAHOMA
SEMINOLE PUBLIC SCHOOLS

As required by Section 311, Title 25 of the Oklahoma Statutes, notice is hereby given that the Board of Education of Independent School District No. 1 of Seminole County, Oklahoma will hold a **SPECIAL MEETING** on December 17, 2014, at 5:30 o'clock p.m., at the Goldie Barnett Conference Room, Seminole Public Library, 424 N. Main, Seminole, Oklahoma.

The following is a list of the business to be conducted by the Board of Education at the above meeting:

1.  The meeting was called to order by President Jamie Mills.

2.  Members Present: Jamie Mills, Cai Levy, Jack Cadenhead, Claudia Willis, and Amie Colclazier.

3.  Board to consider and take necessary action to hire Jack Mattingly Sr. as legal counsel for the district through the completion of the new high school project.

    Cai Levy made the motion seconded by Claudia Willis to hire Jack Mattingly Sr. as legal counsel for the district through the completion of the new high school project.

    Jamie Mills – yes
    Cai Levy – yes
    Jack Cadenhead – yes
    Claudia Willis – yes
    Amie Colclazier - yes

4.  Board to consider and take necessary action to terminate the contract with Renaissance Architecture.

    Claudia Willis made the motion seconded by Jamie Mills to terminate the contract with Renaissance Architecture.

    Jamie Mills – yes
    Cai Levy – yes
    Jack Cadenhead – no
    Claudia Willis – yes
    Amie Colclazier – no

5.  Board to consider and take necessary action to hire Michael Allen Riley Architecture to provide architectural services for the new high school project.

Jamie Mills made the motion seconded by Cai Levy to hire Michael Allen Riley Architecture to provide architectural services for the new high school project.

Jamie Mills – yes
Cai Levy – yes
Jack Cadenhead – yes
Claudia Willis – yes
Amie Colclazier - yes

6.  Keith Shaw to present preliminary site plans for the new high school project.

Keith Shaw gave a power point presentation with preliminary site plans for the new high school project.

7.  Board to consider and take possible action, in the absence of the President and/or Clerk, to appoint an acting President and/or acting Clerk for the School District to execute any and all documents pertaining to the calling of a special election to authorize general obligation bonds.

Item number 7 died from lack of a motion.

8.  Board to consider and take action on a resolution authorizing the calling and holding of a special election to be held in this School District to authorize the issuance of general obligation bonds.

Cai Levy made the motion seconded by Claudia Willis to approve the resolution authorizing the calling and holding of a special election to be held in this School District to authorize the issuance of general obligation bonds.

Jamie Mills – yes
Cai Levy – yes
Jack Cadenhead – no
Claudia Willis – yes
Amie Colclazier – no

9.  Adjourn.

Amie Colclazier made the motion seconded by Cai Levy to adjourn the meeting.

Jamie Mills – yes
Cai Levy – yes
Jack Cadenhead – yes
Claudia Willis – yes
Amie Colclazier - yes

Exhibit No.10
Defendant's

SEP/29/2016/THU 11:58 AM
FAX No.
P. 009

09292016 9:41:25 AM
Page: 185
Page 1 of 3
Filed in ED/OK on 11/14/16
Date Filed: 04/28/2017
Document 26-10
Document: 0101980618
6:16-cv-00182-RAW
Appellate Case: 17-7002

**SEMINOLE PUBLIC SCHOOLS**
**GEN FUND-FOR OP**
**Employee Earnings Audit**
**07012014 to 06302015**

Budget Year 2014 - 2015
Page 1

| Name<br>Prj-Func-Subj-Jcl-Unit | Full Time<br>Gross | Part Time<br>Gross | Retirement<br>Fringe | Other<br>Fringe | Contract<br>Total | Retirement<br>Burdens | Other<br>Burdens | Total<br>Cost | Warrant<br>Date | Warrant<br>Number |
|---|---|---|---|---|---|---|---|---|---|---|
| **Kena Utter** | | | | | | | | | | |
| 000-1000 -1050 -210 -105 | 32,903.09 | 0.00 | 2,075.66 | 0.00 | 34,978.75 | 3,322.97 | 2,434.48 | 40,736.20 | | PAID |
| 334-1000 -1050 -210 -105 | 0.00 | 0.00 | 0.00 | 5,934.84 | 5,934.84 | 0.00 | 0.00 | 5,934.84 | | PAID |
| 367-1000 -1130 -210 -105 | 0.00 | 1,200.00 | 90.32 | 0.00 | 1,290.32 | 122.58 | 91.80 | 1,504.70 | | PAID |
| Total Employee | 32,903.09 | 1,200.00 | 2,165.98 | 5,934.84 | 42,203.91 | 3,445.55 | 2,526.28 | 48,175.74 | | |
| Total | 32,903.09 | 1,200.00 | 2,165.98 | 5,934.84 | 42,203.91 | 3,445.55 | 2,526.28 | 48,175.74 | | |

Number of Employees:    1

**SEMINOLE PUBLIC SCHOOLS**
**GEN FUND-FOR OP**
**Employee Earnings Audit**
**07012014 to 06302015**

| Name Prj-Func-Subj-Jcl-Unit | Full Time Gross | Part Time Gross | Retirement Fringe | Other Fringe | Contract Total | Retirement Burdens | Other Burdens | Total Cost | Warrant Date | Warrant Number |
|---|---|---|---|---|---|---|---|---|---|---|
| **Aubree Holsapple** | | | | | | | | | | |
| 000-2120 -0000 -203-105 | 34,644.44 | 3,100.00 | 2,491.16 | 0.00 | 40,235.60 | 3,822.26 | 2,894.78 | 46,952.64 | | PAID |
| 331-2120 -0000 -203-105 | 836.52 | 0.00 | 0.00 | 0.00 | 836.52 | 0.00 | 0.00 | 836.52 | | PAID |
| Total Employee | 35,480.96 | 3,100.00 | 2,491.16 | 0.00 | 41,072.12 | 3,822.26 | 2,894.78 | 47,789.16 | | |
| Total | 35,480.96 | 3,100.00 | 2,491.16 | 0.00 | 41,072.12 | 3,822.26 | 2,894.78 | 47,789.16 | | |

Number of Employees: 1

6:16-cv-00182-RAW    Document 26-10    Filed in ED/OK on 11/14/16    Page 2 of 3
Appellate Case: 17-7002    Document: 01019800618    Date Filed: 04/26/2017    Page: 186

**SEMINOLE PUBLIC SCHOOLS**
**GEN FUND-FOR OP**
**Employee Earnings Audit**
**07012014 to 06302015**

| Name<br>Prj-Func-Subj-Jcl-Unit | Full Time<br>Gross | Part Time<br>Gross | Retirement<br>Fringe | Other<br>Fringe | Contract<br>Total | Retirement<br>Burdens | Other<br>Burdens | Total<br>Cost | Warrant<br>Date | Warrant<br>Number |
|---|---|---|---|---|---|---|---|---|---|---|
| **Dara Campbell** | | | | | | | | | | |
| 000-1000 -8000 -210 -715 | 34,648.55 | 0.00 | 2,329.03 | 0.00 | 36,977.58 | 3,512.84 | 2,572.82 | 43,063.24 | | PAID |
| 334-1000 -8000 -210 -715 | 0.00 | 0.00 | 0.00 | 5,905.74 | 5,905.74 | 0.00 | 0.00 | 5,905.74 | | PAID |
| 411-1000 -8000 -210 -715 | 8,785.89 | 0.00 | 590.39 | 0.00 | 9,376.28 | 890.76 | 652.50 | 10,919.54 | | PAID |
| Total Employee | 43,434.44 | 0.00 | 2,919.42 | 5,905.74 | 52,259.60 | 4,403.60 | 3,225.32 | 59,888.52 | | |
| Total | 43,434.44 | 0.00 | 2,919.42 | 5,905.74 | 52,259.60 | 4,403.60 | 3,225.32 | 59,888.52 | | |

Number of Employees:   1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF OKLAHOMA
2

3    KENA UTTER, AUBREE HOLSAPPLE,
     and DARA CAMPBELL,
4
               Plaintiffs,
5    vs.                              No. CIV-16-00182-RAW
6    AMIE COLCLAZIER, JACK
     CADENHEAD, MICKEY UPTON and
7    INDEPENDENT SCHOOL DISTRICT
     NO. 1-01 OF SEMINOLE COUNTY,
8    STATE OF OKLAHOMA a/k/a
     SEMINOLE SCHOOL DISTRICT,
9
               Defendants.
10
               DEPOSITION OF DARA CAMPBELL
11        TAKEN ON BEHALF OF THE DEFENDANTS
          ON SEPTEMBER 13, 2016 AT 12:13 PM
12             IN SEMINOLE, OKLAHOMA
13
                    APPEARANCES
14
15   On behalf of the PLAINTIFFS:
     Heath Merchen
16   OKLAHOMA EDUCATION ASSOCIATION
     323 East Madison
17   Oklahoma City, Oklahoma   73154
     405.528.7785
18   hmerchen@okea.org
19   On behalf of the DEFENDANTS:
     Laura Ganz
20   THE CENTER FOR EDUCATION LAW
     900 North Broadway, Suite 300
21   Oklahoma City, Oklahoma   73102
     405.528.2800
22   lganz@cfel.com
23
24   VIDEOTAPED BY:  Marti English
25   REPORTED BY:   Jody Graham, CSR, RPR, RMR, CRR

                                                          1

1  issue?

2      A     I didn't really get too involved.  I just,

3  you know, expressed my opinions on it that -- at

4  the -- at one of the -- the board had asked me to

5  develop a committee to talk about the ag facility and

6  what we wanted, and so I did that and presented at one

7  of the board meetings about how I felt Harvey Road was

8  the best for our ag program.  But other than that, I

9  didn't have a lot to do with the bond itself.  I just

10  supported it.

11      Q     So did you go out and -- I've noticed

12  there's been a lot of signs in the community.  Did you

13  go out and post signs or posters or do any of that

14  sort of thing?

15      A     I never went out to signs.  I never stood on

16  the corners with signs.  I didn't participate in any

17  of that.  I had a sign in my yard.  I did do that.  I

18  put a sign in my yard for the vote yes.

19      Q     Okay.  Why do you think your contract wasn't

20  renewed for 2015-2016?

21      A     Well, with -- performance based, everything

22  was great.  No complaints on the ag program.  Lot of

23  students' involvement.  I clearly think that the

24  reason I was not rehired is because I had a different

25  view on the bond than the three board members.

38

```
 1        A    No.

 2        Q    What about board members?

 3        A    Not that I'm aware of.

 4        Q    When did you start seeking new employment?

 5        A    I was called -- I was chosen as the national

 6   agriscience ambassador; and I remember that I had to

 7   leave for training, I believe, that very next week.  I

 8   was contacted by Moore Public Schools and that they

 9   had an ag position and they wanted to talk to me about

10   coming there.

11        But it was that week that Dr. Utterback here

12   from Seminole State College contacted me about coming

13   to Seminole State College.  So I hadn't even had an

14   opportunity to contact anybody.  They contacted me.

15        Q    So you had two different schools, Moore and

16   Seminole State, contact you?

17        A    And I believe through Mr. Osborn, Mason

18   School also contacted me, as well.

19        Q    How soon after the June 11th board meeting

20   were you contacted?

21        A    The following -- that week -- that following

22   week.  And that would have been by the three of them.

23        Q    Did you have discussions with Moore about a

24   position with them?

25        A    I -- I was talking to their department head,
```

47

1    I think, of their science division; and she had said

2    that the assistant principal or principal wanted to

3    talk to me more about the ag position.  And Mason's

4    position was actually science, was a science position.

5    I did not get back in contact with them -- well, I

6    mean, I told them that I wouldn't be applying because

7    Dr. Utterback had offered me the position here.

8         **Q**    And what was the position he offered you

9    here at Seminole State College?

10        **A**    He called me, and there was a position as a

11   part-time recruiter.  He wanted me to fill that role

12   and he wanted me to begin the agriculture program.  So

13   I was hired as an assistant professor of agriculture,

14   recruiter, advisor.

15        **Q**    And when did you begin your position at

16   Seminole State College?

17        **A**    July 1st.

18        **Q**    Of 2015?

19        **A**    Yes.

20        **Q**    Do you know if any of your potential

21   employers contacted anyone from Seminole School

22   District?

23        **A**    I am not sure.  Possibly.  I believe that I

24   had Mr. Pritchard as a reference.  I'm not sure if

25   they did call.  And I believe that I had Mr. Osborn as

48

1    said that, but they said, "The only thing that we

2    discussed was this other person."

3        Q    Was the other person a teacher?

4        A    It was hiring the new softball coach or

5    maybe getting -- I don't remember.  It was a softball

6    coach issue, and I think it was hiring maybe.  And

7    that -- that's what they had said, that that was the

8    only thing that was discussed in executive session.

9        Q    Do you know whether or not that teacher was

10   hired?

11       A    I don't recall.

12       Q    Did you file an Open Meeting Act complaint?

13       A    Personally myself?

14       Q    Yes.

15       A    I didn't write something myself.  I'm not

16   sure what your --

17       Q    Did anyone else go file an Open Meeting Act

18   complaint?

19       A    The only conversation I've had with the Open

20   Meetings is with my attorney so I'm not -- I'm not

21   sure.

22       Q    Did anyone go talk to the police about Open

23   Meeting violations?

24       A    Yes.  I had to -- I went and gave a

25   statement.  I'm not sure who else may have, but I went

58

```
 1    and gave a statement to -- I can't remember -- their
 2    police officer at Seminole, in Seminole.  I don't
 3    remember his name.  And we had to -- or I -- I should
 4    not say "we".  I had to give a statement on my
 5    thoughts about the violation of the Open Meetings.
 6         Q    Do you recall when you did that?
 7         A    I do not.
 8         Q    Was it within a week after the June
 9    11th board meeting, a couple of weeks, a month?
10         A    It was -- it was not within the week, and I
11    cannot remember how long after.  But it was after.
12    But I don't recall exactly when, when I went to do
13    that.
14         Q    Do you think it was within a month?
15         A    I'm not sure.  I don't -- I don't think it
16    was, but I am not -- I'm not 100 percent sure when
17    that was.
18         Q    So did you actually go to the police station
19    and talk to someone there, or did you talk to them on
20    the phone?  How did that conversation occur?
21         A    I had to go to the police station, and it
22    was me and that gentleman in a room, and he just -- he
23    took my statement.
24         Q    Do you know if anyone else went and talked
25    to the police about an Open Meeting -- an alleged Open
```

59

```
 1   Meeting Act violation?

 2        A    I don't know if anybody did.

 3        Q    After the filing of the Open Meeting Act

 4   complaint, did anyone else meet with you regarding it?

 5        A    No.

 6        Q    What did you tell the investigator about the

 7   alleged Open Meeting Act complaint?

 8        A    The same things that I had said here today,

 9   that multiple board members had met with Mr. Pritchard

10   and discussed the non-rehiring of myself before the

11   board meeting.

12        Q    Do you know what the outcome was of this

13   Open Meeting complaint?

14        A    I never got a follow-up.

15        Q    Do you know if any charges were filed

16   against the district or individual board members?

17        A    I do not know.

18        Q    How have you been damaged as a result of the

19   nonrenewal of your 2015-2016 contract with Seminole

20   Public Schools?

21        A    Financially.  I took a big loss in pay.

22   Emotionally, the most.  Severe depression.  Severe

23   depression.  You know, a little paranoia.  When you --

24   you go -- you go into -- everywhere you go in Seminole

25   you always -- you always wonder who's talking about
```

60

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF OKLAHOMA
 2
 3    KENA UTTER, AUBREE HOLSAPPLE,
      and DARA CAMPBELL,
 4
                   Plaintiffs,
 5    vs.                              No. CIV-16-00182-RAW
 6    AMIE COLCLAZIER, JACK
      CADENHEAD, MICKEY UPTON and
 7    INDEPENDENT SCHOOL DISTRICT
      NO. 1-01 OF SEMINOLE COUNTY,
 8    STATE OF OKLAHOMA a/k/a
      SEMINOLE SCHOOL DISTRICT,
 9
                   Defendants.
10
             VIDEOTAPE DEPOSITION OF STEVE OSBORN
11            TAKEN ON BEHALF OF THE PLAINTIFFS
               ON SEPTEMBER 19, 2016 AT 1:28 PM
12                  IN SEMINOLE, OKLAHOMA
13
14                      APPEARANCES
15    On behalf of the PLAINTIFFS:
      Heath Merchen
16    OKLAHOMA EDUCATION ASSOCIATION
      323 East Madison
17    Oklahoma City, Oklahoma  73154
      405.528.7785
18    hmerchen@okea.org
19    On behalf of the DEFENDANTS:
      Laura Ganz
20    THE CENTER FOR EDUCATION LAW
      900 North Broadway, Suite 300
21    Oklahoma City, Oklahoma  73102
      405.528.2800
22    lganz@cfel.com
23    ALSO PRESENT:  Dara Campbell, Jack Cadenhead
24    VIDEOTAPED BY:  Marti English
25    REPORTED BY:   Jody Graham, CSR, RPR, RMR, CRR
```

1

1    director.

2        Q      In your current position did you previously

3    supervise Dara Campbell?

4        A      I did.

5        Q      How many years?

6        A      One year.

7        Q      Did you perform her evaluation?

8        A      I did.

9        Q      Can you tell me about her performance as a

10   teacher?

11       A      As a classroom teacher Dara scored high on

12   TLE.  Anything that was below a four she brought in,

13   what do you call that, artifacts to improve that

14   score.  So I believe her -- she will be around a four

15   or five teacher.

16       Q      What was your opinion of her instruction?

17       A      She's a good classroom teacher.

18       Q      Did you recommend her for rehire?

19       A      I did.

20       Q      Was there any reason that you were aware of

21   that she should not be recommended for rehire?

22       A      No.

23       Q      Did your superintendent recommend her for

24   rehire?

25       A      He did.

6

1  for them not rehiring her?

2      **A**    Not that I know of.

3      **Q**    Is there any other information you have

4  about the fact she wasn't rehired or the board's

5  action that you think might be relevant to the case?

6      **A**    Not that I know of.

7      **Q**    Were you familiar with any of the other

8  teachers who are plaintiffs in this suit, namely

9  Aubrey Holsapple or Kena Utter?

10     **A**    Not very much.  I've met one of them one

11  time.  That was it.

12     **Q**    Have you had any direct interaction with

13  them?

14     **A**    No.

15          MR. MERCHEN:  I'll pass the witness.

16               CROSS EXAMINATION

17  BY MS. GANZ:

18     **Q**    Mr. Osborne, when you were evaluating Dara

19  Campbell --

20     **A**    Uh-huh.

21     **Q**    -- does evaluation cover the ag program

22  outside of the classroom?

23     **A**    No.  TLE's designed only for classroom.

24     **Q**    What were Dara's strengths as an ag teacher?

25     **A**    Her classroom instruction.

14

| | | |
|---|---|---|
| **English** 1:24 3:1,13 15:24 16:3,12 | **gestures** 5:6 | **Jack** 1:6,23 |
| **entirety** 17:7 | **getting** 15:15 | **Janet** 4:12 |
| **ERRATA** 18:1 | **given** 17:8 | **JLG** 17:25 |
| **evaluating** 14:18 | **good** 6:17 15:4 | **Jody** 1:25 2:14 18:4 19:5,24 |
| **evaluation** 6:7 14:21 | **Gordon** 9:4 | **June** 7:25 8:3 9:24 10:6 11:6 11:20 15:8 |
| **event** 19:15 | **Graham** 1:25 2:14 18:4 19:5 19:24 | **JURAT** 17:1 |
| **Examination** 2:3,4 3:18 14:16 | | |
| **examined** 3:16 | **H** | **K** |
| **exchanged** 12:2 | **hand** 19:17 | **Kaleb** 9:4,18 |
| **exhibits** 2:7 | **hard** 13:11 | **Kena** 1:3 14:9 |
| **expand** 15:12 | **hear** 4:22 9:25 10:6,11 | **kids** 4:7 |
| **experience** 8:5 | **heard** 10:9,10,12 13:15 | **know** 4:23 7:1,16 8:8,11 9:12 10:3,9 11:5,23 14:2,6 |
| **EXPIRES** 17:24 | **Heath** 1:15 3:9 | **knowledge** 11:3,19 15:17,19 |
| **extra-duty** 5:24 | **hereunto** 19:17 | |
| | **hesitation** 11:14,15 | **L** |
| **F** | **high** 5:15,23 6:11 | **Laura** 1:19 3:11 |
| **Facebook** 11:22,23 | **hire** 9:3 | **LAW** 1:20 |
| **fact** 12:4 14:4 15:15 | **history** 5:8 | **leadership** 15:4 |
| **familiar** 14:7 | **hmerchen@okea.org** 1:18 | **learn** 8:16 |
| **far** 13:2 | **Holsapple** 1:3 14:9 | **learned** 11:6 |
| **Federal** 2:13 | **honestly** 12:25 13:2 | **led** 13:20 |
| **feelings** 13:11 | | **lganz@cfel.com** 1:22 |
| **File** 17:3 18:6 | **I** | **LINE** 18:8 |
| **filed** 3:4 | **improve** 6:13 | **living** 4:13 |
| **fine** 7:9 | **incident** 12:21 | **long** 12:16 |
| **fired** 12:18 | **incidents** 11:1 | **lot** 15:13 |
| **first** 3:16,22 8:16 | **INDEPENDENT** 1:7 | |
| **five** 6:15 | **INDEX** 2:1 | **M** |
| **five-minute** 15:22 | **indicated** 19:12 | **Madison** 1:16 |
| **follows** 3:17 | **informal** 4:17 | **March** 12:24 |
| **foregoing** 17:6 19:10 | **information** 14:3 | **marked** 2:7 |
| **forward** 11:18 | **instruction** 6:16 14:25 15:5 | **Marti** 1:24 |
| **four** 5:14,16 6:12,14 7:23,24 | **intend** 9:3 | **matter** 3:3 |
| **freedom** 11:10 | **interact** 7:10 | **media** 11:25 12:1 13:15,16,21 13:23 |
| **full** 17:7 19:10 | **interacted** 7:7 | **medication** 4:20 |
| **further** 16:5 19:13 | **interaction** 14:12 | **meeting** 8:22,24 9:25 12:12 15:9 |
| | **interactions** 7:8,14 | **member** 9:3 |
| **G** | **interested** 19:15 | **members** 10:3,7,21 12:18 |
| **Ganz** 1:19 2:4 3:11,11 14:17 15:21 | **interfere** 4:21 | **mentioned** 12:11,14 13:24 15:6 |
| **general** 7:13 12:15 | **issue** 12:23 13:5,17,21,24 15:14 | |
| | **J** | |

1.5.5       Treasurer. The Treasurer when required by the Board of Education shall prepare and submit in writing a report on the condition of finances of the district. The Treasurer shall pay money only upon warrants signed by the President; or in the absence of the President, by the Vice-President countersigned by the Clerk, and shall execute a surety bond in such sums as the Board may require in compliance with Section 20, Article 4, of the Oklahoma School Code conditioned for the faithful performance of his duties as Treasurer of the Board, and account for all funds and accounts coming into his hands as such Treasurer, and into any depository of the school district.

1.6     Duties of the Board of Education.
Recognizing the legal definitions of its duties, the Board of Education considers its major responsibilities to be:

1.6.1       To secure a Superintendent of Schools who shall be the chief executive officer of the Board.

As Chief Executive Officer, the Superintendent shall have the authority to conduct the affairs of the schools under the policies and regulations established by the Board.

1.6.2       To formulate and adopt policies with the advice and assistance of their chief executive officer and faculty representatives.

1.6.3       To provide for the preparation of the annual budget and to adopt the same.

1.6.4       To provide the funds necessary to finance the operation of the schools within the limits of the law and Oklahoma school finance procedures.

1.6.5       To require reports by the Superintendent concerning the condition, efficiency, and the needs of the schools.

1.6.6       To appraise the general effectiveness of the schools.

1.6.7       To keep the public informed concerning the progress and needs of the schools, and to solicit and weigh public opinion as it affects the schools.

1.7     Auditor.

1.7.1       The Board shall employ an auditor. It shall be the duty of the auditor to audit all accounts of the Board of Education, including activity accounts, lunch room accounts, and to make to the Superintendent, as chief executive officer of the Board of Education, such reports as are required by the Board of Education and the law of the State of Oklahoma.

1.8     Meetings of the Board of Education.

1.8.1       Regular meetings shall be held on the second Monday or Thursday of each month. Special meetings may be called by the President, provided all

Defendant's
Exhibit No. 13

**Agenda – Regular Board Meeting**
**Seminole Public Schools**
**Thursday, June 11, 2015, 6:00 p.m.**
**Seminole Middle School Library**
**618 Mike Snyder Avenue, Seminole, OK 74868**

1. Call the meeting to order.

2. Roll call of members.

3. CONSENT AGENDA:
   All of the following items, which concern reports and items of a routine nature normally approved at board meetings, will be approved by one vote, unless any member wishes to consider an item separately. The consent agenda consists of the discussion, consideration, and approval of the following items:

   A. 1. Minutes of the May 11, 2015, board meeting
   B. Financial reports:
      1. Activity Accounts
      2. Treasurer's Report
   C. Encumbrances and changes as follows:
      1. General Fund (FY15) – #1298-1887; #1889-1893; #50000-50269
      2. Building Fund (FY15) - #3
      3. Child Nutrition Fund (FY15) - #50008-50019
      4. Bond Fund (FY15)- #4-5
   D. Fundraisers:
   E. Resignations:
      1. Elisha Davis
      2. Debbie Hallum
   F. Contracts:
      1. Barlow and Associates – Federal programs
      2. Wewoka Public Schools – Memorandum of Understanding – Wewoka Public Schools Co-op Head Start 2015-2016
      3. Oklahoma School Assurance Group 2015/2016 Workers' Compensation Insurance
      4. Patricia Ford – School psychological consulting services
      5. The City of Seminole – Seminole Softball Complex
      6. OSIG – School Insurance
      7. Jenmark –medical therapy for the district
      8. iMarc Billing Services – medicade billing services for the district

4. Introduction of guests and public discussion by those who requested audience.

5. Administrative report.

6. Principals' Reports.

7. Facilities and Operations Report.

POSTED BY ANN BIDDY. June 10, 2015 at 3:00 p.m

Defendant's
APLT-APP-194
EXHIBIT

Seminole Board of Education to provide school lunch room services to all children enrolled in the Seminole Public Schools at no cost, regardless of their income or background, as long as the Seminole Public School District remains eligible for the Community Eligibility Provision through the United States Department of Agriculture.

3.3.5   In order to effectuate the policy set forth in 3.3.4, above, transfers of funds from the General Fund to the Child Nutrition Fund in whatever amount necessary shall be authorized by this policy.

30.    PROPOSED EXECUTIVE SESSION TO DISCUSS THE EMPLOYMENT OF THOSE CERTIFIED AND/OR NON-CERTIFIED PERSONNEL LISTED IN AGENDA ITEM 34 PURSUANT TO 25 O.S.SEC. 307 (B)(1).

31.    Consider and take necessary action to convene in executive session.

32.    Consider and take necessary action to acknowledge the return of the board to open session

33.    Board president's executive session statement.

34.    Consider and take necessary action on the superintendent's recommendation to hire the following employees:

| Teachers: Moving from Temporary to Non-Career | Teachers: Temporary 2nd year | Teachers: Temporary New Hires |
|---|---|---|
| Lisa Battige | Carey Floyd | Derek Atyia - High School - social studies |
| Jessica Cagle | Josh Forrester | Tami Cole - Wilson |
| Dara Campbell | Laura Headley | Jennifer Choate - Wilson |
| Lisa Campbell | Shane Hodgins | Denise Dean - Middle School language arts |
| Kaleb Gordon | Shannon Hodgins | Susan Gates - Northwood |
| Aubree Holsapple* | Brian McAlvain | Peter Jankowiak - High School science |
| Valerie Jones | Ron Osborn* | McKayla Plett - Middle School math |
| Samantha Manuel | Delaney Pennock | Ben Rothrock - Northwood |
| Beth Moreno | Tywana Reese | John Walker - Alt Ed |
| Diana O'Connell | Thomas Scott | |
| John Phillips | Shane Stanfill | |
| Gina Riley | Donna Summy | *Counselors |
| Kena Utter | Chontaye Walter | |

POSTED BY ANN BIDDY.  June 10, 2015 at 3:00 p.m

**Summer School Teachers:**
Thurza Baker
Charity Boyer
Jessica Cagle
Tammy Conner
Lacey Davis
Janice Harvey
Kade Houck
DeAnn Leader
Carol Lloyd
Bethany Moreno
Angie Parks
Brenna Pierce
Tywana Reese
Peggy Robbins
Joann Sharp
Katie Sims
Kena Utter
Ann Walker

**Summer School Assistants:**
Vicki Anderson
Denese Byrd
Jordan Dobson
Debbie Mitchell
Cindi Mize
Kellye Swearingen

**Summer Cafeteria Workers:**
Vicky Davidson
Nina Kennedy
June Sexton
Toni Stillwell

**Cafeteria:**
Jackie Whiteside

**Driver Education Instructors:**
Blake Johnson
Eric Phillips
Wade Rigney

**Summer Employees:**
Brenda Bighead
Donna Dixon
Judy Robbins
Alta Shiplett
Kade Davis
Kyaah Fox
Christopher Gaddis
Uriah Hardeman
Alexis Long
Tyler Miller
Dake Reese
Shawn Snyder
Charles Kemp

**Summer Sports:**
Blake Johnson - baseball
Eric Phillips - weightlifting
Shawn Snyder - baseball
Charles Kemp - basketball
Pam Fletcher - softball
Pam Fletcher - basketball
Jeremy Bryan - basketball
Sybbia Phillips - volleyball
McKayla Plett - softball
Bobby Sanford - cross country
Bobby Sanford - basketball
Chontaye Walter - basketball
Harlon House - basketball
Wendell Reese - weightlifting

**Middle School Secretary:**
Pamela Baker

**ISD:**
Kenneth
Crawford

35.   New Business.

36.   Adjourn.

POSTED BY ANN BIDDY. June 10, 2015 at 3:00 p.m

Corrected Minutes – **Regular Board Meeting**
**Seminole Public Schools**
**Thursday, June 11, 2015, 6:00 p.m.**
**Seminole Middle School Library**
**618 Mike Snyder Avenue, Seminole, OK  74868**

Corrections on agenda items #17 and #18 are shown in red.

1.     President Cai Levy called the meeting to order.

2.     Members present:  Cai Levy, Jack Cadenhead, Amie Colclazier, Claudia Willis, Mickey Upton.

3.     CONSENT AGENDA:
       All of the following items, which concern reports and items of a routine nature normally approved at board meetings, will be approved by one vote, unless any member wishes to consider an item separately. The consent agenda consists of the discussion, consideration, and approval of the following items:

       A.     1. Minutes of the May 11, 2015, board meeting
       B.     Financial reports:
              1. Activity Accounts
              2. Treasurer's Report
       C.     Encumbrances and changes as follows:
              1. General Fund (FY15) – #1298-1887; #1889-1893; #50000-50269
              2. Building Fund (FY15) - #3
              3. Child Nutrition Fund (FY15) - #50008-50019
              4. Bond Fund (FY15) - #4-5
       D.     Fundraisers:
       E.     Resignations:
              1. Elisha Davis
              2. Debbie Hallum
       F.     Contracts:
              1. Barlow and Associates – Federal programs
              2. Wewoka Public Schools – Memorandum of Understanding – Wewoka Public Schools Co-op Head Start 2015-2016
              3. Oklahoma School Assurance Group 2015/2016 Workers' Compensation Insurance
              4. Patricia Ford – School psychological consulting services
              5. The City of Seminole – Seminole Softball Complex
              6. OSIG – School Insurance
              7. Jenmark –medical therapy for the district
              8.  iMarc Billing Services – Medicaid billing services for the district

Defendant's
Exhibit No. 15
APLT. APP. 197

34.   Consider and take necessary action on the superintendent's recommendation to hire the following employees:

| Teachers: Moving from Temporary to Non-Career | Teachers: Temporary 2nd year | Teachers: Temporary New Hires |
|---|---|---|
| Lisa Battige | Carey Floyd | Derek Atyia - High School - social studies |
| Jessica Cagle | Josh Forrester | Tami Cole - Wilson |
| Dara Campbell | Laura Headley | Jennifer Choate - Wilson |
| Lisa Campbell | Shane Hodgins | Denise Dean - Middle School language arts |
| Kaleb Gordon | Shannon Hodgins | Susan Gates - Northwood |
| Aubree Holsapple* | Brian McAlvain | Peter Jankowiak - High School science |
| Valerie Jones | Ron Osborn* | McKayla Plett - Middle School math |
| Samantha Manuel | Delaney Pennock | Ben Rothrock - Northwood |
| Beth Moreno | Tywana Reese | John Walker - Alt Ed |
| Diana O'Connell | Thomas Scott | |
| John Phillips | Shane Stanfill | |
| Gina Riley | Donna Summy | *Counselors |
| Kena Utter | Chontaye Walter | |

| Summer School Teachers: | Summer School Assistants: | Driver Education Instructors: | Summer Sports: |
|---|---|---|---|
| Thurza Baker | Vicki Anderson | Blake Johnson | Blake Johnson - baseball |
| Charity Boyer | Denese Byrd | Eric Phillips | Eric Phillips - weightlifting |
| Jessica Cagle | Jordan Dobson | Wade Rigney | Shawn Snyder - baseball |
| Tammy Conner | Debbie Mitchell | | Charles Kemp - basketball |
| Lacey Davis | Cindi Mize | Summer Employees: | Pam Fletcher - softball |
| Janice Harvey | Kellye Swearingen | Brenda Bighead | Pam Fletcher - basketball |
| Kade Houck | | Donna Dixon | Jeremy Bryan - basketball |
| DeAnn Leader | | Judy Robbins | Sybbia Phillips - volleyball |
| Carol Lloyd | Summer Cafeteria Workers: | Alta Shiplett | McKayla Plett - softball |
| Bethany Moreno | Vicky Davidson | Kade Davis | Bobby Sanford - cross country |
| Angie Parks | Nina Kennedy | Kyaah Fox | Bobby Sanford - basketball |
| Brenna Pierce | June Sexton | Christopher Gaddis | Chontaye Walter - basketball |
| Tywana Reese | Toni Stillwell | Uriah Hardeman | Harlon House - basketball |
| Peggy Robbins | | Alexis Long | Wendell Reese - weightlifting |
| Joann Sharp | | Tyler Miller | |
| Katie Sims | Cafeteria: | Dake Reese | Middle School Secretary: |
| Kena Utter | Jackie Whiteside | Shawn Snyder | Pamela Baker |
| Ann Walker | | Charles Kemp | |
| | | | ISD: Kenneth Crawford |

Jack Cadenhead made the motion that all of the employees listed above be re-hired with the exception of Dara Campbell, Aubrey Holsapple, and Kena Utter. John Walker asked that his name be removed from the list. Amie Colclazier seconded the motion.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

Claudia Willis made the motion seconded by Cai Levy that Dara Campbell, Aubrey Holsapple, and Kena Utter be re-hired for the 2015/2016 school year.

Cai Levy – yes
Jack Cadenhead – no
Amie Colclazier – no
Claudia Willis – yes
Mickey Upton – no

35.    New Business.

In new business, Superintendent Jeff Pritchard made the announcement that he and Assistant Superintendent Ronda Townsend would be retiring effective June 30, 2015.

Amie Colclazier made the motion seconded by Jack Cadenhead that the retirements of Jeff Pritchard and Ronda Townsend be accepted.

Cai Levy – no
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – no
Mickey Upton – yes

36.    Adjourn.

Jack Cadenhead made the motion seconded by Claudia Willis that the meeting be adjourned.

Cai Levy – yes
Jack Cadenhead – yes
Amie Colclazier – yes
Claudia Willis – yes
Mickey Upton – yes

APLT. APP. 199

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF OKLAHOMA
2
3    KENA UTTER, AUBREE HOLSAPPLE,
     and DARA CAMPBELL,
4
              Plaintiffs,
5    vs.                          No. CIV-16-00182-RAW
6    AMIE COLCLAZIER, JACK
     CADENHEAD, MICKEY UPTON and
7    INDEPENDENT SCHOOL DISTRICT
     NO. 1-01 OF SEMINOLE COUNTY,
8    STATE OF OKLAHOMA a/k/a
     SEMINOLE SCHOOL DISTRICT,
9
              Defendants.
10
         VIDEOTAPE DEPOSITION OF AUBREE HOLSAPPLE
11          TAKEN ON BEHALF OF THE DEFENDANTS
           ON SEPTEMBER 15, 2016 AT 8:54 AM
12               IN SEMINOLE, OKLAHOMA
13                    APPEARANCES
14   On behalf of the PLAINTIFFS:
     Heath Merchen
15   OKLAHOMA EDUCATION ASSOCIATION
     323 East Madison
16   Oklahoma City, Oklahoma   73154
     405.528.7785
17   hmerchen@okea.org
18   On behalf of the DEFENDANTS:
     Laura Ganz
19   THE CENTER FOR EDUCATION LAW
     900 North Broadway, Suite 300
20   Oklahoma City, Oklahoma   73102
     405.528.2800
21   lganz@cfel.com
22
23   VIDEOTAPED BY:  Marti English
24   REPORTED BY:   Jody Graham, CSR, RPR, RMR, CRR
25

                           1

Defendant's
APLT. APP. 200   Exhibit No. 16

1      **A**     I -- I don't know.

2      **Q**     Did any board members make any public

3  statements about your moral character?

4      **A**     I don't know.

5      **Q**     Did any board members make any public

6  statements about your ineffective teaching?

7      **A**     I don't know.

8      **Q**     Did any board members make any public

9  statements about your reputation?

10     **A**     I don't know.

11     **Q**     Your integrity?

12     **A**     I don't know.

13     **Q**     Your honor?

14     **A**     I don't know.

15     **Q**     When did you start seeking new employment

16  after the June 11th, 2015 board meeting?

17     **A**     That evening.

18     **Q**     Where did you start seeking employment?

19     **A**     Online.

20     **Q**     Did you apply anywhere?

21     **A**     Yes.

22     **Q**     Where did you apply?

23     **A**     I believe I -- because my memory's fuzzy for

24  that evening, I believe I applied to Choctaw-Nicoma

25  Park Schools; and I want to say -- it's that way.

**24**

1   Byng, Byng High School.  Those were the ones I could
2   find that evening, maybe.
3        Q    Did you apply anywhere else?
4        A    Yes.
5        Q    Where did you apply?
6        A    I sent it to, gosh, lots of schools.  I
7   don't remember all the names.
8        Q    Do you recall approximately how many you
9   applied to?
10       A    One, two, three, four -- like, seven or
11  eight possibly.
12       Q    After you applied, how many responded to
13  you?
14       A    I had three interviews -- three interviews.
15       Q    Who did you interview with?
16       A    I interviewed at Byng, at Macomb, and at
17  Choctaw-Nicoma Park.
18       Q    Do you recall who you interviewed with at
19  Byng?
20       A    It was the high school principal.
21       Q    And what about at Macomb?
22       A    Yes.  The principal.
23       Q    For -- I don't know --
24       A    There's only -- there's only one principal
25  so he's the school.

25

1    think that Macomb, I believe he did.  I do not know

2    about Byng.  And then Seminole, Mr. Utterback knew

3    about the situation and so he -- I believe he informed

4    them.

5        Q    Informed --

6        A    In the Gear Up.  It was the Gear Up people

7    that I interviewed with.

8        Q    Did any of your potential employers talk

9    with Jack Cadenhead, Amy Colclazier or Mickey Upton

10   about the basis for the nonrenewal of your contract?

11       A    I have no idea.

12       Q    Where were you offered positions?

13       A    Seminole State College, Macomb High

14   School/Middle School and Nicoma Park.

15       Q    Did you list anyone from Seminole as a

16   reference on your job applications?

17       A    Yes.

18       Q    Who?

19       A    Jeff Pritchard, Denese Cheatwood and Rhonda

20   Townsend.

21       Q    Since June 11, 2015 where have you been

22   employed?

23       A    Nicoma Park Elementary.

24       Q    And what is your position there?

25       A    Counselor.

27

PR#116450

HOLSAPPLE, AUBREE

1    happened at Seminole.

2        **Q**     What factual basis do you have that board

3    members colluded outside of any board meeting to

4    remove your name from the rehire list for 2015-2016?

5        **A**     The fact that I was told that those three

6    board members had said that they were not going to

7    rehire me before the board meeting happened.

8        **Q**     Who told you this?

9        **A**     Denese Cheatwood.

10       **Q**     Other than Cheatwood telling you this, do

11   you have any other evidence?

12       **A**     I do not.

13       **Q**     Were any temporary teachers discussed during

14   executive session on the June 11th, 2015 board

15   meeting?

16       **A**     One.

17       **Q**     Do you recall who?

18       **A**     It was not one of the four of us.  It was a

19   different teacher.  I do not recall her name.  But it

20   was not one of the four that were -- said they weren't

21   going to be rehired.

22       **Q**     Do you recall if that person was rehired?

23       **A**     Yes, she was.

24       **Q**     Did you file an Open Meeting Act complaint?

25       **A**     I went to the police department and filed.

31

1      **Q**     Do you recall when you went to the police

2   department?

3      **A**     Not the exact date, no.

4      **Q**     After June 11th?

5      **A**     After June 11th.

6      **Q**     Was it within a week?

7      **A**     Possibly.  It would have been fairly close

8   to the board meeting.

9      **Q**     Did you speak to anyone at the police

10  department?

11     **A**     The clerk at the window.  I asked for the

12  paperwork.  She gave it to me, and then I turned it

13  in.

14     **Q**     After you turned in the paperwork, did you

15  speak to anyone at the police department?

16     **A**     There was a man I gave the paperwork to, but

17  I cannot tell you his name.  He was a police officer,

18  I guess.

19     **Q**     Did you have any conversations with the

20  police officer?

21     **A**     Very brief.

22     **Q**     What was your conversation?

23     **A**     Nothing -- just, "Here's this."  And he said

24  that he had had a couple others turn in the same

25  thing.  And, I mean, that was basically it.  Not a

APLT. APP. 205

```
1    whole lot.

2        Q     So he mentioned that others had filed

3    complaints, also?

4        A     Yes.

5        Q     Did you have any interviews with any

6    investigators or police officers about your Open

7    Meeting Act complaint?

8        A     No.

9        Q     What was the outcome of your Open Meeting

10   Act complaint?

11       A     They -- I'm not completely sure how to word

12   it.  I think that the county turned it over to -- I

13   don't know.  I'm not sure if I'm going to say it

14   right.  They didn't want to do -- they turned it over

15   to somebody, I think, to the state level.  I'm not

16   sure of the wording.

17       Q     Do you recall what happened after that?

18       A     I think they did not want to pursue it.

19       Q     So no --

20       A     I'm not sure.

21       Q     -- no charges were filed?

22       A     No criminal charges.

23       Q     What's the factual basis that you have the

24   district's board violated the Open Meeting Act?

25       A     That the three, which -- of the board
```

33

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENA UTTER, AUBREE HOLSAPPLE, and DARA CAMPBELL, | ) ) ) |
| **Plaintiffs** | ) ) |
| -vs- | ) CIV-16-00182-RAW ) |
| AMIE COLCLAZIER, JACK CADENHEAD, MICKEY UPTON, and INDEPENDENT SCHOOL DISTRICT NO. I-01 OF SEMINOLE COUNTY, STATE OF OKLAHOMA, a/k/a SEMINOLE SCHOOL DISTRICT, | ) ) ) ) ) ) ) |
| **Defendants.** | ) |

### AFFIDAVIT OF JACK CADENHEAD

STATE OF OKLAHOMA      )
                                            ) ss.
COUNTY OF SEMINOLE )

Jack Cadenhead, declares under penalty of perjury under the laws of the United

States

that the foregoing is true and correct:

1.    I am a board member of the Seminole Public School District.

2.    During 2013-2015, I served on the Seminole Public School Board during

the employment of Kena Utter, Aubree Holsapple and Dara Campbell.

3.    I began receiving complaints about Kena Utter, Aubree Holsapple and

Dara Campbell around the beginning of the 2014-2015 school year.

C:\USERS\JACK\APPDATA\LOCAL\MICROSOFT\WINDOWS\TEMPORARY INTERNET FILES\CONTENT.IE5\D4ILH2X2\CADENHEAD
AFFIDAVIT.WPD

4. When I first learned about issues with Kena Utter and Aubree Holsapple, I learned that the same issues also occurred during the 2013-2014 school year.

5. I spoke with Jeff Pritchard, Superintendent of Seminole Public Schools, about issues with Kena Utter and Aubree Holsapple a couple of times towards the end of the 2014-2015 school year.

5. In September 2014, I began hearing complaints about Dara Campbell. At first, I ignored the complaints, because I was concerned about the risk of losing a new Vocational Agriculture program. Unfortunately, the complaints about Dara Campbell continued to grow and I could not ignore them.

6. After I learned about the issues with Dara Campbell, I spoke with Jeff Pritchard, Superintendent of Seminole Public Schools, on multiple occasions during the 2014-2015 school year.

I declare under penalty of perjury that the forgoing is true and correct.

Dated this 14th day of November, 2016.

                                          _____
                                          JACK CADENHEAD

## SEMINOLE PUBLIC SCHOOLS
## ADMINISTRATIVE WRITTEN DISCLOSURE STATEMENT
## FOR OFFER OF TEMPORARY TEACHING CONTRACT

On the _5ᵀᴴ_ day of _June_, 20_14_, _Kina Hitt_ ("Employee") was offered a position by _Jeff Pritchard_ ("Administrator"). Having been offered a position of employment, Employee was provided with this written disclosure regarding the terms and conditions of the temporary contract. Pursuant to 70 O.S. § 6-101.23(G), the administration is required to provide a full written disclosure of the terms and conditions of the temporary contract at the time a temporary teaching position is offered. This statement is intended solely to satisfy that statutory requirement, and is not in any way intended to be interpreted as the temporary teaching contract itself.

It is expressly understood by the Employee that:

1. Employee has been offered employment, and has accepted employment only as a temporary teacher.

2. Employee understands that the term of employment under the proposed contract shall be for the _14-15_ school year only. Employee understands that no continuing employment rights exist to future employment by the school district.

3. Employee understands the dismissal and suspension provisions of the Teacher Due Process Act of 1990 apply to Employee as far as any proposed dismissal or suspension during the time period specified in the temporary contract.

4. Employee understands that the evaluation provisions in Sections 6-101.10 and 1-101.11 of Title 70 and in the Teacher Due Process Act of 1990 apply to Employee during the time period specified in the temporary contract.

5. If Employee works a complete school year under the temporary contract, Employee will receive on year of service credit toward career status in the school district.

6. Employee will receive compensation in an amount to be established by the board of education as per district policy.

7. Employee understands that the temporary teaching position will automatically terminate on the _41_ day of _School_, 20_15_.

8. Employee will not receive any additional notification from the board of education regarding the fact that the temporary teaching contract will not continue beyond the _61_ day of _School_, 20_15_.

Having read and being offered the opportunity to discuss the above-referenced provisions with Administrator, Employee hereby acknowledges that a full, written disclosure of the above-referenced terms has occurred.

Dated this _5ᵗʰ_ day of _June_, 20_14_

_____
Employee

Acknowledged:

_____
Administrator

Defendant's
Exhibit No. 18
APLT. APP. 209

## SEMINOLE PUBLIC SCHOOLS
## ADMINISTRATIVE WRITTEN DISCLOSURE STATEMENT
## FOR OFFER OF TEMPORARY TEACHING CONTRACT

On the _5th_ day of _June_, 20_14_, _Aubrey Holsey_("Employee") was offered a position by
_Jeff Putchins_ ("Administrator"). Having been offered a position of employment, Employee was
provided with this written disclosure regarding the terms and conditions of the temporary contract.
Pursuant to 70 O.S. § 6-101.23(G), the administration is required to provide a full written disclosure of the
terms and conditions of the temporary contract at the time a temporary teaching position is offered. This
statement is intended solely to satisfy that statutory requirement, and is not in any way intended to be
interpreted as the temporary teaching contract itself.

It is expressly understood by the Employee that:

1.     Employee has been offered employment, and has accepted employment only as a temporary
       teacher.

2.     Employee understands that the term of employment under the proposed contract shall be for the
       _14 -15_ school year only. Employee understands that no continuing employment rights exist
       to future employment by the school district.

3.     Employee understands the dismissal and suspension provisions of the Teacher Due Process Act
       of 1990 apply to Employee as far as any proposed dismissal or suspension during the time period
       specified in the temporary contract.

4.     Employee understands that the evaluation provisions in Sections 6-101.10 and 1-101.11 of Title
       70 and in the Teacher Due Process Act of 1990 apply to Employee during the time period
       specified in the temporary contract.

5.     If Employee works a complete school year under the temporary contract, Employee will receive
       on year of service credit toward career status in the school district.

6.     Employee will receive compensation in an amount to be established by the board of education as
       per district policy.

7.     Employee understands that the temporary teaching position will automatically terminate on the
       _last_ day of _School_, 20_15_

8.     Employee will not receive any additional notification from the board of education regarding the
       fact that the temporary teaching contract will not continue beyond the _last_ day of _School_,
       20_15_

Having read and being offered the opportunity to discuss the above-referenced provisions with
Administrator, Employee hereby acknowledges that a full, written disclosure of the above-
referenced terms has occurred.

Dated this _5th_ day of _June_, 20_14_

_____
Employee

Acknowledged:

_____
Administrator

**SEMINOLE PUBLIC SCHOOLS**
**ADMINISTRATIVE WRITTEN DISCLOSURE STATEMENT**
**FOR OFFER OF TEMPORARY TEACHING CONTRACT**

On the 5ᵗʰ day of _June_ , 20 14 _Dana Campbell_ ("Employee") was offered a position by _Jeff Pritchard_ ("Administrator"). Having been offered a position of employment, Employee was provided with this written disclosure regarding the terms and conditions of the temporary contract. Pursuant to 70 O.S. § 6-101.23(G), the administration is required to provide a full written disclosure of the terms and conditions of the temporary contract at the time a temporary teaching position is offered. This statement is intended solely to satisfy that statutory requirement, and is not in any way intended to be interpreted as the temporary teaching contract itself.

It is expressly understood by the Employee that:

1.    Employee has been offered employment, and has accepted employment only as a temporary teacher.

2.    Employee understands that the term of employment under the proposed contract shall be for the _14 -15_ school year only. Employee understands that no continuing employment rights exist to future employment by the school district.

3.    Employee understands the dismissal and suspension provisions of the Teacher Due Process Act of 1990 apply to Employee as far as any proposed dismissal or suspension during the time period specified in the temporary contract.

4.    Employee understands that the evaluation provisions in Sections 6-101.10 and 1-101.11 of Title 70 and in the Teacher Due Process Act of 1990 apply to Employee during the time period specified in the temporary contract.

5.    If Employee works a complete school year under the temporary contract, Employee will receive on year of service credit toward career status in the school district.

6.    Employee will receive compensation in an amount to be established by the board of education as per district policy.

7.    Employee understands that the temporary teaching position will automatically terminate on the _last_ day of _School_ , 20 15.

8.    Employee will not receive any additional notification from the board of education regarding the fact that the temporary teaching contract will not continue beyond the _last_ day of _School_ , 20 15.

Having read and being offered the opportunity to discuss the above-referenced provisions with Administrator, Employee hereby acknowledges that a full, written disclosure of the above-referenced terms has occurred.

Dated this 5ᵗʰ day of _June_ , 20 14.

_____
Employee

Acknowledged:

_____
Administrator

APLT. APP. 211